**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY VILLAR | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 2:14-cv-02558-NIQA |
| PHILADELPHIA UNIVERSITY | : | |
| and | : | |
| JANE DOE | : | |
| Defendants | : | |

## <u>O R D E R</u>

AND NOW, this          day of                    , 2014, upon consideration of Defendant

Jane Doe's Motion to Dismiss Plaintiff's Amended Complaint Under Fed.R.Civ.P. 12(b)(6), and

any response thereto, it is hereby **ORDERED** and **DECREED** that said Motion is **GRANTED**.

Plaintiff's Amended Complaint and all claims against Jane Doe hereby are dismissed, with

prejudice, for failure to state a claim upon which relief can be granted against Jane Doe.


BY THE COURT:


_____
                                                              , J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY VILLAR | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 2:14-cv-02558-NIQA |
| PHILADELPHIA UNIVERSITY | : | |
| and | : | |
| JANE DOE | : | |
| Defendants | : | |

**MOTION OF DEFENDANT JANE DOE TO DISMISS PLAINTIFF'S**
**AMENDED COMPLAINT UNDER FED.R.CIV.P. 12(B)(6) FOR FAILURE**
**TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

Pursuant to Federal Rule of Civil Procedure 12(B)(6), defendant Jane Doe, by and through her counsel, Rawle & Henderson LLP, respectfully moves this Honorable Court to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted.

The arguments and authorities advanced in support of the motion are set forth in the accompanying memorandum of law.

Respectfully submitted,

RAWLE & HENDERSON LLP

Dated: <u>July 3, 2014</u>          By:

_____
Daniel J. Rucket, Esquire
I.D. No. 70009
The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4200
*Attorneys for Defendant Jane Doe*

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY VILLAR | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 2:14-cv-02558-NIQA |
| | : | |
| PHILADELPHIA UNIVERSITY | : | |
| and | : | |
| JANE DOE | : | |
| Defendants | : | |

**DEFENDANT JANE DOE'S MEMORANDUM OF LAW IN
SUPPORT OF HER MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT UNDER FED.R.CIV.P. 12(B)(6)**

Defendant Jane Doe, by and through her counsel, Rawle & Henderson LLP, submit this memorandum of law in support of her motion to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(B)(6).

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.    Plaintiff's sexual assault on Jane Doe ..................................................................... 3

    B.    Philadelphia University's policies and regulations ................................................... 4

    C.    The administrative disciplinary proceedings regarding the sexual assault by
           Plaintiff on Jane Doe .............................................................................................. 7

    D.    The Amended Complaint ......................................................................................... 8

LEGAL ARGUMENT ............................................................................................................ 10

    A.    Standard of Review ................................................................................................. 10

    B.    Plaintiff cannot relitigate the underlying finding against him by Philadelphia
           University, and, as a result, has failed to state any claims against Jane Doe .......... 10

    C.    Statements by Jane Doe regarding plaintiff sexually assaulting her are
           absolutely privileged and cannot form the basis of claims for defamation ............ 16

CONCLUSION AND REQUEST FOR RELIEF ...................................................................... 20

CERTIFICATION OF SERVICE ............................................................................................ 21

i

# TABLE OF AUTHORITIES

**Cases:**

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007)). ................................... 10

*Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 573 A.2d 575
    (Pa. Super. 1990) ........................................................................... 10, 11

*Calabrese v. Zeager,* 976 A.2d 1151, 1154 (Pa.Super. 2009) ................................... 11

*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S. Ct. 1487 (1985) .......................... 18

*Corso v. Creighton Univ.*, 731 F.2d 529 (8th Cir. 1984) ............................................... 11

*Duke v. North Texas State Univ.,* 469 F. 2d 829, 834 (5th Cir. 1972) ......................................... 11

*Fogel v. Forbes, Inc.*, 500 F. Supp. 1081, 1084-85 (E.D. Pa. 1980) ........................................... 17

*Franklin Music Co. v. Am. Broad. Co.*, 616 F.2d 528, 541 (3d Cir. 1979) ............................... 17

*Gorman v. Univ. of Rhode Island*, 837 F. 2d. at 15 (1st Cir. 1988) ............................................. 11

*Greater Nanticoke Area Sch. Dist. v. Greater Nanticoke Area Educ. Ass'n*, 760 A.2d
    1214 (Pa. Commw. 2000) ........................................................................... 11

*Krajewski v. Gusoff,* 53 A.3d 793 (Pa. Super. 2012) ................................................... 17

*Kraisinger v. Kraisinger,* 928 A.2d 333, 339 (Pa.Super. 2007) ................................... 11

*Liddle v. Scholze*, 768 A.2d 1183, 1185 (Pa.Super. 2001) ........................................... 11

*Milliner v. Enck*, 709 A.2d 417, 419 n.1 (Pa. Super. 1998)........................................... 17

*Murphy v. Duquesne University of the Holy Ghost*, 777 A.2d 418, 428 (Pa. 2001) .. 11, 12, 13, 14

*Reardon v. Allegheny Coll.*, 926 A.2d 477, 481 (Pa. Super. 2007) ................................. 10, 13, 14

*Osial v. Cook,* 803 A.2d 209, 213 (Pa. Super. 2002) ................................................... 11

*Pawlowski v. Smorto*, 588 A.2d 36, 42 (Pa. Super. 1991) ........................................... 19

*Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008)................................ 10

*Profit Wize Mktg. v. Wiest,* 812 A.2d 1270 (Pa. Super. 2002) ..................................... 11

*Psi Upsilon of Philadelphia v. Univ. of Pennsylvania*, 591 A.2d 755, 758 (Pa. Super. 1991) .... 10

*Schanne v. Addis*, 898 F. Supp. 2d 751 (E.D.Pa. 2012) ........................................... 17, 18

*Smith v. Gettysburg Coll.*, 22 Pa. D. & C. 3d 607, 1982 Pa. Dist. & Cnty. Dec. LEXIS 469,
    (1982) ........................................................................... 11

*Steuart v. McChesney*, 498 Pa. 45, 49, 444 A.2d 659, 661 (1982) ............................... 12

*Tran v. State Sys. of Higher Educ.*, 986 A.2d 179 (Pa. Commw. 2009) ..................... 10

*Williams v. Howard Univ.*, 528 F.2d 658 (D.C. Cir. 1976) ....................................... 11

**Statutes/Rules:**

28 USC § 2201; ................................................................................................................................8

Fed.R.Civ.P. 12(B)(6).....................................................................................................................10

Restatement (Second) of Torts § 559 (1977) ...................................................................................17

Restatement (Second) of Torts, § 588 (1977)...................................................................................17

Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 et. seq. ............................8

Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A § 201-1, et seq. ..................8

<u>**Preliminary Statement**</u>

*"Sexual violence is more than just a crime against individuals. It threatens our families, it threatens our communities; ultimately, it threatens the entire country. It tears apart the fabric of our communities. And that's why we're here today -- because we have the power to do something about it as a government, as a nation. We have the capacity to stop sexual assault, support those who have survived it, and bring perpetrators to justice."*

President Barack Obama, January 22, 2014

*"Freedom from sexual assault is a basic human right... a nation's decency is in large part measured by how it responds to violence against women... our daughters, our sisters, our wives, our mothers, our grandmothers have every single right to expect to be free from violence and sexual abuse."*

Vice President Joe Biden, January 22, 2014


These two quotes appear at the beginning of the April 2014 first report of the White House Task Force to Protect Students From Sexual Assault, titled "Not Alone".[1] According to the U.S. Department of Education's Summary of Crime Statistics, in 2009, the most recent year in which statistics are available, 3,284 forcible sexual offenses involving a college and university student were reported. *A true and correct copy of the Summary of Statistics is appended hereto as Exhibit "B".* The President of the United States created the White House Task Force to Protect Students From Sexual Assault because one in five women is sexually assaulted in college, most often by someone she knows, and almost most often, she does **not** report what happened. *See Exhibit "A".* The President and his office are committed to turning the tide and encouraging women to come forward to report sexual assaults on campus and for schools to investigate and adjudicate these claims **through their administrative school processes**. *See Exhibit "A" (Emphasis Added).*

---

[1] A copy of the White House Task Force April 2014 report titled "Not Alone" is appended hereto as Exhibit "A".

In the case at bar, plaintiff Anthony Villar wants to set a precedent that any woman who comes forward and claims she is sexually assaulted can now be sued in Federal Court, regardless of the outcome of the administrative process, and have the school finding relitigated in Federal Court. Plaintiff wants to circumvent the school administrative process that both he and Jane Doe ("Doe") agreed to when they enrolled at Philadelphia University, rendering the process meaningless. By doing so, Plaintiff seeks to force college women to remain quiet when sexually assaulted for fear of being sued, which would undermine the concerted efforts of the White House and its Task Force to protect the basic human rights of women in college, social policy discouraging sexual assault, and the encouraging of victims to report sexual assaults to their schools. For the reasons set forth in this memorandum of law, this court is not the proper forum to relitigate the finding of the administrative process because Plaintiff does not agree with the school's decision and public policy dictates that there is an absolute privilege for women to come forward and report sexual assaults.

**Statement of the Facts**

Plaintiff filed this lawsuit after Philadelphia University expelled him upon finding that he **sexually assaulted Doe** on December 13, 2013. Despite being found to have committed this heinous act by Philadelphia University, Plaintiff now attempts to further traumatize and further victimize Doe by filing a lawsuit attempting improperly to relitigate Philadelphia University's findings.

## A.    Plaintiff's sexual assault on Jane Doe[2]

In the fall of 2011, Plaintiff and Doe were both freshmen at Philadelphia University, and began a romantic relationship shortly thereafter. *A true and correct copy of Plaintiff's Amended Complaint is appended hereto as Exhibit "C", ¶ 12* . From September 2013 to December 13, 2013, Doe studied abroad in Denmark.  On the evening of December 13, 2013, Doe returned from Denmark. *See Exhibit "C", ¶ 15* . Plaintiff picked up Doe at the airport at approximately 6:30 pm. *See Exhibit "C", ¶ 16* . According to the Plaintiff, he and Doe decided to stop at Plaintiff's apartment before going to Doe's family's home for a small homecoming party. *See Exhibit "C", ¶ 16* . Once there, Plaintiff claims that he and Doe engaged in foreplay and then proceeded to have oral sex. *See Exhibit "C", ¶ 17-19.* Plaintiff further claims that while in his apartment, Doe and Plaintiff twice had consensual intercourse.  According to the Plaintiff, **Doe told him to stop** because it was hurting her, which he claims that he did. *See Exhibit "C", ¶ 20.*

Plaintiff claims that the next evening, he was at dinner with Doe and her family when Doe received a text message from another female college student whom Plaintiff had been having a sexual relationship with while Doe was in Denmark. *See Exhibit "C", ¶ 25* . Plaintiff avers he put her cell phone in his pocket before she could see the text message and then confessed his infidelity to Doe, after which Plaintiff left the restaurant. *See Exhibit "C", ¶ 25* . On Monday, December 16, 2013, Doe contacted Dean Mark Govoni of Philadelphia University and reported that Plaintiff had sexually assaulted her on Friday, December 13, 2013. *See Exhibit "C", ¶ 26* .

---

[2] As all facts and inferences must be construed in favor of the plaintiff on this motion to dismiss, the facts contained herein are only those alleged by the plaintiff.  Jane Doe's account of what actually transpired is vastly different than the facts alleged by the plaintiff.

**B.** **Philadelphia University's policies and regulations**

Philadelphia University's Student Handbook (the "Handbook") sets out the University's policies, regulations, and procedures.[3] *A true and correct copy of pertinent portions of the Philadelphia University Student Handbook is appended hereto as Exhibit "D".* According to the Handbook, any student alleged to have committed or alleged to have attempted to commit a sexual offense, as set forth in the University's Sexual Misconduct Policy, is subject to the Community Standards process outlined in the Handbook. *See Exhibit "D".* The Community Standards state that by accepting admission and registration, students accept responsibility for compliance with The Community Standards, along with other policies and regulations listed in the Handbook. *See Exhibit "D".* Students also are expected to abide by all local, state, and federal laws. *See Exhibit "D".* The Sexual Misconduct Policy provides that an act of sexual violence is "any sexual physical contact (intercourse, penetration of the genitals or indecent contact) by a person, without the consent of the complainant". *See Exhibit "D".* Faculty and staff, including peer counselors (i.e. Resident Assistants) must report allegations of sexual misconduct to the Dean of Students Office. *See Exhibit "D".*

The Handbook sets forth a process for handling student on student Sexual Misconduct violations, which is to follow the Community Standards Process, based on guidance from the United States Department of Education, Office for Civil Rights ("OCR").[4] *See Exhibit "D"; A true and correct copy of the OCR Dear Colleague Letter dated April 4, 2011 is appended hereto as Exhibit "E"; A true and correct copy of the OCR April 2014 "Questions and Answers on Title*

---

[3] Although referring repeatedly in his Amended Complaint to the Philadelphia University Student Handbook, Plaintiff does not attach a copy of it to the Amended Complaint.

[4] On April 4, 2011, the OCR issued a "Dear Colleague" letter outlining a mandate for how schools must handle claims of student on student sexual violence. In April 2014 , the OCR published a lengthy document further explaining and expanding on the policies and procedures in the Dear Colleague letter, titled "Questions and Answers on Title IX and Sexual Violence".

*IX and Sexual Violence" is appended hereto as Exhibit "F".* The Community Standards complaint process begins when "any University community member who has witnessed or been victim of a violation of The Community Standards [files] a complaint in writing to the Director of Judicial Affairs or the Dean of Students." *See Exhibit "D".* Written complaints must contain "a description of the alleged violation… [and] the Community Standard alleged to have been violated" *See Exhibit "D".*

Under the Sexual Misconduct policy, "any complaints alleging that a student has been the victim of sexual misconduct… are reported to the Dean of Students, who is the Title IX Coordinator for the University" *See Exhibit "D".* The Title IX Coordinator will "either act as the complaint coordinator or appoint a complaint coordinator" and the complainant and the coordinator will "review information and expectations of the complaint process and select an advisor from the University staff to assist the complainant during the complaint process". *See Exhibit "D".* The respondent is notified of the alleged violation, by University email. *See Exhibit "D".* The respondent, together with the coordinator, will "review the same information and expectations that were shared with the complainant, and will select an adviser from the University staff to assist the respondent during the complaint process". *See Exhibit "D".*

Both the complainant and the respondent are asked to provide a written statement about their participation and perspective on the incident in question. *See Exhibit "D".* After both parties have submitted their statements, the coordinator will appoint an investigator to initiate the investigation, which is normally completed within 60 days from the initiation of the complaint. *See Exhibit "D".* Once the investigative report is complete, it is then reviewed by the Title IX Coordinator and, in all cases of sexual violence, the case is referred to the University's judicial process. *See Exhibit "D".*

All cases of sexual misconduct are heard by the Sexual Misconduct Board. *See Exhibit*

"D".  The Sexual Misconduct Board committee is composed of "faculty, staff, and students trained in matters related to sexual misconduct."  The Board convenes as a three member panel, comprised of one faculty member, one student, and one administrative staff member.  *See Exhibit "D"*.  Both the respondent and the complainant are assigned advisors from the Student Life staff or faculty from the University community.  *See Exhibit "D"*.  The advisor's role is to assist the student in understanding the judicial procedure and the advisor "does not advocate on behalf of the [student] or address the judicial board in any way" *See Exhibit "D"*.  The Director of Judicial Affairs "will establish the procedure for the parties to exchange information prior to the hearing" *See Exhibit "D"*.

After receiving information at the hearing, the Sexual Misconduct Board shall determine whether the respondent is responsible for a violation of the Student Community Standard in question.  *See Exhibit "D"*.  The decision of the judicial hearing board shall be made on the basis of the preponderance of the evidence.  *See Exhibit "D"*.  According to the April 4, 2011 "Dear Colleague" letter from OCR, "in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard" (emphasis added) *See Exhibit "E", p. 11*.

OCR explicitly notes that "when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program." *See Exhibit "E", p. 3*.  Additionally, OCR states that "a single instance of rape is sufficiently severe to create a hostile environment." *See Exhibit "E", p. 3*.  Further, OCR recommends that "if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects".  *See Exhibit "E", p. 15*.

In the case of a finding of 'responsible', the judicial hearing board will assign the appropriate sanctions. *See Exhibit "D"*. Sanctions that may be imposed upon any student found to have violated The Student Community Standards include expulsion. *See Exhibit "D"*. In sexual misconduct cases, both the complainant and respondent receive written notification of the outcome of the proceeding. *See Exhibit "D"*.

The Student Misconduct policy provides that "any retaliation by any person directed at a student filing a complaint of sexual misconduct is strictly prohibited". *See Exhibit "D"*. The respondent and the complainant both have a right to appeal a decision reached by the Sexual Misconduct Board. *See Exhibit "D"*. The Handbook specifically provides that "[d]ecisions made by a judicial hearing board shall be final, pending the [outlined] appeals process". *See Exhibit "D"*. Appeals of a decision of a judicial hearing officer are referred to the Director of Judicial Affairs, and appeals of expulsion from the University are referred to the University President's Office. *See Exhibit "D"*.

### C. The administrative disciplinary proceedings regarding the sexual assault by Plaintiff on Jane Doe

In his Amended Complaint, Plaintiff sets forth a procedure that he alleges occurred in the handling of Doe's complaint that omits key and important steps and events in order to attempt to state a claim that Philadelphia University did not follow the above policies and regulations. According to Plaintiff, he met with Dean Mark Govoni of Philadelphia University regarding Doe's complaint, who discussed the procedures that would be followed and specifically referred Plaintiff to the Sexual Misconduct Policy section of the Philadelphia University Student Handbook. *See Exhibit "C", ¶ 27.* Plaintiff acknowledges that he was allowed to review the investigative case file, and could bring a support person to the hearing. *See Exhibit "C", ¶ 27.* Plaintiff claims that he was given "a mere five weeks" to prepare for the hearing. *See Exhibit*

*"C", ¶ 28.*

On January 23, 2014, Plaintiff appeared for the hearing, **with an attorney**. *See Exhibit "C", ¶ 30.* The hearing proceeded before the Sexual Misconduct Hearing Board, which, per the Handbook, was composed of one faculty member, one student, and one administrative staff member. *See Exhibit "C", ¶ 31.* Plaintiff avers that, following the hearing, he was found guilty and informed that he would be expelled from Philadelphia University. *See Exhibit "C", ¶ 31.*

### D. The Amended Complaint

Despite being found to have sexually assaulted Doe by the Philadelphia University Sexual Misconduct Board, Plaintiff filed this lawsuit in an attempt further to victimize and traumatize Doe in an improper effort to relitigate the decision of the Sexual Misconduct Board. Plaintiff filed this Amended Complaint on May 23, 2014, asserting the following claims against Philadelphia University: (1) Violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 et. seq.; (2) Declaratory Judgment Against Philadelphia University Pursuant to 28 USC § 2201; and (3) Breach of Contract. Plaintiff also asserts causes of action against Philadelphia University and Doe for: (4) Defamation; (5) Intentional Infliction of Emotional Distress; and (6) Negligent Infliction of Emotional Distress. Plaintiff further asserts a cause of action against Philadelphia University only for (7) Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A § 201-1, et seq. Finally, Plaintiff asserts a cause of action against Doe only for (8) Intentional Interference with Contractual Relations. *See Exhibit "C".*

In his cause of action for Defamation, Plaintiff alleges that the defamatory communications included, without limitation, (a) Doe and Philadelphia University stating verbally and in writing that Plaintiff was the perpetrator of a criminal offense involving serious sexual misconduct (b) Doe's statement to Dean Mark Govoni on December 16, 2013 that

Plaintiff had sexually assaulted her; (c) Doe and Philadelphia University making the same statements to the Sexual Misconduct Board and (d) Philadelphia University continuing to publish defamatory communications about Plaintiff to third persons outside Philadelphia University. *See Exhibit "C", ¶ 72-79.* In his cause of action for Intentional Infliction of Emotional Distress, Plaintiff alleges that Doe made public statements about Plaintiff that were blatantly false and untrue. *See Exhibit "C", ¶ 90.* While these "public statements" are not identified in this Count, they are believed to be the statements alleged in paragraph 79 of the Amended Complaint, which Plaintiff incorporates into that cause of action. *See Exhibit "C", ¶ 79.* In his cause of action for Negligent Infliction of Emotional Distress, Plaintiff alleges that Doe acted in a negligent manner. *See Exhibit "C", ¶ 96.* While these actions are not identified in this Count, they are believed to be the statements alleged in paragraph 79 of the Amended Complaint, which plaintiff incorporates into that cause of action. *See Exhibit "C", ¶ 79.* In his cause of action for Intentional Interference with Contractual Relations, Plaintiff alleges that Doe did willfully interfere with an existing contract between Plaintiff and Philadelphia University by repeatedly meeting with Philadelphia University and leveling false accusations against Plaintiff. *See Exhibit "C", ¶ 105.* Plaintiff further alleges that by accusing Plaintiff of sexual assault, Doe was giving false information to Philadelphia University, which Doe knew to be false. *See Exhibit "C", ¶ 108.*

## Legal Argument

### A.      Standard of Review

When considering a motion to dismiss under Fed.R.Civ.P. 12(B)(6), the Court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.  *See Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007)).  In order for a complaint to survive a motion to dismiss, it must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory".  *See Twombly,* 550 U.S. 544, at 562, 127 S.Ct. at 1969.

### B.      Plaintiff cannot relitigate the underlying finding against him by Philadelphia University, and, as a result, has failed to state any claims against Jane Doe.

All of Plaintiff's claims against Doe are premised on his allegation that he did not sexually assault her and, therefore, her claims that he did are not true.  The  Sexual Misconduct Board found that Plaintiff did sexually assault Doe.  Plaintiff is attempting improperly to relitigated the finding of the Sexual Misconduct Board that Plaintiff sexually assaulted Doe, which both parties agreed would be final, and he therefore is unable to set forth any claims upon which relief may be granted against Doe.

The relationship between a student and privately funded college, such as Philadelphia University, is contractual in nature.  *Tran v. State Sys. of Higher Educ.*, 986 A.2d 179 (Pa. Commw. 2009); *Reardon v. Allegheny Coll.*, 926 A.2d 477, 481 (Pa. Super. 2007); *Psi Upsilon of Philadelphia v. Univ. of Pennsylvania*, 591 A.2d 755, 758 (Pa. Super. 1991); *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 573 A.2d 575 (Pa. Super. 1990).  "Therefore, students who are being disciplined are entitled only to those procedural safeguards which the school

specifically provides." *Boehm*, 573 A.2d 579 (citing *Corso v. Creighton Univ.*, 731 F.2d 529 (8th Cir. 1984)); *Williams v. Howard Univ.*, 528 F.2d 658 (D.C. Cir. 1976). A claim by a student that a private college has violated its procedures is a breach of contract case between private parties, which are adjudicated like all other breach of contract claims. *Murphy v. Duquesne University of the Holy Ghost*, 777 A.2d 418, 428 (Pa. 2001). Fourteenth Amendment due process and fundamental fairness issues do <u>not</u> apply. *Id.*; *Smith v. Gettysburg Coll.*, 22 Pa. D. & C. 3d 607, 1982 Pa. Dist. & Cnty. Dec. LEXIS 469, (1982). Moreover, there is a presumption of fairness in administrative proceedings which favors administrators and "alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Gorman v. Univ. of Rhode Island*, 837 F. 2d. at 15 (1st Cir. 1988) (citing *Duke v. North Texas State Univ.*, 469 F. 2d 829, 834 (5th Cir. 1972)).

The interpretation of the contractual provisions is a question of law for the Court to decide. *See e.g. Calabrese v. Zeager,* 976 A.2d 1151, 1154 (Pa.Super. 2009), *Kraisinger v. Kraisinger,* 928 A.2d 333, 339 (Pa.Super. 2007); *Profit Wize Mktg. v. Wiest,* 812 A.2d 1270 (Pa. Super. 2002). When contracts with clear and unambiguous language are interpreted, only the writing itself is examined to give effect to the parties' intent. *Osial v. Cook,* 803 A.2d 209, 213 (Pa. Super. 2002). Courts do not modify the plain meaning of the contract words "under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used". *Profit Wize,* 812 A.2d at 1274-75 (citing *Meeting House Lane, Ltd. v. Melso*, 628 A.2d 854, 857 (Pa. Super. 1993). As a matter of law, Courts should give meaning to the words contained in the contract. *Greater Nanticoke Area Sch. Dist. v. Greater Nanticoke Area Educ. Ass'n*, 760 A.2d 1214 (Pa. Commw. 2000); *Profit Wize*, 812 A.2d 1270 (Pa. Super. 2002). The ultimate goal of interpreting a contract is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. *Liddle v.*

*Scholze*, 768 A.2d 1183, 1185 (Pa.Super. 2001). Where contract language is clear and unambiguous, the court shall interpret the agreement as expressed, rather than silently intended. *Steuart v. McChesney*, 498 Pa. 45, 49, 444 A.2d 659, 661 (1982).

By accepting admission to Philadelphia University and registering for school, both Plaintiff and Doe agreed to comply with the Community Standards and all policies and regulations listed in the Handbook. *See Exhibit "D"*. Part of this contractual agreement was that complaints of sexual violence and misconduct would be adjudicated before the Sexual Misconduct Board **and that the decision of the Sexual Misconduct Board would be final, with rights of appeal only to the University's Director of Judicial Affairs.** *See Exhibit "D"*. There is no provision in the Handbook for an appeal to the courts. Hence, Doe had an expectation when agreeing to comply with the Community Standards and policies and regulations listed in the Handbook that any complaint she should have of sexual violence or misconduct would be adjudicated **at the school through its policies and procedures**. Plaintiff asks this court to now reconsider the decision of the Sexual Misconduct Board, in contravention of the contract between the parties and Philadelphia University. To do so would render the administrative school proceeding absolutely meaningless and afford Doe no protection of the contract she (and the plaintiff) entered into with Philadelphia University when they matriculated there and agreed to abide by the rules, regulations, and procedures in the Student Handbook.

Plaintiff is precluded from relitigating the final decision of Philadelphia University in court. In *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418 (Pa. 2001), Cornelius F. Murphy, Jr., a law school professor at Duquesne University of the Holy Ghost, had his tenure terminated for serious misconduct. After exhausting all of his remedies within the University, Murphy filed a breach of contract action claiming that he did not receive the process of tenure termination required by his employment contract. The Pennsylvania Supreme Court held that

while Murphy "is free to assert in a court of law that the process of forfeiture that was afforded to him did not comply with the Contract's terms, he is **not free to demand that a jury re-consider and re-decide the merits of his termination**." *Id.* at 433 (emphasis added). Because the contract set forth precisely how the standard of determining whether Murphy had forfeited his tenure was to be evaluated and by who (the chief executive of the University), the court found that the contract reflected that forfeiture of tenure was considered to be a matter of the University's self-governance, which the parties had kept for themselves to determine and not the courts. *Id*. The court stated that

> it would be unreasonable to believe that the parties intended that the process for deciding the matter of tenure forfeiture, which was so carefully elaborated in their Contract to the point of final determination, could be completely circumvented by the filing of a civil action. Rather, the detailed provisions of the Contract for deciding the matter have inherent in them the intent of the parties that that agreed-upon process was to be final.

*Murphy*, 777 A.2d. at 433-434. The Pennsylvania Supreme Court therefore held that Murphy was "**not entitled to litigate the merits of his termination in this breach of contract action. That is to say, the questions as to whether he engaged in serious misconduct and whether his serious misconduct should have resulted in the forfeiture of tenure have been conclusively and finally decided**." *Id*. at 434 (emphasis added).

Similarly, in *Reardon v. Allegheny Coll.*, 926 A.2d 477, 481 (Pa. Super. 2007), an Allegheny College student was accused of plagiarism by her professor and, after being found guilty of plagiarism by the College Judicial Board, filed a lawsuit alleging, *inter alia,* breach of contract. After finding that the case was to be guided by contract principles and not due process concerns because Allegheny College is a private institution, the Superior Court of Pennsylvania found that it was **precluded from relitigating the actual decision of the Judicial Board**. The Court noted that

"[a] distinction must be made between the allegation that Allegheny breached the terms of [the student handbook] by failing to adhere to its provisions, which is a reviewable claim, and the allegation that the way in which these provisions were implemented, or the outcome arrived at by such implementation, was unfair – **a claim which is *not* reviewable** according to the provisions of [the student handbook]."

*Reardon*, 926 A.2d at 482 (emphasis added, italics in original); *Murphy,* 777 A.2d at 429.  The Court noted that "[w]hen a contract so specifies, generally applicable principles of contract law will suffice to insulate the institution's internal, private decisions from judicial review".

*Reardon,* 926 A.2d at 480-481 (citing *Murphy,* 777 A.2d at 429).  The Superior Court concluded that the trial court properly dismissed the breach of contract claim because the plaintiff was "unable to contend Allegheny breached any of the terms contained in [the student handbook]. Thus, she is merely asking us to review the 'private, internal decisions' of the College, **something that is forbidden by the terms of both [the student handbook] and case law**."

*Id.*; *Murphy,* 777 A.2d at 429 (emphasis added).

In the case at bar, Plaintiff alleges that he entered into a contract with Philadelphia University, which included the Handbook, and that Philadelphia University was required to comply with the procedures set forth in the Handbook.  Plaintiff does not claim that his contract with Philadelphia University is ambiguous.  In addition to providing a detailed process for addressing claims of sexual violence, the Handbook provides that the Sexual Misconduct Board determines if Community Standards involving acts of sexual misconduct have been violated.  *See Exhibit "D"*.  The Philadelphia University Handbook then provides that the decision of the Sexual Misconduct Board shall be final; pending the appeals process to the Director of Judicial Affairs.  *See Exhibit "D"*.  Hence, as in *Murphy*, it is clear that Philadelphia University and Plaintiff, as the other party to this contract, agreed that Philadelphia was to make the final determination as to whether a violation of Community Standards was committed and that no

further determination of the underlying, substantive issue was intended, either internally or externally.

While Plaintiff may be able to challenge, under *Murphy* and *Reardon,* whether Philadelphia University complied with the contract in the way in which it adjudicated the sexual assault claim, **he cannot relitigate** the actual finding by the Sexual Misconduct Board that he sexually assaulted Doe. Plaintiff's guilt for the sexual assault has therefore been **conclusively and finally** decided by Philadelphia University at the Sexual Misconduct Board hearing. The jury in this case **cannot** reconsider or alter that decision.

As the decision that Plaintiff sexually assaulted Doe is conclusive and final and cannot be relitigated, **Doe cannot be found by this court to have made any statements regarding the sexual assault that are false or defamatory**. Likewise, as the decision that Plaintiff sexually assaulted Doe is conclusive and final, Doe **cannot** be found to have intentionally or negligently inflicted any emotional distress on Plaintiff or intentionally have interfered with the contract between Philadelphia University and Plaintiff by simply reporting the sexual assault, as confirmed by the Sexual Misconduct Board, and then participating in the University proceeding.

In addition to the requirements in the Handbook that sexual assaults be reported, there clearly is a public interest in victims of sexual violence, including women who believe that they have been victims of a sexual assault, coming forward to report these acts. The President of the United States created the White House Task Force to Protect Students From Sexual Assault this year to help encourage college women to come forward after being subjected to sexual violence. If a woman believes that she has been subjected to a sexual assault, but does not come forward for fear that she may thereafter sued for defamation, infliction of emotional distress, etc., even after the administrative hearing board (which she also contractually agreed to proceed in front of)

finds in her favor, the policy behind encouraging the reporting of such acts is thwarted.  It is such a situation as is occurring in this case that this public policy addresses.

A woman who has been victimized and sexually assaulted should not have to be afraid of reporting it because she may be forced to relive the trauma repeatedly, in this case at the Sexual Misconduct Board hearing and now in this lawsuit.  If students who commit sexual assaults are allowed to relitigated the findings of the school administrative boards to which they have contractually agreed to submit to, the result will be that (1) the administrative process will be rendered meaningless as the decision, whatever it is, simply can be rendered moot and relitigated in the courts, and (2) students will stop reporting acts of sexual violence to prevent having to relive the trauma during the school proceeding only to be sued in court regardless of the outcome.  Hence, public policy dictates that victims of sexual violence be allowed to report what happened without fear of retribution, including lawsuits for defamation and infliction of emotional distress.  As a result, because the Plaintiff is precluded from relitigating the decision of the Sexual Misconduct Board because he does not like the decision and the decision that he committed the sexual assault is conclusive and final, the Plaintiff has failed to state any claim against Doe for allegedly lying about the sexual assault.  All of his causes of action against her therefore must be dismissed.[5]

C.     **Statements by Jane Doe regarding plaintiff sexually assaulting her are absolutely privileged and cannot form the basis of claims for defamation.**

Plaintiff attempts to further victimize Doe in this lawsuit by claiming that she is at fault for reporting his sexual assault of her and making claims that include defamation.  If the court

---

[5] Conversely, if the Sexual Misconduct Board had found that Jane Doe was not sexually assaulted, and Jane Doe had filed this lawsuit against the Plaintiff, Villar certainly would be making this exact same argument, that the findings of the Sexual Misconduct Board cannot be relitigated.

reaches the merits of these claims, there is no basis for them as Doe's statements about the sexual assault are absolutely privileged.

A claim for defamation involves a communication that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from dealing with him." *Fogel v. Forbes, Inc.*, 500 F. Supp. 1081, 1084-85 (E.D. Pa. 1980), (quoting *Franklin Music Co. v. Am. Broad. Co.*, 616 F.2d 528, 541 (3d Cir. 1979)); Restatement (Second) of Torts § 559 (1977). In an action for defamation, the plaintiff must prove:

> (1) the defamatory character of the communication;
> (2) publication by the defendant;
> (3) its application to the plaintiff;
> (4) understanding by the recipient of its defamatory meaning;
> (5) understanding by the recipient of it as intended to be applied to plaintiff;
> (6) special harm to the plaintiff; and
> (7) abuse of a conditionally privileged occasion.

*Krajewski v. Gusoff*, 53 A.3d 793 (Pa. Super. 2012). Statements by Doe regarding the sexual assault are **absolutely privileged** and cannot be the basis for a claim of defamation. It is axiomatic that a witness is absolutely privileged to publish alleged defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." Restatement (Second) of Torts, § 588 (1977). Pennsylvania also applies this absolute privilege to **quasi-judicial proceedings**. *Milliner v. Enck*, 709 A.2d 417, 419 n.1 (Pa. Super. 1998). This includes hearings before tribunals that perform judicial functions, such as proceedings by administrative officers, boards, and commissions. *Id.*

In Pennsylvania, **quasi-judicial proceedings also include school administrative hearings and statements made that lead to such hearings.** In *Schanne v. Addis*, 898 F. Supp. 2d 751 (E.D.Pa. 2012), Schanne, a Lower Merion High School teacher had an inappropriate

relationship with Addis, one of his students. Addis later confided in her neighbor, who was also a Lower Merion teacher, about the relationship. The next day, the neighbor informed the principal of Lower Merion and the principal, together with the Human Resources director, called to speak to Addis about the incident. Eventually, Addis signed an official statement regarding the relationship. On December 15, 2010, Schanne was summoned for a pre-termination *Loudermill* hearing. *See, Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487 (1985). Schanne was ultimately terminated on January 24, 2011.

After his termination, Schanne filed a lawsuit asserting that Addis has made three defamatory communications: her original conversation with her neighbor and then two phone calls with the Lower Merion principal and Human Resources director prior to signing her statement. The court granted summary judgment in Addis' favor because her statements served as the catalyst for Schanne's *Loudermill* hearing, and were therefore **absolutely privileged**. The court found that "the importance of encouraging current and former students to come forward outweighs the potential for a wrongly accused teacher to suffer from a defamatory accusation." *Schanne*, 898 F.Supp. 2d at 758.

Plaintiff's Sexual Misconduct Board hearing is a quasi-judicial proceeding. Doe's allegedly defamatory statements after the sexual assault by Plaintiff include statements that were made in order to report Plaintiff's actions that violated, among other things, Philadelphia University's Community Standards, and that ultimately led to the Sexual Misconduct Board hearing. The remaining alleged defamatory statements were made during the University's investigation of the sexual assault and the actual Sexual Misconduct Board hearing. As a result, all of these statements leading to and during this quasi-judicial proceeding are absolutely privileged and cannot be the basis of claims for defamation.

Moreover, courts must also consider whether applying an absolute privilege in a given case would promote the privilege's purpose. When courts choose to apply the privilege, they deem the policy concerns, such as encouraging open communication without fear of retributive lawsuits, to outweigh the right of the defamation plaintiff to seek redress. *Pawlowski v. Smorto*, 588 A.2d 36, 42 (Pa. Super. 1991) (applying an absolute privilege to a report made by several attorneys to the District Attorney and State Police that another attorney committed perjury because that statement aligns with the policy reasons for the privilege: to "ensure free and uninhibited access to the judicial system."). Moreover, the motive of the speaker (be it malicious or not) is entirely irrelevant. *Id. At 41.*

As discussed above, there clearly is a public interest in victims of sexual violence, including women who believe that they have been victims of a sexual assault, coming forward to report these acts. This year, the White House even created a task force to try to protect college women who have been sexually assaulted and to encourage them to come forward and report these acts to their schools. The purpose of quasi-judicial hearings, such as Philadelphia University provides, is to encourage women to come forward and report sexual assaults. Like criminal proceedings, they provide a "safe haven" where a woman will not be forced, under public scrutiny, to relive again and again the trauma she experienced. A woman who has been victimized and sexually assaulted should not have to be afraid of reporting it because she may be forced to relive the trauma repeatedly, in this case at the Sexual Misconduct Board hearing and now in this lawsuit. If reporting incidents of sexual violence that lead to quasi-judicial hearings is not privileged, the result will be the silencing of such reports, and many other women having to endure the trauma of reliving such heinous acts over and over in the courts. Hence, public policy dictates that victims of sexual violence be allowed to report what happened without fear

of retribution, including lawsuits for defamation.  As a result, Doe's statements are absolutely privileged and cannot be defamatory if proven to be untrue (which they are not).

## Conclusion

Because the Plaintiff cannot relitigate the decision of the Sexual Misconduct Board, the finding that he sexually assaulted Doe is conclusive and final.  Therefore, he is unable to support his claim that Doe made untrue statements and all of his claims against her fail.  Moreover, Doe's statements are absolutely privileged and cannot be the basis of claims for defamation.  Consequently, this Honorable Court should dismiss Plaintiff's Amended Complaint and all claims against Doe, with prejudice.

Respectfully submitted,

RAWLE & HENDERSON LLP

Dated: July 3, 2014                                       By:

_____
Daniel J. Rucket, Esquire
I.D. No. 70009
The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4200
*Attorneys for Defendant Jane Doe*

## CERTIFICATE OF SERVICE

I, Daniel J. Rucket, do hereby certify that I caused a true and correct copy of Defendant Jane Doe's Motion to Dismiss Plaintiff's Amended Complaint For Failure to State a Claim Upon Which Relief Can Be Granted to be filed electronically and it is available for viewing and downloading from the ECF system. Service upon the parties listed below was made electronically on July 3, 2014.

William Spade, Esquire
Law Offices of William Spade
1525 Locust Street
Suite 1400
Philadelphia, PA 19103

James A. Keller, Esquire
Joshua W.B. Richards, Esquire
Saul Ewing LLP
3800 Centre Square West
1500 Market Street
Philadelphia, PA 19102-2186

Respectfully submitted,

RAWLE & HENDERSON LLP

Dated: July 3, 2014        By: _____

Daniel J. Rucket, Esquire
I.D. No. 70009
The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4200
*Attorneys for Defendant Jane Doe*

"A"



# NOT ALONE

The First Report of the White House Task Force to Protect Students From Sexual Assault

April 2014





**President Barack Obama signs the Presidential Memorandum establishing the White House Task Force to Protect Students From Sexual Assault on January 22, 2014. (Official White House Photo by Lawrence Jackson)**

*Sexual violence is more than just a crime against individuals. It threatens our families, it threatens our communities; ultimately, it threatens the entire country. It tears apart the fabric of our communities. And that's why we're here today -- because we have the power to do something about it as a government, as a nation. We have the capacity to stop sexual assault, support those who have survived it, and bring perpetrators to justice.*

**President Barack Obama, January 22, 2014**

*Freedom from sexual assault is a basic human right… a nation's decency is in large part measured by how it responds to violence against women… our daughters, our sisters, our wives, our mothers, our grandmothers have every single right to expect to be free from violence and sexual abuse.*

**Vice President Joe Biden, January 22, 2014**

*This report was prepared by the White House Task Force to Protect Students From Sexual Assault.*

*The Task Force is Co-Chaired by the Office of the Vice President and the White House Council on Women and Girls.*

# Table of Contents

Executive Summary ............................................................2

Introduction ..................................................................6

Our First Task: Listening ...................................................6

I.   How Best to Identify the Problem: Campus Climate Surveys ..........7

II.  Preventing Sexual Assault on Campus...........................9

III. Responding Effectively When a Student is Sexually Assaulted ......11

IV. Improving the Federal Government's Enforcement Efforts, and
      Making Them More Transparent ...............................16

Next Steps ..................................................................20

# Executive Summary

## Why We Need to Act

One in five women is sexually assaulted in college.  Most often, it's by someone she knows – and also most often, she does not report what happened.  Many survivors are left feeling isolated, ashamed or to blame.  Although it happens less often, men, too, are victims of these crimes.

The President created the Task Force to Protect Students From Sexual Assault to turn this tide.  As the name of our new website – NotAlone.gov – indicates, we are here to tell sexual assault survivors that they are not alone.  And we're also here to help schools live up to their obligation to protect students from sexual violence.

Over the last three months, we have had a national conversation with thousands of people who care about this issue.  Today, we offer our first set of action steps and recommendations.

## 1.  Identifying the Problem: Campus Climate Surveys

The first step in solving a problem is to name it and know the extent of it – and a campus climate survey is the best way to do that.  We are providing schools with a toolkit to conduct a survey – and we urge schools to show they're serious about the problem by conducting the survey next year.  The Justice Department, too, will partner with Rutgers University's Center on Violence Against Women and Children to pilot, evaluate and further refine the survey – and at the end of this trial period, we will explore legislative or administrative options to require schools to conduct a survey in 2016.

## 2.  Preventing Sexual Assault – and Engaging Men

Prevention programs can change attitudes, behavior – and the culture.  In addition to identifying a number of promising prevention strategies that schools can undertake now, we are also researching new ideas and solutions.  But one thing we know for sure: we need to engage men as allies in this cause.  Most men are not perpetrators – and when we empower men to step in when someone's in trouble, they become an important part of the solution.

As the President and Vice President's new Public Service Announcement puts it: if she doesn't consent – or can't consent – it's a crime.  And if you see it happening, help her, don't blame her, speak up.  We are also providing schools with links and information about how they can implement their own bystander intervention programs on campus.

## 3.  Effectively Responding When a Student Is Sexually Assaulted

When one of its students is sexually assaulted, a school needs to have all the pieces of a plan in place.  And that should include:

### Someone a survivor can talk to in confidence

While many victims of sexual assault are ready to file a formal (or even public) complaint against an alleged offender right away – many others want time and privacy to sort through their next steps.  For some, having a confidential place to go can mean the difference between getting help and staying silent.

Today, we are providing schools with a model reporting and confidentiality protocol – which, at its heart, aims to give survivors more control over the process. Victims who want their school to fully investigate an incident must be taken seriously – and know where to report. But for those who aren't quite ready, they need to have – and know about – places to go for confidential advice and support.

That means a school should make it clear, up front, who on campus can maintain a victim's confidence and who can't – so a victim can make an informed decision about where best to turn. A school's policy should also explain when it may need to override a confidentiality request (and pursue an alleged perpetrator) in order to help provide a safe campus for everyone. Our sample policy provides recommendations for how a school can strike that often difficult balance, while also being ever mindful of a survivor's well-being.

New guidance from the Department of Education also makes clear that on-campus counselors and advocates – like those who work or volunteer in sexual assault centers, victim advocacy offices, women's and health centers, as well as licensed and pastoral counselors – can talk to a survivor in confidence. In recent years, some schools have indicated that some of these counselors and advocates cannot maintain confidentiality. This new guidance clarifies that they can.

## A comprehensive sexual misconduct policy

We are also providing a checklist for schools to use in drafting (or reevaluating) their own sexual misconduct policies. Although every school will need to tailor a policy to its own needs and circumstances, all schools should be sure to bring the key stakeholders – including students – to the table. Among other things, this checklist includes ideas a school could consider in deciding what is – or is not – consent to sexual activity. As we heard from many students, this can often be the essence of the matter – and a school community should work together to come up with a careful and considered understanding.

## Trauma-informed training for school officials

Sexual assault is a unique crime: unlike other crimes, victims often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress. Starting this year, the Justice Department, through both its Center for Campus Public Safety and its Office on Violence Against Women, will develop trauma-informed training programs for school officials and campus and local law enforcement. The Department of Education's National Center on Safe and Supportive Learning Environments will do the same for campus health centers. This kind of training has multiple benefits: when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable.

## Better school disciplinary systems

Many sexual assault survivors are wary of their school's adjudication process – which can sometimes subject them to harsh and hurtful questioning (like about their prior sexual history) by students or staff unschooled in the dynamics of these crimes. Some schools are experimenting with new models – like having a single, trained investigator do the lion's share of the fact-finding – with very positive results. We need to learn more about these promising new ideas. And so starting this year, the Justice Department will begin assessing different models for

investigating and adjudicating campus sexual assault cases with an eye toward identifying best practices.

The Department of Education's new guidance also urges some important improvements to many schools' current disciplinary processes: questions about the survivor's sexual history with anyone other than the alleged perpetrator should not be permitted; adjudicators should know that the mere fact of a previous consensual sexual relationship does not itself imply consent or preclude a finding of sexual violence; and the parties should not be allowed to personally cross-examine each other.

### Partnerships with the community

Because students can be sexually assaulted at all hours of the day or night, emergency services should be available 24 hours a day, too. Other types of support can also be crucial – like longer-term therapies and advocates who can accompany survivors to medical and legal appointments. Many schools cannot themselves provide all these services, but in partnership with a local rape crisis center, they can. So, too, when both the college and the local police are simultaneously investigating a case (a criminal investigation does not relieve a school of its duty to itself investigate and respond), coordination can be crucial. So we are providing schools with a sample agreement they can use to partner with their local rape crisis center – and by June, we will provide a similar sample for forging a partnership with local law enforcement.

## 4.    Increasing Transparency and Improving Enforcement

### More transparency and information

The government is committed to making our enforcement efforts more transparent – and getting students and schools more resources to help bring an end to this violence. As part of this effort, we will post enforcement data on our new website – NotAlone.gov – and give students a roadmap for filing a complaint if they think their school has not lived up to its obligations.

Among many other things on the website, sexual assault survivors can also locate an array of services by typing in their zip codes, learn about their legal rights, see which colleges have had enforcement actions taken against them, get "plain English" definitions of some complicated legal terms and concepts; and find their states' privacy laws. Schools and advocates can access federal guidance, learn about relevant legislation, and review the best available evidence and research. We invite everyone to take a look.

### Improved Enforcement

Today, the Department of Education's Office for Civil Rights (OCR) is releasing a 52-point guidance document that answers many frequently asked questions about a student's rights, and a school's obligations, under Title IX. Among many other topics, the new guidance clarifies that Title IX protects all students, regardless of their sexual orientation or gender identity, immigration status, or whether they have a disability. It also makes clear that students who report sexual violence have a right to expect their school to take steps to protect and support them, including while a school investigation is pending. The guidance also clarifies that recent amendments to the Clery Act do not alter a school's responsibility under Title IX to respond to and prevent sexual violence.

OCR is also strengthening its enforcement procedures in a number of ways – by, for example, instituting time limits on negotiating voluntary resolution agreements and making clear that schools should provide survivors with interim relief (like changing housing or class schedules) pending the outcome of an OCR investigation. And OCR will be more visible on campus during its investigations, so students can help give OCR a fuller picture about what's happening and how a school is responding.

The Departments of Education and Justice, which both enforce Title IX, have entered into an agreement to better coordinate their efforts – as have the two offices within the Department of Education charged with enforcing Title IX and the Clery Act.

## Next Steps

This report is the first step in the Task Force's work. We will continue to work toward solutions, clarity, and better coordination. We will also review the various laws and regulations that address sexual violence for possible regulatory or statutory improvements, and seek new resources to enhance enforcement. Also, campus law enforcement officials have special expertise to offer – and they should be tapped to play a more central role. We will also consider how our recommendations apply to public elementary and secondary schools – and what more we can do to help there.

\* \* \*

The Task Force thanks everyone who has offered their wisdom, stories, expertise, and experiences over the past 90 days. Although the problem is daunting and much of what we heard was heartbreaking, we are more committed than ever to helping bring an end to this violence.

# Introduction

For too many of our nation's young people, college doesn't turn out the way it's supposed to.

One in five women is sexually assaulted while in college.[1]  Most often, it happens her freshman or sophomore year.[2]  In the great majority of cases (75-80%), she knows her attacker, whether as an acquaintance, classmate, friend or (ex)boyfriend.[3]  Many are survivors of what's called "incapacitated assault": they are sexually abused while drugged, drunk, passed out, or otherwise incapacitated.[4]  And although fewer and harder to gauge, college men, too, are victimized.[5]

The Administration is committed to turning this tide.  The White House Task Force to Protect Students From Sexual Assault was established on January 22, 2014, with a mandate to strengthen federal enforcement efforts and provide schools with additional tools to help combat sexual assault on their campuses.  Today, we are taking a series of initial steps to:

1. **Identify the scope of the problem on college campuses;**
2. **Help prevent campus sexual assault;**
3. **Help schools respond effectively when a student is assaulted; and**
4. **Improve, and make more transparent, the federal government's enforcement efforts.**

As the Task Force recognized at the outset, campus sexual assault is a complicated, multi-dimensional problem with no easy or quick solutions.  These initial recommendations do not purport to find or even identify all of them.  Our work is not over.[6]

---

[1]    Krebs, C.P., Lindquist, C.H., Warner, T.D., Fisher, B.S., & Martin, S.L. (2007). *The Campus Sexual Assault (CSA) Study*. Washington, DC: National Institute of Justice, U.S. Department of Justice.; Krebs, C.P., Lindquist, C.H., Warner, T.D., Fisher, B.S., & Martin, S.L. (2009). College Women's Experiences with Physically Forced, Alcohol- or Other Drug-Enabled, and Drug-Facilitated Sexual Assault Before and Since Entering College. *Journal of American College Health*, 57(6), 639-647.

[2]    Krebs et al., *The Campus Sexual Assault (CSA) Study*.

[3]    *Ibid.*

[4]    *Ibid.; see also* Kilpatrick, D.G., Resnick, H.S., Ruggiero, K.J., Conoscenti, L.M., & McCauley, J. (2007). *Drug Facilitated, Incapacitated, and Forcible Rape: A National Study*. Charleston, SC: Medical University of South Carolina, National Crime Victims Research & Treatment Center.

[5]    The *CSA Study* found that 6.1% of college males were victims of ether attempted or completed sexual assault. Although many advocates prefer to use the term "survivor" to describe an individual who has been sexually assaulted, the term "victim" is also widely used.  This document uses the terms interchangeably and always with respect for those who have been subjected to these crimes.

[6]    This first Task Force report focuses on sexual assault at postsecondary institutions – such as colleges, universities, community colleges, graduate and professional schools, and trade schools – that receive federal financial assistance. Thus, our use of the term "schools" refers to these postsecondary institutions.

# Our First Task: Listening

Many people are committed to solving this problem. To hear as many of their views as possible, the Task Force held 27 listening sessions (12 webinars and 15 in-person meetings) with stakeholders from across the country: we heard from survivors; student activists; faculty, staff and administrators from schools of all types; parents; alumni; national survivors' rights and education associations; local and campus-based service providers and advocates; law enforcement; civil rights activists; school general counsels; men's and women's groups; Greek organizations; athletes; and researchers and academics in the field. Thousands of people joined the conversation.

Not surprisingly, no one idea carried the day. But certain common themes did emerge. Many schools are making important strides and are searching in earnest for solutions. A new generation of student activists is effectively pressing for change, asking hard questions, and coming up with innovative ways to make our campuses safer.

Even so, many problems loom large. Prevention and education programs vary widely, with many doing neither well. And in all too many instances, survivors of sexual violence are not at the heart of an institution's response: they often do not have a safe, confidential place to turn after an assault, they haven't been told how the system works, and they often believe it is working against them. We heard from many who reached out for help or action, but were told they should just put the matter behind them.

Schools, for their part, are looking for guidance on their legal obligations and best practices to keep students safe. Many participants called on the federal government to improve and better coordinate our enforcement efforts, and to be more transparent. And there was another constant refrain: get men involved. Most men are not perpetrators – and when we empower men to speak up and intervene when someone's in trouble, they become an important part of the solution.

## I. How Best to Identify the Problem: Campus Climate Surveys

When then-Senator Joe Biden wrote the Violence Against Women Act 20 years ago, he recognized a basic truth: no problem can be solved unless we name it and know the extent of it. That is especially true when it comes to campus sexual assault, which is chronically underreported: only 2% of incapacitated sexual assault survivors, and 13% of forcible rape survivors, report the crime to campus or local law enforcement.[7]

The reasons for non-reporting (whether to a school or to law enforcement) vary. Many survivors of acquaintance rape don't call what happened to them rape and often blame themselves. One report found that 40% of college survivors feared reprisal by the perpetrator.[8] Survivors also cite

---

[7]    Krebs et al., *The Campus Sexual Assault (CSA) Study*.
[8]    Sampson, Rana (2002). *Acquaintance Rape of College Students*; Washington, DC: Office of Community Oriented Policing Services, U.S. Department of Justice.

fear of treatment by authorities, not knowing how to report, lack of independent proof, and not wanting families or other students to find out what happened.[9]  Still others don't report because they don't want to participate in a formal college adjudication process.[10]

For colleges and universities, breaking the cycle of violence poses a unique challenge.  When a school tries to tackle the problem – by acknowledging it, drawing attention to it, and encouraging survivors to report – it can start to look like a dangerous place.  On the flip side, when a school ignores the problem or discourages reporting (either actively or by treating survivors without care), it can look safer.  Add to this the competition for top students or a coveted spot on a college rankings list – and a school might think it can outshine its neighbor by keeping its problem in the shadows.

We have to change that dynamic.

Schools have to get credit for being honest – and for finding out what's really happening on campus.  Reports to authorities, as we know, don't provide a fair measure of the problem.  But a campus climate survey can.  When done right, these surveys can gauge the prevalence of sexual assault on campus, test students' attitudes and awareness about the issue, and provide schools with an invaluable tool for crafting solutions.  And so:

- **We are providing schools with a new toolkit for developing and conducting a climate survey**. This guide explains the methods for conducting an effective survey – and contains a set of evidence-based sample questions to get at the answers.

- **We call on colleges and universities to voluntarily conduct the survey next year.** Again, a school that is willing to get an accurate assessment of sexual assault on its campus is one that's taking the problem – and the solution – seriously.  Researchers recommend that schools conduct the survey in the winter or spring semesters, rather than when students first arrive on campus in the fall.

  Rutgers University, with its leading research institute on violence against women,[11] will pilot and evaluate the survey.  Also, the Justice Department's Office on Violence Against Women will work with its campus grantees to conduct the survey and evaluate it.  And the Bureau of Justice Statistics will further refine the survey methodology.
  What we learn from these pilots, evaluations, and schools' experiences will chart the path forward for everyone – and will culminate in a survey for all to use.

- **We will explore legislative or administrative options to require colleges and universities to conduct an evidence-based survey in 2016.**  A mandate for schools to periodically conduct a climate survey will change the national dynamic: with a better picture of what's really happening on campus, schools will be able to more effectively tackle the problem and measure the success of their efforts.

---

[9]     Krebs et al., *The Campus Sexual Assault (CSA) Study*.
[10]    *Ibid.*
[11]    The Center on Violence Against Women & Children at the School of Social Work.

# II. Preventing Sexual Assault on Campus

Participants in our listening sessions roundly urged the Task Force to make prevention a top priority. Some even suggested that if prevention and education efforts don't start earlier, it's too late by the time students get to college. While we certainly agree that this work should begin early, the college years, too, are formative. During this transition to adulthood, attitudes and behaviors are created or reinforced by peer groups. And students look to coaches, professors, administrators, and other campus leaders to set the tone. If we get this right, today's students will leave college knowing that sexual assault is simply unacceptable. And that, in itself, can create a sea change.

Federal law now requires schools to provide sexual assault prevention and awareness programs.[12] To help colleges and universities in this endeavor, we are providing schools with new guidance and tools.

- **Best practices for better prevention.** The Centers for Disease Control and Prevention (CDC) conducted a systematic review of primary prevention strategies for reducing sexual violence, and is releasing an advance summary of its findings. CDC's review summarizes some of the best available research in the area, and highlights evidence-based prevention strategies that work, some that are promising, and – importantly – those that don't work. The report points to steps colleges can take now to prevent sexual assault on their campuses.

   Among other things, CDC's review shows that effective programs are those that are sustained (not brief, one-shot educational programs), comprehensive, and address the root individual, relational and societal causes of sexual assault. It also includes a listing of prevention programs being used by colleges and universities across the country, so schools can better compare notes about effective and encouraging approaches.[13]

- **Getting everyone to step in: bystander intervention.** Among the most promising prevention strategies – and one we heard a lot about in our listening sessions – is bystander intervention. Social norms research reveals that men often misperceive what other men think about this issue: they overestimate their peers' acceptance of sexual assault and underestimate other men's willingness to intervene when a woman is in trouble.[14] And when men think their peers don't object to abusive behavior, they are

---

[12] *See* 20 U.S.C. § 1092(f) (The Jeanne Clery Disclosure of Campus Security and Campus Crimes Statistics Act, commonly known as the Clery Act). The Department of Education is currently engaged in negotiated rule-making to implement the VAWA 2013 amendments to the Clery Act that require schools to provide education and awareness programs and to improve their campus security policies. Rule-making is scheduled to be completed in 2015, but schools are expected to make a good faith effort now to meet the new requirements.

[13] For a concise and complementary factsheet on prevention strategies, *see* http://notalone.gov/assets/prevention-overview.pdf.

[14] Berkowitz, A.D. (2010) "Fostering Healthy Norms to Prevent Violence and Abuse: The Social Norms Approach." Accessed from: http://www.alanberkowitz.com/articles/Preventing%20Sexual%20Violence%20Chapter%20-%20Revision.pdf

much less likely to step in and help. Programs like *Bringing in the Bystander*[15] work to change those perspectives – and teach men (and women) to speak out against rape myths (*e.g.*, women who drink at parties are "asking for it") and to intervene if someone is at risk of being assaulted.

- o **To help enlist men as allies, we are releasing [a Public Service Announcement](#) featuring President Obama, Vice President Biden, and celebrity actors.** The message of the PSA is simple: if she doesn't consent – or can't consent – it's a crime. And if you see it happening, help her, don't blame her, speak up. We particularly urge men's groups, Greek organizations, coaches, alumni associations, school officials and other leaders to use the PSA to start campus conversations about sexual assault.

- o **To help keep these conversations going, we are [providing a basic factsheet on bystander intervention](#).** In addition to the CDC summary, this document identifies the messages and skills that effective programs impart, describes the various ways to get the word out (in-person workshops, social marketing campaigns, online training, interactive theater) and provides links to some of the more promising programs out there.

- **Developing new prevention strategies.** More research is needed to develop and evaluate evidence-based programming to prevent sexual violence on campus. And so:

  - o In Fall 2014, the CDC, in collaboration with the Justice Department's Office on Violence Against Women and the Department of Education, will convene a panel of experts to identify emerging, promising practices to prevent sexual assault on campus. CDC will then convene pilot teams to put the consensus recommendations into practice.

  - o The Justice Department's Office on Violence Against Women (OVW) is developing a multi-year initiative on campus sexual assault which, among other things, will test and evaluate prevention programs used by its campus grantees. Grantees will work with OVW and technical assistance experts to meet core standards and evaluate the results. The next group of campus grantees will be selected by October 2014.

  - o In 2015, the CDC will solicit proposals to identify, and fill, gaps in the research on sexual violence prevention.

---

[15]   Banyard, V. L., Moynihan, M. M., & Plante, E. G. (2007). Sexual violence prevention through bystander education: An experimental evaluation. *Journal of Community Psychology*, 35, 463-481

# III. Responding Effectively When a Student is Sexually Assaulted

Sexual assault is a crime – and while some survivors turn to the criminal justice system, others look to their schools for help or recourse. Under federal law, when a school knows or reasonably should know that one of its students has been sexually assaulted, it is obligated to act. These two systems serve different (though often overlapping) goals. The principal aim of the criminal system is to adjudicate a defendant's guilt and serve justice. A school's responsibility is broader: it is charged with providing a safe learning environment for all its students – and to give survivors the help they need to reclaim their educations. And that can mean a number of things – from giving a victim a confidential place to turn for advice and support, to effectively investigating and finding out what happened, to sanctioning the perpetrator, to doing everything we can to help a survivor recover. The Task Force is taking the following steps:

## Giving Survivors More Control: Reporting and Confidentially Disclosing What Happened

Sexual assault survivors respond in different ways. Some are ready to make a formal complaint right away, and want their school to move swiftly to hold the perpetrator accountable.

Others, however, aren't so sure. Sexual assault can leave victims feeling powerless – and they need support from the beginning to regain a sense of control. Some, at least at first, don't want their assailant (or the assailant's friends, classmates, teammates or club members) to know they've reported what happened. But they do want someone on campus to talk to – and many want to talk in confidence, so they can sort through their options at their own pace. If victims don't have a confidential place to go, or think a school will launch a full-scale investigation against their wishes, many will stay silent.

In recent years, some schools have directed nearly all their employees (including those who typically offer confidential services, like rape crisis and women's centers) to report all the details of an incident to school officials – which can mean that a survivor quickly loses control over what happens next. That practice, however well-intentioned, leaves survivors with fewer places to turn.

This is, by far, the problem we heard most about in our listening sessions. To help solve it:

- **Schools should identify trained, confidential victim advocates who can provide emergency and ongoing support.** This is a key "best practice." The person a victim talks to first is often the most important. This person should understand the dynamics of sexual assault and the unique toll it can take on self-blaming or traumatized victims. The advocate should also be able to help get a victim needed resources and accommodations, explain how the school's grievance and disciplinary system works, and help navigate the process. As many advocates have learned over the years, after survivors receive initial, confidential support, they often decide to proceed with a formal complaint or cooperate in an investigation.

- **We are also providing schools with a sample reporting and confidentiality protocol.** A school, of course, must make any policy its own – but a few guiding principles should universally apply. As noted, some sexual assault survivors are ready to press forward with a formal (or even public) complaint, while others need time and privacy to heal. There is no one-size-fits-all model of victim care. Instead, there must be options.

  That means, at a minimum, that schools should make it clear, up front, who on campus will (or will not) share what information with whom. And a school's policy should also explain when it may need to override a request for confidentiality (and pursue an alleged perpetrator) in order to provide a safe campus for everyone. The watchword here is clarity: both confidential resources and formal reporting options should be well and widely publicized – so a victim can make an informed decision about where best to turn.

  And in all cases, the school must respond. When a student wants the school to take action against an offender – or to change dorms or working arrangements – the school must take the allegation seriously, and not dissuade a report or otherwise keep the survivor's story under wraps. Where a survivor does not seek a full investigation, but just wants help to move on, the school needs to respond there, too. And because a school has a continuing obligation to address sexual violence campus-wide, it should always think about broader remedial action – like increasing education and prevention efforts (including to targeted groups), boosting security and surveillance at places where students have been sexually assaulted, and/or revisiting its policies and practices.

## Developing a Comprehensive Sexual Misconduct Policy

Every college and university should have an easily accessible, user-friendly sexual misconduct policy. As the Task Force recognizes, there is no one approach that suits every school – but as we also learned, many schools don't have adequate policies. To help:

- **We are providing schools with a checklist for a sexual misconduct policy.** This checklist provides both a suggested process for developing a policy, as well as the key elements a school should consider in drafting one. Importantly, schools should bring all the key stakeholders to the table – including students, survivors, campus security, law enforcement, resident advisors, student groups (including LGBTQ groups), on-campus advocates, and local victim service providers. Effective policies will vary in scope and detail, but an inclusive process is common to all.

  We have not endeavored with this checklist to provide schools with all the answers: again, depending on its size, mission, student body, location, administrative structure and experience, a school community needs to tailor the checklist and make the policy its own.

- **By September 2014, the Task Force will provide samples of promising policy language on several other key issues.** While all schools are different, we have identified several challenging areas (in addition to confidentiality) where sample language could be helpful. These include definitions of various forms of sexual misconduct; the role of the

Title IX coordinator (recognizing that there may be various appropriate models for different schools); and the proper immediate, interim and long-term measures a school should take on behalf of survivors, whether or not they seek a full investigation.

## Training for School Officials

Sexual assault can be hard to understand. Some common victim responses (like not physically resisting or yelling for help) may seem counter-intuitive to those unfamiliar with sexual victimization. New research has also found that the trauma associated with rape or sexual assault can interfere with parts of the brain that control memory – and, as a result, a victim may have impaired verbal skills, short term memory loss, memory fragmentation, and delayed recall.[16] This can make understanding what happened challenging.

Personal biases also come into play. Insensitive or judgmental comments – or questions that focus on a victim's behavior (*e.g.*, what she was wearing, her prior sexual history) rather than on the alleged perpetrator's – can compound a victim's distress.

Specialized training, thus, is crucial. School officials and investigators need to understand how sexual assault occurs, how it's perpetrated, and how victims might naturally respond both during and after an assault. To help:

- **By September 2014, the Justice Department's Center for Campus Public Safety will develop a training program for campus officials involved in investigating and adjudicating sexual assault cases.** The Clery Act requires these officials to receive annual training on sexual assault (and also on domestic violence, dating violence and stalking). The Center will develop a trauma-informed training program consistent with the new requirements.

- **By June 2014, the Justice Department's Office on Violence Against Women will launch a comprehensive online technical assistance project for campus officials.** Key topics will include victim services, coordinated community responses, alcohol and drug-facilitated sexual assaults, and Clery Act compliance. Webinars and materials will include the latest research, promising practices, training opportunities, policy updates, prevention programming, and recent publications. The project will feature strategies and training materials for campus and local law enforcement.

- **By December 2014, the Department of Education, through the National Center on Safe and Supportive Learning Environments, will develop trauma-informed training materials for campus health center staff.** Often, campus health centers are the first responders for victims of sexual assault. Services will vary according to the

---

[16] Bremner, J.D., Elzinga, B., Schmahl, C., & Vermetten, E. (2008). Structural and functional plasticity of the human brain in posttraumatic stress disorder. *Progress in Brain Research*. *167*(1), 171-186; Nixon, R. D., Nishith, P., & Resick, P. A. (2004). The Accumulative Effect of Trauma Exposure on Short-Term and Delayed Verbal Memory in a Treatment-Seeking Sample of Female Rape Victims. *Journal of Traumatic Stress*, *17*(1), 31-35.

school's resources, but all staff should be trained on trauma-informed care – and these materials will help.

## New Investigative and Adjudicative Protocols: Better Holding Offenders Accountable

Separate and apart from training, we also need to know more about what investigative and adjudicative *systems* work best on campus: that is, who should gather the evidence; who should make the determination whether a sexual assault occurred; who should decide the sanction; and what an appeals process, if the school has one, should look like.

Schools are experimenting with new ideas. Some are adopting different variations on the "single investigator" model, where a trained investigator or investigators interview the complainant and alleged perpetrator, gather any physical evidence, interview available witnesses – and then either render a finding, present a recommendation, or even work out an acceptance-of-responsibility agreement with the offender. These models stand in contrast to the more traditional system, where a college hearing or judicial board hears a case (sometimes tracking the adversarial, evidence-gathering criminal justice model), makes a finding, and decides the sanction.

Preliminary reports from the field suggest that these innovative models, in which college judicial boards play a much more limited role, encourage reporting and bolster trust in the process, while at the same time safeguarding an alleged perpetrator's right to notice and to be heard. To evaluate these ideas:

- **By October 2014, the Justice Department's Office on Violence Against Women and National Institute of Justice will begin assessing models for investigating and adjudicating campus sexual assault cases, and identify promising practices.** OVW will also further test and evaluate these models through its campus grantees – which will be selected by October 2014.

- **On April 29, 2014, the Justice Department's SMART Office will release a solicitation for a pilot sex offender treatment program targeting college perpetrators.** Research suggests that treatment can be effective in reducing recidivism among offenders, yet no programs currently exist for the college population. Regardless of campus-imposed sanctions, we need to help reduce the risk that young perpetrators will offend again. This first-of-its kind pilot project holds out new hope for reducing sexual violence on campuses.

## Providing Comprehensive Support: Partnering with the Community

**Rape Crisis Centers.** Sexual assault survivors often need a variety of services, both immediate and long-term, to help them regain a sense of control and safety. While some schools may be able to provide comprehensive trauma-informed services on campus, others may need to partner with community-based organizations.

Regardless of where they are provided, certain key elements should be part of a comprehensive victim-services plan.  Because students can be assaulted at all hours of the day or night, crisis intervention services should be available 24 hours a day, too.  Survivors also need advocates who can accompany them to medical and legal appointments.  And because, for some survivors, the road to recovery is neither short nor easy, longer-term clinical therapies can be crucial.

Rape crisis centers can help schools better serve their students.  These centers often provide crisis intervention, 24-hour services, longer-term therapy, support groups, accompaniment to appointments, and community education.  Rape crisis centers can also help schools train students and employees and assist in developing prevention programs.  And so:

- **To help schools build these partnerships, we are providing a sample Memorandum of Understanding (MOU) with a local rape crisis center.**  Schools can adapt this MOU depending on their specific needs and the capacity of a local center.

- **To help schools develop or strengthen on-campus programs, we are also providing a summary of promising practices in victim services.**  This guide reviews the existing research on sexual assault services and outlines the elements of an effective victim services program.

- **To assist Tribal Colleges and Universities (TCUs) with victim services, the Justice Department's Office on Violence Against Women will continue to prioritize TCUs in its campus grant program solicitations.**  OVW is working to raise awareness of funding opportunities by engaging with leading tribal organizations and partnering with the White House Initiative on American Indian and Alaska Native Education.  OVW will also work with tribal domestic violence and sexual assault coalitions to provide TCUs with technical assistance on victim services.

**Local Law Enforcement.**  At first blush, many may ask why all cases of sexual assault are not referred to the local prosecutor for criminal prosecution.  Some, of course, are – but for many survivors, the criminal process simply does not provide the services and assistance they need to get on with their lives or to get their educations back on track.  There are times, however, when the local police and a school may be simultaneously pursuing a case.  A criminal investigation does not relieve a school of its independent obligation to conduct its own investigation – nor may a school wait for a criminal case to conclude to proceed.  Cooperation in these situations, thus, is critical.  So:

- **By June 2014, we will provide schools with a sample Memorandum of Understanding (MOU) with local law enforcement.**  An MOU can help open lines of communication and increase coordination among campus security, local law enforcement and other community groups that provide victim services.  An MOU can also improve security on and around campus, make investigations and prosecutions more efficient, and increase officers' understanding of the unique needs of sexual assault victims.

## Developing a Research Collaborative: Enlisting School Researchers to Find New Solutions

Many schools have research institutes that can measurably improve our thinking about sexual assault. Schools are uniquely suited to identify gaps in the research and develop methods to address them. To lead by example, three universities have committed to developing research projects that will better inform their response to the problem and contribute to the national body of work on campus sexual assault:

- The Johns Hopkins University School of Nursing will study sexual assault among student intimate partners, including LGBTQ relationships.

- The University of Texas at Austin School of Social Work will develop and evaluate training for campus law enforcement and examine the effectiveness of Sexual Assault Response Teams.

- The University of New Hampshire Prevention Innovations Center will design and evaluate a training program for incoming students on sexual assault policies and expectations for student conduct.

We invite others to join this collaborative – and to add their own research brains and resources toward finding solutions.

## IV. Improving the Federal Government's Enforcement Efforts, and Making Them More Transparent

The federal government plays an important role in combatting sexual violence. And as we outlined in our recent report, "Rape and Sexual Assault: A Renewed Call to Action," this Administration has taken aggressive action on many fronts.

We need to build on these efforts. To better address sexual assault at our nation's schools, we need to both strengthen our enforcement efforts and increase coordination among responsible federal agencies. Also, and importantly, we need to improve our communication with students, parents, school administrators, faculty, and the public, by making our efforts more transparent.

## Some Background on the Laws

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, requires schools that receive federal financial assistance to take necessary steps to prevent sexual assault on their campuses, and to respond promptly and effectively when an assault is reported. Title IV of the 1964 Civil Rights Act, 42 U.S.C. § 2000c *et seq.*, also requires public schools to respond to sexual assaults committed against their students. The Clery Act requires colleges and

universities that participate in federal financial aid programs to report annual statistics on crime, including sexual assault and rape, on or near their campuses, and to develop and disseminate prevention policies.[17]

The Department of Education's Office for Civil Rights (OCR) is charged with administrative enforcement of Title IX in schools receiving financial assistance from the Department. OCR may initiate an investigation either proactively or in response to a formal complaint. If OCR finds a Title IX violation, the school risks losing federal funds. In these cases, OCR must first seek to voluntarily resolve the non-compliance before terminating funds. Through this voluntary resolution process, OCR has entered into agreements that require schools to take a number of comprehensive steps to remedy the problem on their campuses.

The Department of Education's Federal Student Aid (FSA) office is responsible for enforcing the Clery Act, and conducts on-site reviews to ensure compliance. If a school is found to have violated Clery, FSA directs it to take steps to comply and can impose fines for violations.

The Justice Department (DOJ) is responsible for coordinating enforcement of Title IX across all federal agencies. DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools receiving DOJ financial assistance. If schools are found to violate Title IX and a voluntary resolution cannot be reached, DOJ can initiate litigation, including upon referral from other federal agencies, or seek to terminate DOJ funds. DOJ is also responsible for enforcing Title IV. DOJ can use its authority under Title IV, Title IX, and other federal civil rights statutes to bring all facets of a school, including its campus police, and local police departments into compliance with the law. DOJ can also intervene, file amicus briefs, and/or file statements of interest in court cases involving these statutes.

## Improving Transparency and Information-sharing

The Administration is committed to making our enforcement efforts more transparent, and getting schools and students more resources. And so:

- **The Task Force is launching a dedicated website – NotAlone.gov – to make enforcement data public and to make other resources accessible to students and schools.** Although many tools and resources exist, students and schools often haven't been able to access them – either because the materials haven't been widely available or because they are too hard to find. Today, we are changing that.

  Our new website will give students a clear explanation of their rights under Title IX and Title IV, along with a simple description of how to file a complaint with OCR and DOJ and what they should expect throughout the process. It will help students wade through often complicated legal definitions and concepts, and point them toward people who can give them confidential advice – and those who can't.

---

[17] Other laws also authorize the Justice Department to investigate campus sexual assaults and help campus police as well as local, tribal and state law enforcement adopt comprehensive policies and practices to address the problem. These include the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141; and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.

The website will also put in one central place OCR resolution letters and agreements (except those that raise individual privacy concerns), and all DOJ federal court filings, including complaints, motions, and briefs, consent decrees, and out-of-court agreements (which are also available on DOJ's website). These documents will be posted as a matter of course, so students, school officials, and other stakeholders can easily access the most current agreements.

The website will also contain the relevant guidance on a school's federal obligations, best available evidence and research on prevention programs, and sample policies and model agreements.

Finally, the website will have trustworthy resources from outside the government – like hotline numbers and mental health services locatable by simply typing in a zip code. It will also have a list of resources broken down by issue – like advocacy/survivor services, student groups, or LGBTQ resources – so someone can find more issue-specific information.

- **The Task Force will continue to work with developers and advocates to find ways that tech innovations can help end the violence.** On April 11, more than 60 innovators, technologists, students, policy experts, and survivors of sexual assault gathered at the White House for a "Data Jam" to brainstorm new ways to use technology to shed light on campus sexual assault and better support survivors.

- **Federal agencies are making datasets relevant to sexual assault readily available.** In keeping with the Administration's open data pledge, federal agencies, including the Departments of Education, Justice, Interior, and Health & Human Services have made public more than 100 datasets related to sexual assault and higher education. These datasets include survey results related to sexual violence, program evaluations, and guidance documents. This data is posted on data.gov.

- **The Department of Education is taking additional steps to make its activities more transparent.** As noted, OCR is posting nearly all recent resolution letters and agreements with schools on its website. OCR will also make public the schools that are under OCR investigation, including those that involve Title IX sexual violence allegations. This information will be made available by contacting the Department of Education.

- **The Department of Education will collect and disseminate a list of Title IX coordinators by next year.** Every school must designate at least one employee to coordinate its efforts to carry out its Title IX responsibilities. Although schools must notify students of the name and contact information of the Title IX coordinator, there is no central, national repository of coordinator contact information. The Department of Education's Office of Postsecondary Education and OCR will collect and disseminate the list of higher education Title IX coordinators annually so anyone can easily locate a coordinator. This information will also encourage coordinators to talk to each other and share positive practices to Title IX compliance.

## Improving Our Enforcement Efforts

The Administration is also committed to improving, and better coordinating, our enforcement efforts. And so:

- **The Department of Education is providing more clarity on schools' obligations under Title IX.** In April 2011, OCR [issued groundbreaking guidance](#) to schools on their obligations to prevent and respond to sexual violence under Title IX. Since then, schools and students have asked for further guidance and clarity – and, today, OCR is [issuing its answers](#) to these frequently asked questions.

  Among many other topics, this new guidance clarifies that:

  - Title IX protects all students, regardless of their sexual orientation or gender identity, immigration status, or whether they have a disability;
  - non-professional on-campus counselors and advocates – like those who work or volunteer in on-campus sexual assault centers, victim advocacy offices, women's centers and health centers – can generally talk to a survivor in confidence;
  - questioning or evidence about the survivor's sexual history with anyone other than the alleged perpetrator should not be permitted during a judicial hearing;
  - adjudicators should know that the mere fact of a previous consensual dating or sexual relationship does not itself imply consent or preclude a finding of sexual violence; and
  - the parties should not be allowed to personally cross-examine each other.

  The Q&A also discusses (again, among many other topics) college employees' reporting obligations; the role of the Title IX coordinator; how a school should conduct investigations; and Title IX training, education and prevention.

- **The Department of Education is strengthening its enforcement procedures.** OCR has made changes to its enforcement procedures.[18]

  Among other things, OCR is instituting time limits for negotiating voluntary resolution agreements. By law, OCR is required to pursue a voluntary resolution with a school before initiating an enforcement action. Although this process is usually much faster than litigation, it can also take time and, as a result, be frustrating for survivors who typically remain on campus or enrolled in school for a limited time. To help guard against the risk that a school may extend negotiations to delay enforcement, OCR is placing a 90-day limit on voluntary resolution agreement negotiations where it has found a school in violation of Title IX.

  OCR's procedures also now make explicit that schools should provide survivors with interim relief – such as changing housing or class schedules, issuing no-contact orders, or providing counseling – pending the outcome of an OCR investigation. OCR will also be

---

[18] *See* http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

more visible on campus and reach out to more students and school officials during its investigations, in order to get a fuller picture as to whether or not there is a problem on campus.

- **The Department of Education is also clarifying how key federal laws intersect.** In addition to Title IX and the Clery Act, the Family Educational Rights and Privacy Act (FERPA),[19] which protects the privacy of student education records, can also come into play in campus sexual violence investigations. In response to requests for guidance, the Department of Education has created a chart outlining a school's reporting obligations under Title IX and the Clery Act, and how each intersects with FERPA. The chart shows that although the requirements of Title IX and the Clery Act may differ in some ways, they don't conflict.

- **The Departments of Education and Justice have entered into an agreement clarifying each agency's role vis-à-vis Title IX.** OCR and the Justice Department's Civil Rights Division (CRT) both enforce Title IX. To increase coordination and strengthen enforcement, the agencies have entered into a formal memorandum of understanding.[20]

- **The Department of Education offices responsible for Title IX and Clery Act enforcement have also entered into an agreement clarifying their respective roles.** As noted, the Federal Student Aid (FSA) office is responsible for Clery Act compliance, whereas OCR enforces Title IX. Sometimes, their efforts overlap. To clarify their roles and increase efficiency, FSA and OCR have formalized an agreement to ensure more efficient and effective handling of complaints and to facilitate information sharing.

## Next Steps

The action steps and recommendations highlighted in this report are the initial phase of an ongoing plan. The Task Force is mindful, for instance, of the continuing challenges schools face in meeting Title IX and Clery Act requirements. We will continue to work toward solutions, clarity, and better coordination. We will also review the various laws and regulations that address sexual violence for possible regulatory or statutory improvements, and seek new resources to enhance enforcement. Also, campus law enforcement officials have special expertise – and they should be tapped to play a more central role. We will also consider how our recommendations apply to public elementary and secondary schools – and what more we can do to help there.

Our work continues.

---

[19]   20 U.S.C. § 1232g; 34 C.F.R. Part 99.
[20]   *See* http://www.justice.gov/crt/about/cor/ED_DOJ_MOU_TitleIX-04-29-2014.pdf.

"B"

| Location | SECTOR | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 42 | 9 | 8 |
| | Private nonprofit, 4-year or above | 2 | 2 | 6 |
| | Private for profit, 4-year or above | 0 | 0 | 0 |
| | Public, 2-year | 0 | 2 | 2 |
| | Private nonprofit, 2-year | 0 | 0 | 0 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 1 |
| | Private for profit, less-than-2-year | 1 | 0 | 0 |
| | Total | 45 | 13 | 17 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 6 | 1 | 3 |
| | Private nonprofit, 4-year or above | 1 | 0 | 1 |
| | Private for profit, 4-year or above | 0 | 0 | 0 |
| | Public, 2-year | 0 | 0 | 0 |
| | Private nonprofit, 2-year | 0 | 0 | 0 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 7 | 1 | 4 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 4 | 1 | 0 |
| | Private nonprofit, 4-year or above | 2 | 1 | 1 |
| | Private for profit, 4-year or above | 0 | 0 | 1 |
| | Public, 2-year | 0 | 2 | 0 |
| | Private nonprofit, 2-year | 0 | 0 | 0 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 6 | 4 | 2 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 5 | 6 | 3 |

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Private nonprofit, 4-year or above | 9 | 14 | 3 |
| Private for profit, 4-year or above | 0 | 0 | 0 |
| Public, 2-year | 0 | 3 | 4 |
| Private nonprofit, 2-year | 0 | 1 | 0 |
| Private for profit, 2-year | 1 | 0 | 0 |
| Public, less-than-2-year | 0 | 0 | 1 |
| Private nonprofit, less-than-2-year | 0 | 0 | 1 |
| Private for profit, less-than-2-year | 0 | 11 | 0 |
| Total | 15 | 35 | 12 |

| Total | 2007 | 2008 | 2009 |
|---|---|---|---|
| Public, 4-year or above | 51 | 16 | 11 |
| Private nonprofit, 4-year or above | 13 | 17 | 10 |
| Private for profit, 4-year or above | 0 | 0 | 1 |
| Public, 2-year | 0 | 7 | 6 |
| Private nonprofit, 2-year | 0 | 1 | 0 |
| Private for profit, 2-year | 1 | 0 | 0 |
| Public, less-than-2-year | 0 | 0 | 1 |
| Private nonprofit, less-than-2-year | 0 | 0 | 2 |
| Private for profit, less-than-2-year | 1 | 11 | 0 |
| Total | 66 | 52 | 31 |

Negligent Manslaughter

| Location | SECTOR | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 2 | 1 | 0 |
| | Private nonprofit, 4-year or above | 1 | 0 | 0 |
| | Private for profit, 4-year or above | 0 | 0 | 0 |
| | Public, 2-year | 0 | 0 | 0 |
| | Private nonprofit, 2-year | 0 | 1 | 0 |
| | Private for profit, 2-year | 0 | 1 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 3 | 3 | 0 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 0 | 0 | 0 |
| | Private nonprofit, 4-year or above | 1 | 0 | 0 |
| | Private for profit, 4-year or above | 0 | 0 | 0 |
| | Public, 2-year | 0 | 0 | 0 |
| | Private nonprofit, 2-year | 0 | 1 | 0 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 1 | 1 | 0 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 0 | 0 | 0 |
| | Private nonprofit, 4-year or above | 1 | 0 | 0 |
| | Private for profit, 4-year or above | 0 | 0 | 0 |
| | Public, 2-year | 0 | 0 | 0 |
| | Private nonprofit, 2-year | 0 | 0 | 0 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 1 | 0 | 0 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 2 | 2 | 1 |

Negligent Manslaughter

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Private nonprofit, 4-year or above | 0 | 0 | 2 |
| Private for profit, 4-year or above | 0 | 0 | 0 |
| Public, 2-year | 1 | 0 | 1 |
| Private nonprofit, 2-year | 0 | 0 | 0 |
| Private for profit, 2-year | 0 | 0 | 0 |
| Public, less-than-2-year | 0 | 0 | 0 |
| Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| Private for profit, less-than-2-year | 0 | 0 | 0 |
| Total | 3 | 2 | 4 |

Total

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Public, 4-year or above | 4 | 3 | 1 |
| Private nonprofit, 4-year or above | 2 | 0 | 2 |
| Private for profit, 4-year or above | 0 | 0 | 0 |
| Public, 2-year | 1 | 0 | 1 |
| Private nonprofit, 2-year | 0 | 1 | 0 |
| Private for profit, 2-year | 0 | 1 | 0 |
| Public, less-than-2-year | 0 | 0 | 0 |
| Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| Private for profit, less-than-2-year | 0 | 0 | 0 |
| Total | 7 | 5 | 4 |

Forcible Sex Offenses

| Location | SECTOR | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 1434 | 1322 | 1208 |
| | Private nonprofit, 4-year or above | 1088 | 1097 | 1137 |
| | Private for profit, 4-year or above | 16 | 9 | 8 |
| | Public, 2-year | 175 | 211 | 210 |
| | Private nonprofit, 2-year | 10 | 18 | 10 |
| | Private for profit, 2-year | 2 | 5 | 5 |
| | Public, less-than-2-year | 7 | 0 | 9 |
| | Private nonprofit, less-than-2-year | 0 | 2 | 2 |
| | Private for profit, less-than-2-year | 4 | 6 | 1 |
| | Total | 2736 | 2670 | 2590 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 947 | 913 | 867 |
| | Private nonprofit, 4-year or above | 846 | 876 | 849 |
| | Private for profit, 4-year or above | 12 | 7 | 5 |
| | Public, 2-year | 65 | 75 | 57 |
| | Private nonprofit, 2-year | 8 | 5 | 8 |
| | Private for profit, 2-year | 1 | 1 | 4 |
| | Public, less-than-2-year | 0 | 0 | 1 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 2 | 1 |
| | Total | 1879 | 1879 | 1792 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 194 | 157 | 206 |
| | Private nonprofit, 4-year or above | 74 | 90 | 76 |
| | Private for profit, 4-year or above | 10 | 7 | 13 |
| | Public, 2-year | 7 | 9 | 11 |
| | Private nonprofit, 2-year | 2 | 0 | 0 |
| | Private for profit, 2-year | 5 | 8 | 5 |
| | Public, less-than-2-year | 1 | 0 | 1 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 1 |
| | Private for profit, less-than-2-year | 1 | 0 | 0 |
| | Total | 294 | 271 | 313 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 169 | 130 | 118 |

Forcible Sex Offenses

| | 167 | 115 | 149 |
|---|---|---|---|
| Private nonprofit, 4-year or above | 167 | 115 | 149 |
| Private for profit, 4-year or above | 17 | 8 | 11 |
| Public, 2-year | 36 | 36 | 50 |
| Private nonprofit, 2-year | 3 | 2 | 3 |
| Private for profit, 2-year | 24 | 6 | 7 |
| Public, less-than-2-year | 3 | 11 | 14 |
| Private nonprofit, less-than-2-year | 0 | 0 | 4 |
| Private for profit, less-than-2-year | 29 | 21 | 25 |
| Total | 448 | 329 | 381 |

Total

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Public, 4-year or above | 1797 | 1609 | 1532 |
| Private nonprofit, 4-year or above | 1329 | 1302 | 1362 |
| Private for profit, 4-year or above | 43 | 24 | 32 |
| Public, 2-year | 218 | 256 | 271 |
| Private nonprofit, 2-year | 15 | 20 | 13 |
| Private for profit, 2-year | 31 | 19 | 17 |
| Public, less-than-2-year | 11 | 11 | 24 |
| Private nonprofit, less-than-2-year | 0 | 2 | 7 |
| Private for profit, less-than-2-year | 34 | 27 | 26 |
| Total | 3478 | 3270 | 3284 |

Nonforcible Sex Offenses

| Location | SECTOR | **2007** | **2008** | **2009** |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 23 | 12 | 41 |
| | Private nonprofit, 4-year or above | 8 | 16 | 11 |
| | Private for profit, 4-year or above | 2 | 0 | 1 |
| | Public, 2-year | 7 | 7 | 13 |
| | Private nonprofit, 2-year | 0 | 0 | 1 |
| | Private for profit, 2-year | 0 | 0 | 1 |
| | Public, less-than-2-year | 2 | 1 | 4 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 42 | 36 | 72 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 10 | 8 | 24 |
| | Private nonprofit, 4-year or above | 7 | 12 | 9 |
| | Private for profit, 4-year or above | 0 | 0 | 0 |
| | Public, 2-year | 1 | 4 | 3 |
| | Private nonprofit, 2-year | 0 | 0 | 1 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 18 | 24 | 37 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 1 | 3 | 1 |
| | Private nonprofit, 4-year or above | 11 | 6 | 4 |
| | Private for profit, 4-year or above | 2 | 1 | 0 |
| | Public, 2-year | 2 | 0 | 2 |
| | Private nonprofit, 2-year | 0 | 0 | 0 |
| | Private for profit, 2-year | 1 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 17 | 10 | 7 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 0 | 3 | 3 |

Nonforcible Sex Offenses

| | | | |
|---|---|---|---|
| Private nonprofit, 4-year or above | 0 | 1 | 5 |
| Private for profit, 4-year or above | 0 | 0 | 0 |
| Public, 2-year | 1 | 2 | 11 |
| Private nonprofit, 2-year | 0 | 0 | 0 |
| Private for profit, 2-year | 0 | 6 | 1 |
| Public, less-than-2-year | 0 | 0 | 0 |
| Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| Private for profit, less-than-2-year | 1 | 1 | 0 |
| Total | 2 | 13 | 20 |

| Total | 2007 | 2008 | 2009 |
|---|---|---|---|
| Public, 4-year or above | 24 | 18 | 45 |
| Private nonprofit, 4-year or above | 19 | 23 | 20 |
| Private for profit, 4-year or above | 4 | 1 | 1 |
| Public, 2-year | 10 | 9 | 26 |
| Private nonprofit, 2-year | 0 | 0 | 1 |
| Private for profit, 2-year | 1 | 6 | 2 |
| Public, less-than-2-year | 2 | 1 | 4 |
| Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| Private for profit, less-than-2-year | 1 | 1 | 0 |
| Total | 61 | 59 | 99 |

| Location | SECTOR | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 752 | 786 | 675 |
| | Private nonprofit, 4-year or above | 610 | 567 | 511 |
| | Private for profit, 4-year or above | 45 | 50 | 89 |
| | Public, 2-year | 290 | 294 | 275 |
| | Private nonprofit, 2-year | 22 | 24 | 23 |
| | Private for profit, 2-year | 89 | 72 | 90 |
| | Public, less-than-2-year | 24 | 12 | 11 |
| | Private nonprofit, less-than-2-year | 25 | 28 | 73 |
| | Private for profit, less-than-2-year | 75 | 106 | 118 |
| | Total | 1932 | 1939 | 1865 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 132 | 149 | 129 |
| | Private nonprofit, 4-year or above | 62 | 73 | 46 |
| | Private for profit, 4-year or above | 2 | 5 | 3 |
| | Public, 2-year | 50 | 37 | 19 |
| | Private nonprofit, 2-year | 0 | 3 | 0 |
| | Private for profit, 2-year | 1 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 2 | 0 | 1 |
| | Total | 249 | 267 | 198 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 129 | 86 | 83 |
| | Private nonprofit, 4-year or above | 87 | 82 | 64 |
| | Private for profit, 4-year or above | 30 | 36 | 42 |
| | Public, 2-year | 12 | 24 | 12 |
| | Private nonprofit, 2-year | 2 | 4 | 1 |
| | Private for profit, 2-year | 8 | 31 | 27 |
| | Public, less-than-2-year | 1 | 1 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 3 | 0 |
| | Private for profit, less-than-2-year | 5 | 1 | 2 |
| | Total | 274 | 268 | 231 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 754 | 565 | 685 |

| | | | |
|---|---|---|---|
| Private nonprofit, 4-year or above | 1166 | 987 | 880 |
| Private for profit, 4-year or above | 147 | 106 | 93 |
| Public, 2-year | 245 | 208 | 256 |
| Private nonprofit, 2-year | 20 | 22 | 21 |
| Private for profit, 2-year | 108 | 116 | 142 |
| Public, less-than-2-year | 27 | 33 | 27 |
| Private nonprofit, less-than-2-year | 29 | 27 | 93 |
| Private for profit, less-than-2-year | 254 | 269 | 356 |
| Total | 2750 | 2333 | 2553 |

**Total**

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Public, 4-year or above | 1635 | 1437 | 1443 |
| Private nonprofit, 4-year or above | 1863 | 1636 | 1455 |
| Private for profit, 4-year or above | 222 | 192 | 224 |
| Public, 2-year | 547 | 526 | 543 |
| Private nonprofit, 2-year | 44 | 50 | 45 |
| Private for profit, 2-year | 205 | 219 | 259 |
| Public, less-than-2-year | 52 | 46 | 38 |
| Private nonprofit, less-than-2-year | 54 | 58 | 166 |
| Private for profit, less-than-2-year | 334 | 376 | 476 |
| Total | 4956 | 4540 | 4649 |

| Location | SECTOR | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 1291 | 1207 | 1203 |
| | Private nonprofit, 4-year or above | 794 | 795 | 701 |
| | Private for profit, 4-year or above | 41 | 65 | 47 |
| | Public, 2-year | 477 | 428 | 473 |
| | Private nonprofit, 2-year | 70 | 86 | 46 |
| | Private for profit, 2-year | 43 | 38 | 69 |
| | Public, less-than-2-year | 30 | 30 | 82 |
| | Private nonprofit, less-than-2-year | 4 | 7 | 8 |
| | Private for profit, less-than-2-year | 22 | 33 | 46 |
| | Total | 2772 | 2689 | 2675 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 467 | 466 | 448 |
| | Private nonprofit, 4-year or above | 333 | 337 | 300 |
| | Private for profit, 4-year or above | 6 | 16 | 7 |
| | Public, 2-year | 100 | 96 | 74 |
| | Private nonprofit, 2-year | 4 | 8 | 6 |
| | Private for profit, 2-year | 1 | 2 | 6 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 1 | 0 | 0 |
| | Total | 912 | 925 | 841 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 249 | 146 | 153 |
| | Private nonprofit, 4-year or above | 173 | 161 | 115 |
| | Private for profit, 4-year or above | 38 | 47 | 63 |
| | Public, 2-year | 17 | 36 | 27 |
| | Private nonprofit, 2-year | 4 | 4 | 5 |
| | Private for profit, 2-year | 5 | 10 | 8 |
| | Public, less-than-2-year | 3 | 0 | 1 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 45 | 2 | 1 |
| | Total | 534 | 406 | 373 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 604 | 542 | 589 |

| | | | |
|---|---|---|---|
| Private nonprofit, 4-year or above | 732 | 612 | 575 |
| Private for profit, 4-year or above | 68 | 54 | 47 |
| Public, 2-year | 192 | 176 | 255 |
| Private nonprofit, 2-year | 22 | 14 | 21 |
| Private for profit, 2-year | 94 | 62 | 70 |
| Public, less-than-2-year | 20 | 53 | 36 |
| Private nonprofit, less-than-2-year | 9 | 10 | 32 |
| Private for profit, less-than-2-year | 166 | 209 | 308 |
| Total | 1907 | 1732 | 1933 |
| | 2007 | 2008 | 2009 |
| Public, 4-year or above | 2144 | 1895 | 1945 |
| Private nonprofit, 4-year or above | 1699 | 1568 | 1391 |
| Private for profit, 4-year or above | 147 | 166 | 157 |
| Public, 2-year | 686 | 640 | 755 |
| Private nonprofit, 2-year | 96 | 104 | 72 |
| Private for profit, 2-year | 142 | 110 | 147 |
| Public, less-than-2-year | 53 | 83 | 119 |
| Private nonprofit, less-than-2-year | 13 | 17 | 40 |
| Private for profit, less-than-2-year | 233 | 244 | 355 |
| Total | 5213 | 4827 | 4981 |

Total

Burglary

| Location | SECTOR | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 13591 | 13138 | 10816 |
| | Private nonprofit, 4-year or above | 12116 | 11766 | 9153 |
| | Private for profit, 4-year or above | 482 | 413 | 305 |
| | Public, 2-year | 3168 | 3422 | 2998 |
| | Private nonprofit, 2-year | 252 | 239 | 220 |
| | Private for profit, 2-year | 396 | 284 | 282 |
| | Public, less-than-2-year | 60 | 76 | 85 |
| | Private nonprofit, less-than-2-year | 23 | 21 | 38 |
| | Private for profit, less-than-2-year | 177 | 235 | 172 |
| | Total | 30265 | 29594 | 24069 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 7006 | 7023 | 5796 |
| | Private nonprofit, 4-year or above | 7007 | 6782 | 5620 |
| | Private for profit, 4-year or above | 76 | 86 | 60 |
| | Public, 2-year | 832 | 893 | 715 |
| | Private nonprofit, 2-year | 120 | 94 | 78 |
| | Private for profit, 2-year | 52 | 42 | 79 |
| | Public, less-than-2-year | 0 | 0 | 1 |
| | Private nonprofit, less-than-2-year | 2 | 2 | 0 |
| | Private for profit, less-than-2-year | 0 | 7 | 0 |
| | Total | 15095 | 14929 | 12349 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 1431 | 1264 | 1179 |
| | Private nonprofit, 4-year or above | 693 | 567 | 515 |
| | Private for profit, 4-year or above | 262 | 340 | 298 |
| | Public, 2-year | 97 | 110 | 127 |
| | Private nonprofit, 2-year | 34 | 25 | 10 |
| | Private for profit, 2-year | 35 | 30 | 47 |
| | Public, less-than-2-year | 4 | 1 | 2 |
| | Private nonprofit, less-than-2-year | 1 | 1 | 6 |
| | Private for profit, less-than-2-year | 26 | 4 | 28 |
| | Total | 2583 | 2342 | 2212 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 26 | 5 | 0 |

Burglary

| | | | |
|---|---|---|---|
| Private nonprofit, 4-year or above | 34 | 1 | 0 |
| Private for profit, 4-year or above | 16 | 1 | 0 |
| Public, 2-year | 21 | 10 | 0 |
| Private nonprofit, 2-year | 2 | 0 | 0 |
| Private for profit, 2-year | 5 | 0 | 0 |
| Public, less-than-2-year | 4 | 0 | 0 |
| Private nonprofit, less-than-2-year | 2 | 0 | 0 |
| Private for profit, less-than-2-year | 3 | 0 | 0 |
| Total | 113 | 17 | 0 |

| Total | | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| | Public, 4-year or above | 15048 | 14407 | 11995 |
| | Private nonprofit, 4-year or above | 12843 | 12334 | 9668 |
| | Private for profit, 4-year or above | 760 | 754 | 603 |
| | Public, 2-year | 3286 | 3542 | 3125 |
| | Private nonprofit, 2-year | 288 | 264 | 230 |
| | Private for profit, 2-year | 436 | 314 | 329 |
| | Public, less-than-2-year | 68 | 77 | 87 |
| | Private nonprofit, less-than-2-year | 26 | 22 | 44 |
| | Private for profit, less-than-2-year | 206 | 239 | 200 |
| | Total | 32961 | 31953 | 26281 |

Motor Vehicle Theft

| Location | SECTOR | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 2338 | 2079 | 1872 |
| | Private nonprofit, 4-year or above | 1015 | 890 | 871 |
| | Private for profit, 4-year or above | 105 | 97 | 77 |
| | Public, 2-year | 1175 | 1066 | 1141 |
| | Private nonprofit, 2-year | 43 | 28 | 22 |
| | Private for profit, 2-year | 131 | 111 | 153 |
| | Public, less-than-2-year | 17 | 4 | 22 |
| | Private nonprofit, less-than-2-year | 24 | 25 | 34 |
| | Private for profit, less-than-2-year | 77 | 70 | 78 |
| | Total | 4925 | 4370 | 4270 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 62 | 28 | 1 |
| | Private nonprofit, 4-year or above | 23 | 2 | 0 |
| | Private for profit, 4-year or above | 0 | 0 | 0 |
| | Public, 2-year | 4 | 0 | 0 |
| | Private nonprofit, 2-year | 1 | 0 | 0 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 1 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 1 |
| | Total | 91 | 30 | 1 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 327 | 204 | 194 |
| | Private nonprofit, 4-year or above | 145 | 158 | 99 |
| | Private for profit, 4-year or above | 63 | 90 | 136 |
| | Public, 2-year | 26 | 33 | 32 |
| | Private nonprofit, 2-year | 4 | 3 | 1 |
| | Private for profit, 2-year | 18 | 34 | 31 |
| | Public, less-than-2-year | 2 | 4 | 1 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 2 |
| | Private for profit, less-than-2-year | 2 | 6 | 12 |
| | Total | 587 | 532 | 508 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 1161 | 866 | 736 |

| | | | |
|---|---|---|---|
| Private nonprofit, 4-year or above | 978 | 746 | 818 |
| Private for profit, 4-year or above | 155 | 115 | 117 |
| Public, 2-year | 383 | 290 | 292 |
| Private nonprofit, 2-year | 17 | 14 | 5 |
| Private for profit, 2-year | 194 | 119 | 150 |
| Public, less-than-2-year | 16 | 35 | 30 |
| Private nonprofit, less-than-2-year | 27 | 14 | 34 |
| Private for profit, less-than-2-year | 292 | 243 | 327 |
| Total | 3223 | 2442 | 2509 |
| | 2007 | 2008 | 2009 |
| Public, 4-year or above | 3826 | 3149 | 2802 |
| Private nonprofit, 4-year or above | 2138 | 1794 | 1788 |
| Private for profit, 4-year or above | 323 | 302 | 330 |
| Public, 2-year | 1584 | 1389 | 1465 |
| Private nonprofit, 2-year | 64 | 45 | 28 |
| Private for profit, 2-year | 343 | 264 | 334 |
| Public, less-than-2-year | 35 | 43 | 53 |
| Private nonprofit, less-than-2-year | 51 | 39 | 70 |
| Private for profit, less-than-2-year | 371 | 319 | 417 |
| Total | 8735 | 7344 | 7287 |

Total

| Location | SECTOR | **2007** | **2008** | **2009** |
|---|---|---|---|---|
| Reporting Location | Sector of Institution | | | |
| On Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 471 | 433 | 403 |
| | Private nonprofit, 4-year or above | 224 | 193 | 183 |
| | Private for profit, 4-year or above | 1 | 0 | 2 |
| | Public, 2-year | 76 | 70 | 52 |
| | Private nonprofit, 2-year | 3 | 7 | 1 |
| | Private for profit, 2-year | 4 | 0 | 2 |
| | Public, less-than-2-year | 4 | 5 | 3 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 2 | 0 | 1 |
| | Total | 785 | 708 | 647 |
| Residence Halls (included in on-campus) | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 264 | 244 | 222 |
| | Private nonprofit, 4-year or above | 114 | 99 | 102 |
| | Private for profit, 4-year or above | 0 | 0 | 2 |
| | Public, 2-year | 10 | 13 | 9 |
| | Private nonprofit, 2-year | 1 | 5 | 1 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 0 | 0 |
| | Total | 389 | 361 | 336 |
| Non-Campus | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 39 | 35 | 20 |
| | Private nonprofit, 4-year or above | 14 | 6 | 8 |
| | Private for profit, 4-year or above | 1 | 3 | 3 |
| | Public, 2-year | 6 | 2 | 0 |
| | Private nonprofit, 2-year | 0 | 0 | 1 |
| | Private for profit, 2-year | 0 | 0 | 0 |
| | Public, less-than-2-year | 0 | 0 | 0 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 0 |
| | Private for profit, less-than-2-year | 0 | 1 | 0 |
| | Total | 60 | 47 | 32 |
| Public Property | | 2007 | 2008 | 2009 |
| | Public, 4-year or above | 32 | 28 | 28 |

Arson

| | | | |
|---|---|---|---|
| Private nonprofit, 4-year or above | 20 | 16 | 16 |
| Private for profit, 4-year or above | 7 | 2 | 2 |
| Public, 2-year | 7 | 10 | 11 |
| Private nonprofit, 2-year | 0 | 0 | 0 |
| Private for profit, 2-year | 1 | 4 | 1 |
| Public, less-than-2-year | 1 | 0 | 1 |
| Private nonprofit, less-than-2-year | 0 | 0 | 1 |
| Private for profit, less-than-2-year | 2 | 5 | 2 |
| Total | 70 | 65 | 62 |

| Total | | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| | Public, 4-year or above | 542 | 496 | 451 |
| | Private nonprofit, 4-year or above | 258 | 215 | 207 |
| | Private for profit, 4-year or above | 9 | 5 | 7 |
| | Public, 2-year | 89 | 82 | 63 |
| | Private nonprofit, 2-year | 3 | 7 | 2 |
| | Private for profit, 2-year | 5 | 4 | 3 |
| | Public, less-than-2-year | 5 | 5 | 4 |
| | Private nonprofit, less-than-2-year | 0 | 0 | 1 |
| | Private for profit, less-than-2-year | 4 | 6 | 3 |
| | Total | 915 | 820 | 741 |

"C"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY VILLAR<br>105 Cedar Avenue<br>Willow Grove, PA 19090 | :    CIVIL ACTION<br>:<br>:    NO. 2:14-CV-02558-NIQA<br>: |
|          Plaintiff, | :<br>: |
|          v. | :<br>: |
| PHILADELPHIA UNIVERSITY<br>4201 Henry Avenue<br>Philadelphia, PA 19144 | :<br>:    TRIAL BY JURY DEMANDED<br>: |
| and | : |
| JANE DOE, | : |
|          Defendants | : |

FILED

MAY 2 3 2014

MICHAEL E. KUNZ, Clerk
By _____Dep. Clerk

## AMENDED COMPLAINT

Plaintiff, Anthony Villar, by and through his attorney, William Spade,
Esquire, hereby files this Complaint and avers the following:

### I.  INTRODUCTION AND NATURE OF ACTION

1.  This case arises out of the actions taken and procedures
employed by Defendant Philadelphia University ("Philadelphia University")
concerning allegations made against Anthony Villar, a junior student at
Philadelphia University studying Biopsychology.  Anthony Villar was involved
for more than two years in a romantic and sexual relationship with another
Philadelphia University student named Jane Doe.  Ms. Doe spent the Fall
semester of 2013 in Denmark in a study abroad program.  She was
scheduled to return to Philadelphia on December 13, 2013, and Anthony was

going to pick her up from the airport. The day before, Anthony and Jane Doe had texted each other, discussing what to do upon her arrival the next day, and Anthony offered to make her Chicken Marsala at his apartment, to which Jane Doe enthusiastically agreed. On December 13, 2013, Anthony picked Jane Doe up at Philadelphia International Airport and they returned to his apartment in East Falls, Philadelphia. At his apartment, Anthony offered to give Jane Doe a massage. She agreed and he helped her to remove her clothes. During the massage, Anthony began to give Jane oral sex and then they had consensual sexual intercourse. This was something they had done hundreds of times over the past two years. That night, after the alleged sexual assault, Anthony and Jane drove to her parents house in a suburb of Philadelphia, where they had dinner together, celebrated Jane's return, and enjoyed each other's company. The next day, Jane invited Anthony to dinner with her parents near their home. After dinner, they returned to Jane's house and Anthony informed Jane that he had become romantically involved with another woman, Ruthanna Witherite, while Jane was away in Denmark. Two days later, Ms. Doe filed a complaint against Anthony with Philadelphia University, accusing him of having nonconsensual sex with her. On January 23, 2014, barely more than five weeks after these serious allegations were made, and after denying Anthony Villar's repeated requests for more time to prepare a defense to the charges, Philadelphia University held a perfunctory hearing, found Anthony Villar guilty of sexual misconduct, and expelled him.

    2.     When defendant Philadelphia University found Anthony Villar

2

guilty of sexual misconduct, Mr. Villar was not afforded due process and was discriminated against on the basis of his sex/gender.  Mr. Villar was rushed into a hearing a mere 37 days after the extremely serious allegation of sexual assault was made against him; he was misled into not participating in the hearing by his accuser, Jane Doe, and Philadelphia University, who falsely informed him that there was an ongoing criminal investigation of him by the Philadelphia Police Department at the time of the hearing; he was denied the effective assistance of any advisor; he was effectively denied cross-examination of his accuser, Jane Doe; and the hearing board announced its decision less than 45 minutes after the abbreviated, sham hearing, reflecting the lack of impartiality and the pre-judgment against an accused male student.  Defendant Philadelphia University failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to enable a male student to have a fair hearing before an impartial tribunal.  The decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached and expulsion ordered.

3.     Anthony Villar has been greatly damaged by his expulsion: his academic future is severely damaged; the money spent by him and his family to obtain a college education at Philadelphia University lost; and the real sacrifices made by Anthony Villar and his family so that he could obtain a college degree wasted.  Anthony Villar therefore brings this action for among other things, a violation of Title IX of the Education Amendments of 1972 and

various state laws.  He seeks declaratory, monetary and other appropriate
relief to redress the intentional violations by defendants Philadelphia
University and Jane Doe of his rights under the laws of the United States of
America and the Commonwealth of Pennsylvania.

## II.   JURISDICTION

4.     This action is brought pursuant to Title IX of the Education
Amendments of 1972, 20 U.S.C. §§ 1681-1688 (2011).

5.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(1)
and (3) and the aforementioned statutory and constitutional provisions.

6.     Jurisdiction over state law claims, based on supplemental
jurisdiction, is proper under 28 U.S.C. § 1367.

7.     The amount in controversy, exclusive of interest and costs,
exceeds the sum of One Hundred Fifty Thousand ($150,000.00) Dollars.

## III.   VENUE

8.     All the claims herein arose within the jurisdiction of the United
States District Court for the Eastern District of Pennsylvania and involve
defendants who reside within the jurisdiction limits.  Accordingly, venue is
proper under 28 U.S.C. § 1391(b)(1) and (b)(2).

## IV.   PARTIES

9.     Plaintiff Anthony Villar is an adult citizen of the United States,
who resides at 105 Cedar Avenue, Willow Grove, Pennsylvania 19090.

10.    Defendant Philadelphia University is a private University located
at 4201 Henry Avenue, Philadelphia, Pennsylvania 19144.  It receives funds

4

from the federal government.

11.     Defendant Jane Doe is an adult citizen of the United States, who resides in a suburb of Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania.

## V.     FACTS

## A.     The Two-Year Romantic Relationship Between Jane Doe and Anthony Villar.

12.     Anthony Villar and Jane Doe met in September, 2011, when they were both freshman at Philadelphia University and began a romantic relationship shortly thereafter.  As part of their relationship, they engaged in sexual intercourse several times per week and spent many nights together in their dormitory rooms and later, during their junior year, at Villar's apartment, which was near the Philadelphia University campus in the East Falls section of Philadelphia.

13.     During the Autumn semester of 2013, Ms. Doe studied abroad in Denmark.  She lived in Denmark from September, 2013, to December 13, 2013.  During the time that she was away, she and Anthony Villar spoke often by telephone and corresponded by electronic mail and texting.

14.     During the time period that Ms. Doe was in Denmark, Anthony Villar continued to be enrolled in Philadelphia University.  During this time, he became involved in a romantic relationship with another Philadelphia University student, Ruthanna Witherite.  Mr. Villar intended to tell Jane Doe about the relationship with Ms. Witherite when Ms. Doe returned from Denmark.

5

**B.    The Night of The Alleged Assault**

15.    On December 13, 2013, Jane Doe returned from Denmark, arriving at Philadelphia International Airport in the early evening.  She and Anthony Villar had texted each other the day before to discuss the details of him picking her up from the airport and what they intended to do on the evening of December 13, when they returned from the airport.  In one exchange, Anthony asked whether Jane wanted sushi or for him to make her Chicken Marsala.  Jane replied, "OOOOOO actually I'd rather have something you make :)"

16.    Jane's flight arrived at approximately 6:30 p.m. on December 13, 2013.  Anthony picked her up at the airport.  As they drove away from the airport, they discussed the fact that Jane's mother was having a small homecoming party for her at the family's house in the suburbs.

17.    They decided to stop at Anthony's apartment before going to Ms. Doe's family's house for the party.  At his apartment, Anthony offered to give Jane a massage to relax her because she had been traveling for approximately 20 hours and had been complaining of a sore back.  Jane agreed that she would like a massage.  Anthony helped Jane take off her clothes.  Jane was naked except for her underwear.

18.    During the course of the massage, Jane told Anthony how good it felt.  They then began to kiss.  Anthony kissed her all over her body and Jane responded positively.

19.    Anthony then removed Jane's underwear and told her he was

6

going to give her oral sex. Jane said he could, but told him to be gentle because she had not been sexually active for the several months she had been in Denmark. While Anthony gave her oral sex, Jane had an orgasm.

20.    They then kissed again and Jane performed oral sex on Anthony. Their lovemaking was the same as it had been during the two years that they had been together in a romantic relationship. They then began to have intercourse. The intercourse did not last long, however, because Anthony felt guilty about having become romantically involved with another woman. They attempted intercourse again a little later, but stopped because Jane said that it hurt. At no point during their lovemaking did Jane Doe ever tell Anthony to stop, except at the very end when she said that it was hurting her. At that point, Anthony immediately stopped having intercourse with her.

21.    After their lovemaking, Jane Doe took the unusual step for the victim of a sexual assault of bringing her alleged attacker home with her to her parents' house. They drove from East Falls to Jane's parents' house in the suburbs and then spent several hours socializing with Jane's mother and father and two of their acquaintances. The evening included dinner, conversation, and watching a movie together. During both the drive to the suburbs and the hours of socializing at her house, Jane Doe seemed happy and content and never complained to anyone present that she had just allegedly been sexually assaulted. After midnight, Anthony drove home by himself.

C.   **The Next Day, Jane Doe, Who Allegedly Had Been Sexually Assaulted By Anthony Villar the Previous Evening, Invited Him To Have Dinner With Her and Her Parents Again.**

22.   The next day, December 14, 2013, Jane Doe texted Anthony, the man who allegedly had sexually assaulted her less than twelve hours earlier, to invite him back up to her suburban town to have dinner with her and her parents, giving him directions to the restaurant at which they would meet.

23.   At approximately 5:00 p.m., Anthony met Jane and her parents at a restaurant near Jane's parents' house  They had dinner together.  There was amiable conversation and laughter.  After dinner, Jane Doe drove with Anthony, the man who had allegedly sexually assaulted her less than 24 hours earlier, back to her house while her parents drove in a separate car.

24.   Back at the house, Anthony and Jane talked some more at the kitchen table.  At one point, Jane leaned into Anthony's ear and whispered that she wanted him.  Jane's parents returned home and went to a separate part of the house.

25.   As Anthony and Jane talked, he saw her phone vibrate and saw that Ruthanna Witherite had sent Jane a text.  Anthony picked up Jane's phone and put it in his pocket.  Anthony then told Jane that he had become romantically and sexually involved with Ruthanna while Jane was studying abroad in Denmark.  Jane was silent.  Anthony then apologized for having become involved with Ruthanna, put Jane's phone on the table, and left.

D.     **Two Days After Learning That Her Boyfriend, Anthony Villar, Had Become Involved With Another Woman, Jane Doe Accused Him Of Sexual Assault To Defendant Philadelphia University, Which Then Rushed Anthony To A Hearing, At Which They Deceived Him Into Believing That There Was An Active Criminal Investigation With Him As The Target And Denied Him Due Process And A Fair and Unbiased Hearing Of Jane Doe's False Allegation.**

26.     On Monday, December 16, 2013, Jane Doe contacted Dean Mark Govoni of Philadelphia University and reported that Anthony had sexually assaulted her on Friday, December 13, 2013.

27.     Later in the day on December 16, 2013, Dean Govoni sent an email to Anthony stating that he needed to meet with him on an urgent matter. Anthony telephoned Dean Govoni and informed him that he had a final examination in one hour. Anthony requested that Dean Govoni tell him over the telephone why he needed to meet with him. Dean Govoni refused. Anthony was left to take his final examination in a distracted and emotionally upset state of mind. After he took his final examination, Anthony met with Dean Govoni, who informed him of Jane Doe's accusation. Dean Govoni then gave Anthony a brief description of the procedures that would be followed, specifically referring Anthony to the Sexual Misconduct Policy section of the Philadelphia University Student Handbook. Anthony was informed among other things that he could review the "investigative case file" before the hearing, but he would not be permitted to have a copy of any of the documents that constituted evidence in the case. He was also informed that he could bring a "support person" to the hearing, but that the support person could not "play an active role in the hearing, he/she serves as a second set of

9

ears."

28.    The hearing was scheduled for January 23, 2014, a mere five weeks after this most serious of allegations had been lodged against Anthony Villar. This extremely abbreviated time period between the notification of the charges against him and the hearing of those charges denied Anthony Villar the fundamental due process right of being able to effectively and completely investigate the accusations and prepare a defense to them.

29.    Philadelphia University's judicial procedures are woefully inadequate to provide male students accused of sexual assault due process in their investigation of and defense against these extremely serious charges, which can have adverse and extremely destructive consequences for the male student's entire life and economic future. For instance, Philadelphia University's judicial procedures deny the accused the right to legal counsel, providing instead that, "[b]ecause cases are often stressful and overwhelming . . . the respondent may request that a personal friend or associate accompany them at the hearing. This person has no role other than to advise and to provide moral support to the student and may not address the judicial hearing board." Thus, when a male student faces charges that can permanently destroy his reputation and future earning ability, he is permitted to have a friend present to provide moral support, but not a trained professional to defend him. Moreover, the accused is not permitted to have and possess copies of any of the documents being used to convict him prior to the hearing and thus is denied the opportunity to meaningfully investigate

10

and test the evidence against him.  Finally, the standard of proof pursuant to
which a male student may be found guilty of sexual assault is a
"preponderance of the evidence," a standard of proof much lower than the
"beyond a reasonable doubt" standard used in criminal cases in United States
courts.

     30.    On January 23, 2014, Anthony appeared for the hearing with an
attorney, whom he had retained.  Philadelphia University informed Anthony
Villar that the hearing would be recorded and that the entire file, including the
transcript of the hearing, could be made available through subpoena to any
state, federal, or local law enforcement agency.  Upon reviewing the
investigation file, the attorney noticed a notation that Jane Doe had
reported the alleged sexual assault to the Philadelphia Police Department.
There was a name of a specific Philadelphia Police Detective in the file.  Mr.
Villar's attorney immediately informed Dean Mark Govoni that Mr. Villar could
not participate in the hearing, since anything that he said at the recorded
hearing could be used against him by the Philadelphia Police Department and
District Attorney's Office should they at some future point decide to bring
criminal charges against him.  Mr. Villar's attorney requested a postponement
of the hearing until Mr. Villar was informed by Philadelphia County law
enforcement authorities that he would not be charged with a crime.  He
further told Dean Govoni that to proceed with the hearing while Anthony was
under active criminal investigation would deny Anthony due process since he
would not be able to defend himself.  Philadelphia University denied the

postponement request. Dean Govoni told Anthony Villar that the hearing would proceed "with Anthony or without him." Thus, defendant Philadelphia University had actual notice of its defective sexual misconduct hearing procedures and refused to correct the defects. Defendant Philadelphia University was deliberately indifferent to plaintiff Anthony Villar's rights.

31.     The hearing proceeded. The Sexual Misconduct Hearing Board, which consisted of one faculty member, one student, and one administrative staff member (two women and one man), conducted a perfunctory hearing that lasted less than 60 minutes. During that hearing, Anthony could not say anything in his own defense or cross-examine Jane Doe, due to his belief that he was the target of a criminal Investigation. At the end of the hearing, the Board "deliberated" for less than 45 minutes and then announced its pre-ordained decision of "guilty." The Board then announced the punishment as expulsion. The Board issued no written opinion documenting the reasons for its finding.

32.     Anthony Villar later learned though inquiries made to the Philadelphia Police Department that no criminal complaint had ever been lodged against him by Jane Doe. Upon information and belief, the notation in the Philadelphia University investigation file was a complete fabrication.

## VI.   AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN ANTHONY VILLAR AND PHILADELPHIA UNIVERSITY

33.     Prior to his enrollment at Philadelphia University, Anthony Villar was a successful high school student at Upper Moreland High School in Willow Grove, Pennsylvania.  When he graduated, he had a 3.65 grade point average in a course of study that included Advanced Placement English, Biology, History, and Psychology.  He was a member of the National Honor Society, and had earned several awards, including the Presidential Award.  He had a bright future in front of him.  In addition to Philadelphia University, he was also accepted to Temple University.

34.     After weighing the various factors and considerations of each college, Anthony Villar made a conscious and informed decision to pursue a college education at Philadelphia University, and to begin classes for the 2011-12 academic year.

35.     Upon his acceptance, defendant Philadelphia University provided Anthony Villar with a copy of its Student Handbook and The University Catalogue.  These documents, as well as documents that they reference, are readily available on Philadelphia University's web site, which also contains other policies, regulations, and representations made by Philadelphia University.  The Philadelphia University Handbook states, among other things, that:

"Statement of Nondiscrimination"

Philadelphia University does not discriminate on the basis of race, color, **sex,** age, religion, national origin, marital status, sexual orientation, or

disability in its admissions, education programs, activities, or employment practices.  This policy is in accordance with state and federal laws, including Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990.

See Philadelphia University Student Handbook, pg. 2 (emphasis added).

36.    The Philadelphia University Student Handbook also contains a

Commitment to Diversity, which states, in pertinent part, that:

Philadelphia University is fully committed to making diversity an integral part of its mission . . . The University Community respects the uniqueness and worth of each member . . . Factors such as disability, religion, **gender,** sexual orientation, and ethnic background all make up differences. This diversity enriches the educational experience of every individual . . . We therefore reject stereotyping, prejudice, harassment, and **discrimination for any reason.**

See Philadelphia University Student Handbook, pg. 3 (emphasis added).

37.    Philadelphia University represented and agreed, in its Student

Handbook, that its Sexual Misconduct Board members would be adequately

trained in "matters related to sexual misconduct."  Philadelphia University

Student Handbook, Community Standards and Judicial System, 4. The

Sexual Misconduct Board.

38.    Philadelphia University represented and agreed, in its Student

Handbook, that it would schedule a hearing for students accused of violations

of The Community Standards "a reasonable time" after the complaint was

reported."  Philadelphia University Student Handbook, Community Standards

and Judicial System, Judicial Procedures for Complaints Referred to Judicial

Officers. 1. Notice.

39.    Philadelphia University represented and agreed, in its Student

Handbook, that it would conduct an investigation of the complaint, gather

14

evidence, and interview any parties involved in or witness to the matter. Philadelphia University Student Handbook, Community Standards and Judicial System, Judicial Procedures for Complaints Referred to Judicial Officers. 2.(c) Hearing Protocols.

40.     Philadelphia University represented and agreed, in its Student Handbook, that it would present to the student accused of violating the Community Standards any evidence pertaining to the allegations of the violation.  Philadelphia University Student Handbook, Community Standards and Judicial System, Judicial Procedures for Complaints Referred to Judicial Officers. 2.(d) Hearing Protocols.

41.     Philadelphia University represented and agreed, in its Student Handbook, that a student accused of violating the Community Standards would have an opportunity to present and cross-examine witnesses. Philadelphia University Student Handbook, Community Standards and Judicial System, Judicial Procedures for Complaints Referred to Judicial Hearing Boards. 4. Pre-Hearing Procedures.

42.     Philadelphia University represented and agreed, in its Student Handbook, that a student accused of violating the Community Standards would be permitted to exchange information with his accuser no later than 5 days before the hearing and would be given copies of all information relevant to the incident that would be used at the hearing. Philadelphia University Student Handbook, Community Standards and Judicial System, Judicial Procedures for Complaints Referred to Judicial Hearing Boards. 4. Pre-

Hearing Procedures.

43.     Philadelphia University represented and agreed, in its Student
Handbook, that a student accused of violating the Community Standards
would be permitted "ample opportunity to review all evidence prior to the
hearing." Philadelphia University Student Handbook, Community Standards
and Judicial System, Judicial Procedures for Complaints Referred to Judicial
Hearing Boards. 6. Evidence.

44.     Philadelphia University represented and agreed, in its Student
Handbook, that a student who was found to have violated the Community
Standards by a Sexual Misconduct Board would have the right to appeal the
Board's decision and, as long as the appeal was in writing and met the criteria
set forth in the Appeals section of the Student Handbook, the student would
have the right to a re-hearing of his case or further investigation of the
complaint and an amendment of the decision and/or sanction. Philadelphia
University Student Handbook, Community Standards and Judicial System,
Judicial Procedures for Complaints Referred to Judicial Hearing Boards. 10.
Appeals.

### FIRST CAUSE OF ACTION
### VIOLATION OF TITLE IX OF THE EDUCATION
### AMENDMENTS OF 1972, 20 U.S.C. §§ 1681-1688 (2011) BY
### DEFENDANT PHILADELPHIA UNIVERSITY

45.     The allegations set forth in paragraphs 1-44 are incorporated
herein by specific reference as if fully set forth.

46.     Title IX of the Education Amendments of 1972 states in

16

pertinent part that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ."  20 U.S.C. § 1681(a).

47.      Title IX applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX, even though there is very little direct federal funding of school sports.

48.      Upon information and belief, defendant Philadelphia University receives federal funding under Title IX, 20 U.S.C. §§ 1681-1688 (2011).

49.      As a Title IX recipient, Philadelphia University is required to comply with the requirements of Title IX as well as those of the regulations promulgated thereunder by the Department of Education.

50.      These regulations require each school receiving Title IX funds to, "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by [Title IX or its regulations]."  34 C.F.R. 106.8(b) (2014).

51.      The regulations further require that a school's procedures must accord "due process to both parties involved . . ."  *See* Title IX (2001) "Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, Or Third Parties" (U.S. Department of Education, Office for Civil Rights, January 19, 2001) (notice of publication at 66 Fed. Reg. 5512), at pg. 22.

52.    Philadelphia University's sexual misconduct and disciplinary policies, as written and as implemented in Anthony Villar's case, are not equitable and do not accord due process and equal protection to the accused. Philadelphia University's sexual misconduct and disciplinary policies and procedures discriminate against male students accused of sexual misconduct and/or sexual assault based upon their gender/sex.

53.    Philadelphia University has deprived Anthony Villar, based upon his sex/gender, of his rights to due process and equal protection of the laws, through its sexual misconduct grievance procedures, which do not afford the accused male students due process in defending against sexual assault and other sexual misconduct charges.

54.    Defendant Philadelphia University conducted its investigation and hearing regarding the charges of sexual assault made by Jane Doe against Anthony Villar in a biased and fundamentally unfair manner.  Both the investigation and the hearing were flawed and resulted in an erroneous outcome, *i.e.,* an erroneous finding that Anthony Villar had sexually assaulted Jane Doe and committed sexual misconduct.  The particular circumstances that prove that gender bias was the motivating factor behind the erroneous outcome include, but are not limited to the following:

(a) defendant Philadelphia University placed absolutely no value on the fact that Ms. Doe's allegations were supported by no physical evidence, such as a rape kit examination records, DNA samples, crime scene analysis records, or even self-taken photos of injuries;

18

(b) defendant Philadelphia University placed absolutely no value on the fact that there were no eyewitness accounts of the alleged assault;

(c) defendant Philadelphia University took no steps to investigate the gaping holes in Ms. Doe's credibility, such as the fact that she invited Anthony Villar to her parents' house immediately after the alleged assault, socialized with him, her parents, acquaintances of her parents, and never mentioned the fact that she had just been assaulted; and that she invited him back to her house again the day after the alleged assault to socialize with her and her parents and again made no mention of the alleged assault;

(d) defendant Philadelphia University placed absolutely no value on the fact that Jane Doe only reported a "sexual assault" **AFTER** learning that Anthony had been unfaithful to her;

(e) defendant Philadelphia University rushed Anthony Villar to a hearing less than five (5) weeks after the allegations were made, even though it had not conducted a complete, thorough and unbiased investigation of the allegations and had not gathered all relevant evidence;

(f) defendant Philadelphia University intentionally denied Mr. Villar the right to defend himself at the Sexual Misconduct Board hearing by falsely reporting that Mr. Villar was under active criminal investigation by the Philadelphia Police Department;

(g) Philadelphia University also took no account of the very obvious motivation that Ms. Doe had to fabricate the charges against Mr. Villar, given that her complaint came less than 48 hours after she found out that he was

19

romantically involved with another woman;

(h) The hearing on the charges against Anthony Villar lasted less than 60 minutes and when it concluded, the Sexual Misconduct Hearing Board "deliberated" for less than 45 minutes and then announced its pre-ordained decision of "guilty." The Board then announced the punishment as expulsion. The Board issued no written opinion documenting the reasons for its finding.

55.     All of the actions taken by defendant Philadelphia University set forth *supra* in Paragraph 54 are sufficient to permit a factfinder to draw a reasonable inference that Philadelphia University discriminated against Anthony Villar based upon his gender when it engaged in a flawed disciplinary process that resulted in the erroneous outcome that he had committed sexual misconduct and that defendant Philadelphia University was deliberately indifferent to Villar's rights. *See Wells v. Xavier University,* 2014 WL 972172 (S.D. Ohio March 12, 2014).

56.     Defendant Philadelphia University imposed sanctions on Anthony Villar that were disproportionate to the severity of the charges levied against him and without any consideration of his solid academic record and without providing any written summary setting forth the basis of its findings and the basis for the punishment. The unduly severe sanction of expulsion was also evidence of the fact that defendant Philadelphia University selectively enforced its policies and procedures against Anthony Villar based upon his gender.

57.     Upon information and belief, the fundamental unfairness and

20

discrimination based upon gender/sex that characterized Anthony Villar's disciplinary process, as well as the erroneous outcome, are part of a pattern of decision-making by defendant Philadelphia University that discriminates against male students accused of sexual misconduct at Philadelphia University based solely upon their sex/gender.  Defendant Philadelphia University, in the manner in which it investigates, adjudicates, and hears appeals of male students accused of sexual misconduct creates an environment in which the male student is so fundamentally denied due process as to be virtually assured of a finding of guilt regardless of the evidence, or lack thereof.  Such a biased and fundamentally unfair process excludes male students from participation in and denies them the benefits of Philadelphia University's educational programs, and subjects them to discrimination under those educational programs.

        58.     As a direct and proximate result of Philadelphia University's enforcement of these discriminatory policies and procedures, which violate Title IX, and its failure to comply with the other requirements under Title IX with respect to its sexual misconduct disciplinary procedures, Mr. Villar has been excluded from participation in and denied the benefits of Philadelphia University's educational programs in violation of Title IX, and has suffered damages including, but not limited to, having his permanent Philadelphia University academic record contain an improper and untrue conviction and/or finding of guilt for sexual misconduct (assault), being unable to be accepted to and enroll in another university or college of similar or better reputation than

Philadelphia University, actual and permanent damage to his reputation and standing in the community, and monetary losses.

**WHEREFORE**, Plaintiff Anthony Villar demands judgment against Defendant Philadelphia University with the following relief:

a. Compensatory damages in an amount in excess of $150,000.00;

b. Reasonable attorney's fees and costs;

c. Expenses, costs and disbursements; and

d. Such other and further relief as the Court deems reasonable and just.

## SECOND CAUSE OF ACTION
## DECLARATORY JUDGMENT
## AGAINST DEFENDANT PHILADELPHIA UNIVERSITY

59.     The allegations set forth in paragraphs 1-58 are incorporated herein by specific reference as if fully set forth.

60.     Defendant Philadelphia University has committed numerous breaches of the parties' contract and violations of federal and state law.

61.     Anthony Villar's education and future career have been severely damaged. Without appropriate redress, the unfair and erroneous outcome of the sexual misconduct disciplinary hearing conducted by defendant Philadelphia University will continue to cause irreversible and irreparable damages to Anthony Villar into the future without end.

62.     As a result of the foregoing, there exists an actual, judiciable controversy between the parties with respect to the outcome, permanency,

and future handling of Anthony Villar's formal student record at Philadelphia University.

63.    By reason of the foregoing, Anthony Villar requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Philadelphia University at Anthony Villar's sexual misconduct disciplinary hearing be reversed; (ii) Anthony Villar's reputation be restored; (iii) Anthony Villar's disciplinary record be cleared of the false and untrue finding of sexual misconduct by defendant Philadelphia University; specifically that the finding that he was guilty of sexual misconduct involving a sexual assault of Jane Doe, be expunged from his record; (iv) the record of Anthony Villar's expulsion from Philadelphia University be removed; (v) any record of Anthony Villar's disciplinary investigation and hearing regarding the alleged sexual assault of Jane Doe be permanently destroyed; and (vi) that Philadelphia University's rules, regulations, and guidelines are unconstitutional as applied.

### THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
### AGAINST DEFENDANT PHILADELPHIA UNIVERSITY

64.    The allegations set forth in paragraphs 1-63 are incorporated herein by specific reference as if fully set forth.

65.    A contractual relationship, either express or implied, existed between Philadelphia University and Anthony Villar.  The contract was formed by Mr. Villar's payment of tuition and fees to Philadelphia University and by the terms set forth in Philadelphia University's Student Handbook, University Catalogue and other policies, regulations, and representations made by

Philadelphia University on its web site, which were all deemed part of that contract.

66.     Pursuant to Title IX, Philadelphia University was required to adopt sexual misconduct and disciplinary policies and procedures that were equitable and accorded due process and equal protection to the accused in sexual misconduct cases.  Philadelphia University represented in its Student Handbook, University Catalogue, and other policies, regulations, and representations on its web site that it complied with the requirements of Title IX and had in place disciplinary policies and procedures that accorded due process and equal protection to the accused in sexual misconduct cases. However, Philadelphia University did not act in accordance with the terms and representations in its Student Handbook, University Catalogue, and other policies, regulations, and representations on its web site in investigating and adjudicating complaints of sexual misconduct and violations of Philadelphia University's Community Standards, policies, and regulations, and in deciding appeals that challenged disciplinary decisions.  Philadelphia University's failure to act in accordance with the terms and representations made in its Student Handbook, University Catalogue, and other policies, regulations, and representations on its web site breached its agreement that it would not engage in discrimination for any reason.

67.     Defendant Philadelphia University breached the express and/or implied terms of its contract with Anthony Villar.  Specifically, Philadelphia University breached its contract with Anthony Villar by failing to comply with

24

the policies and procedures it claimed to have in place in its Student

Handbook, University Catalogue, and other policies, regulations, and

representations on its web site for investigating and adjudicating complaints

of sexual misconduct. The specific ways that Philadelphia University

breached the terms of its contract with Anthony Villar include, but are not

limited to the following:

(a) failing to have, as it represented and agreed in its Student

Handbook, Sexual Misconduct Board members who were adequately

trained in "matters related to sexual misconduct;"

(b) failing to schedule, as it represented and agreed in its Student

Handbook, a hearing on the charges against Anthony Villar "a reasonable

time" after the complaint was reported with the result that Anthony Villar was

not able to properly investigate the charges against him or adequately

prepare for the hearing;

(c) failing to conduct, as it represented and agreed in its Student

Handbook, an investigation of the complaint, gather evidence, and interview

any parties involved in or witness to the matter;

(d) failing to present to Anthony Villar, as it represented and agreed in

its Student Handbook, any evidence pertaining to the allegations of the

violation.

(e) failing to afford Anthony Villar, as it represented and agreed in its

Student Handbook, an opportunity to present and cross-examine witnesses at

his hearing.

(f)  failing to afford Anthony Villar, as it represented and agreed in its Student Handbook, the opportunity to exchange information with his accuser no later than 5 days before the hearing and to give to Anthony Villar copies of all information relevant to the incident that would be used at the hearing.

(g)  failing to permit Anthony Villar, as it represented and agreed in its Student Handbook, "ample opportunity to review all evidence prior to the hearing."

(h)  failing to afford Anthony Villar, as it represented and agreed in its Student Handbook, the right to a re-hearing of his case or further investigation of the complaint and an amendment of the decision and/or sanction after he had filed a proper appeal of the Sexual Misconduct Board's decision.

68.    Defendant Philadelphia University does not have a provision in its Student Handbook, University Catalogue, or any other of its policies, regulations, and representations referenced on its web site, which were all deemed part of the contract between Anthony Villar and Philadelphia University, that explicitly insulates its decisions made in disciplinary proceedings from review by state and federal courts.  To the extent that Philadelphia University does have such a provision in any of the afore-mentioned documents, the provision is ambiguous.

69.    As a direct, foreseeable, and proximate result of these breaches by defendant Philadelphia University, Anthony Villar sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, reputational damages, economic injuries, and other direct and

consequential damages.

**WHEREFORE**, Plaintiff Anthony Villar demands judgment against Defendant Philadelphia University for compensatory damages in an amount in excess of $150,000.00 plus interest, costs, attorney's fees and such other and further relief as the Court deems reasonable and just.

### FOURTH CAUSE OF ACTION
### DEFAMATION
### AGAINST DEFENDANTS PHILADELPHIA UNIVERSITY
### AND JANE DOE

70.     The allegations set forth in paragraphs 1-69 are incorporated herein by specific reference as if fully set forth.

71.     Philadelphia University and Jane Doe each made communications about Anthony Villar that were defamatory in nature.

72.     Specifically, each stated verbally and in writing that Anthony Villar was the perpetrator of a criminal offense involving serious sexual misconduct -- sexual assault -- on Doe, even though they knew the allegation was false, or with reckless indifference to the truth or falsity of said allegation.

73.     The defamatory communications tended to harm and did harm the reputation of Anthony Villar so as to lower him in the estimation of the community and to deter third persons from associating with him.

74.     The defamatory communications were intended to, and did, convey to third persons Anthony Villar's guilt of a serious sexual criminal offense involving moral turpitude.

75.     Philadelphia University and Doe intended not only to deprive Villar of his good name, and to bring him into scandal and disrepute amongst

27

his neighbors and peers, but also to limit Villar's future educational and
employment prospects.

76.    The defamatory communications tended to, and did, blacken
Villar's reputation and exposed him to public hatred, contempt and ridicule.

77.    The allegations against Villar were so inherently improbable that
only a reckless and dishonest person would have conveyed them as there
were obvious reasons to doubt Doe's veracity and the accuracy of her
allegation.

78.    The defamatory communications were not statements of mere
opinion.

79.    The defamatory communications were published in that they
were made to numerous third parties.  They included Doe's statement to
Dean Mark Govoni on December 16, 2013, that Anthony Villar had sexually
assaulted her.  They also included the same allegations made to the Sexual
Misconduct Board.  Finally, they also consisted of Doe and Philadelphia
University making the same false and malicious statements to numerous of
Anthony Villar's fellow Philadelphia University students, peers, and
professors.  Philadelphia University continues to publish defamatory
communications about Anthony Villar to third persons outside Philadelphia
University.

80.    The defamatory communications were malicious, reckless, and
negligently made.

81.    The defamatory communications were not justifiably protected

by any privilege; or, in the alternative, if they were protected by a privilege, it was abused.

82.     The defamatory communications referenced Villar by name to ensure that those who received the communications knew that they referred and applied to Anthony Villar, and the recipients of the defamatory communications understood that they applied to Villar.

83.     All persons receiving the communications understood the defamatory meaning of the communications. All persons receiving the communications believed that Anthony Villar had committed a serious criminal offense involving serious sexual misconduct -- sexual assault -- on Doe.

84.     Anthony Villar was specially harmed by the publication of the defamatory communications. They adversely affected his fitness for the conduct of lawful business.

85.     Anthony Villar suffered actual loss to his reputation and personal humiliation and anguish.

86.     The defamatory communications led the audience to conclude that Anthony Villar lacked honor and integrity, was a criminal, and have grievously fractured his standing in respectable society.

87.     Philadelphia University and Doe's conduct was wanton, reckless, willful, malicious, and oppressive, demonstrating reckless indifference to the rights and interests of Villar, so as to warrant an award of punitive damages.

29

**WHEREFORE**, Plaintiff Anthony Villar demands judgment against Defendants Philadelphia University and Jane Doe, jointly and severally, for compensatory damages in an amount in excess of $150,000.00 plus interest, punitive damages, costs, attorney's fees and such other and further relief as the Court deems reasonable and just

### FIFTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DEFENDANTS PHILADELPHIA UNIVERSITY
### AND JANE DOE

88.     The allegations set forth in paragraphs 1-87 are incorporated herein by specific reference as if fully set forth.

89.     At all times material to this Complaint, defendants Jane Doe and Philadelphia University, acting through its agents, servants, and employees, did by extreme, outrageous, intentional, willful, malicious, and reckless conduct humiliate, embarrass, shock, and emotionally damage Anthony Villar.

90.     Philadelphia University and Jane Doe intentionally made public statements which were blatantly false and untrue and took actions based upon that false information to falsely portray Anthony Villar as a sex offender, which was not true and caused him severe anxiety, depression, and emotional distress.

91.     Philadelphia University and Jane Doe intentionally made public statements which were blatantly false and untrue and took actions based upon that false information to falsely portray Anthony Villar as a sex offender, which was not true and caused him severe anxiety, depression, and emotional distress as the result of unjustly being found guilty of sexual

misconduct and being expelled from Philadelphia University and not being able to complete his college education and go on to earn a living, to all of which he had looked forward.

92.     Philadelphia University and Jane Doe's actions further caused Anthony Villar extreme anxiety, emotional distress, and depression because for close to two months he believed, based upon the intentional fabrications and lies of Philadelphia University and Doe, that he was the target of a criminal investigation by the Philadelphia Police Department and/or the Philadelphia District Attorney's Office.  He literally lived in fear that the police would knock at his door, arrest, and jail him.  These fears caused him severe and extreme emotional distress.

93.     As a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful and malicious conduct of Philadelphia University and Doe, Anthony Villar suffered and will continued to suffer, among other things, severe emotional distress, mental anguish, embarrassment, and humiliation, all of which may be permanent in nature.

94.     Philadelphia University and Doe's conduct was wanton, reckless, willful, malicious, and oppressive, demonstrating reckless indifference to the rights and interests of Anthony Villar, so as to warrant an award of punitive damages.

**WHEREFORE**, Plaintiff Anthony Villar demands judgment against Defendants Philadelphia University and Jane Doe, jointly and severally, for compensatory damages in an amount in excess of $150,000.00 plus interest,

punitive damages, costs, attorney's fees, and such other and further relief as the Court deems reasonable and just.

## SIXTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANTS PHILADELPHIA UNIVERSITY
## AND JANE DOE

95.    The allegations set forth in paragraphs 1-94 are incorporated herein by specific reference as if fully set forth.

96.    At all times material hereto, Philadelphia University and Jane Doe acted in a negligent manner for the reasons set forth above as a direct and proximate result of which Plaintiff Anthony Villar suffered and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment and humiliation, all of which may be permanent in nature.

**WHEREFORE**, Plaintiff Anthony Villar demands judgment against Defendants Philadelphia University and Jane Doe, jointly and severally, for compensatory damages in an amount in excess of $150,000.00 plus interest, costs, and such other and further relief as the Court deems reasonable and just.

## SEVENTH CAUSE OF ACTION
## (UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73
## Pa. C.S.A. § 201-1, et seq.)
## AGAINST DEFENDANT PHILADELPHIA UNIVERSITY

97.    The allegations set forth in paragraphs 1-96 are incorporated herein by specific reference as if fully set forth.

98.    At all times material hereto, Philadelphia University offered for

sale to the public, educational services. Plaintiff Anthony Villar purchased,

*inter alia,* educational services from Philadelphia University for which he

remitted payment in the form of tuition and fees.

99.    In connection with the sale of its educational services and

collection of tuition, fees and costs related thereto, Philadelphia University

committed various unfair and deceptive acts and practices in violation of the

Unfair Trade Practices and Consumer Protection Law 73 Pa. C.S.A. § 201-1,

et seq. ("UTPCPL"), including, but not limited to:

>    a.    Representing, warranting and guaranteeing in writing that
>          Philadelphia University trained its employees and agents
>          in the proper and unbiased investigation and adjudication
>          of complaints of sexual misconduct, when in fact it had
>          not;
>
>    b.    Representing that Anthony Villar would receive a fair and
>          impartial hearing in connection with any allegations of
>          sexual misconduct, when he would not;
>
>    c.    Representing that Anthony Villar would receive adequate
>          notice of and due process in connection with allegations
>          of sexual misconduct, when he would not; and,
>
>    d.    misrepresenting Philadelphia University's compliance
>          with Title IX;

100.    Anthony Villar purchased, *inter alia,* educational services from

Philadelphia University for which he remitted payment in the form of tuition

and fees. In purchasing educational services from Philadelphia University

and in entering into his agreement with Philadelphia University, Anthony Villar

justifiably relied upon the various warranties and misrepresentations of

Philadelphia University.

101.    Philadelphia University's unfair and deceptive conduct constituted untrue representations of the characteristics and benefits of Philadelphia University's educational services; constituted untrue representations that Philadelphia University's educational services were of a particular standard or quality; constituted a failure to comply with the terms of a written guarantee or warranty; and constituted deceptive conduct which created a likelihood of confusion and misunderstanding – all within the meaning of §3 of the UTPCPL and §§2(4)(v), (vii), (xiv) and (xxi) of the UTCPL.

102.    Anthony Villar's justifiable reliance upon the the various warranties and misrepresentations of Philadelphia University, caused him to suffer the following losses, among others: the money he paid to Philadelphia University in tuition and fees; the loss of a college education; the loss of a college degree; the ability to obtain professional employment.  Mr. Villar's justifiable reliance upon the various warranties and misrepresentations of Philadelphia University also caused him to suffer injury to his reputation, which resulted from the erroneous outcome of the disciplinary hearing, *i.e.*, that he had committed sexual misconduct.

**WHEREFORE,** Plaintiff Anthony Villar demands that judgment be entered in his favor and against Defendant Philadelphia University for the following relief:

(a)    Find, determine and declare that Philadelphia University's business practices violate the UTPCPL;

34

(b)     Enjoin Philadelphia University from continuing to investigate and adjudicate claims of sexual misconduct in the manner prescribed by the Student Handbook;

(c)     Award actual and/or statutory damages including attorney's fees and costs; and,

(d)     Grant such any and other further relief that is just and proper under the circumstances.

## EIGHTH CAUSE OF ACTION    ·
## (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)
## AGAINST DEFENDANT JANE DOE

103.    The allegations set forth in paragraphs 1-102 are incorporated herein by specific reference as if fully set forth.

104.    Anthony Villar has the right to pursue his contractual relationships free from interference on the part of other persons.

105.    At all times material hereto, defendant Jane Doe did willfully, maliciously, and improperly interfere with an existing contract between Anthony Villar and Philadelphia University by repeatedly meeting with Philadelphia University agents, servants, and/or employees and leveling false accusations against Villar that he had committed a serious sexual offense against her – sexual assault -- which resulted in his expulsion from Philadelphia University.

106.    Jane Doe had no privilege, justification or legitimate interest for interfering with the contract between Villar and Philadelphia University.

35

107.    Jane Doe, who intentionally and improperly interfered with the performance of this contract, is subject to liability.

108.    In intentionally accusing Anthony Villar of sexual assault, Jane Doe was giving false information to Philadelphia University, which Doe knew to be false.

109.    As a direct and proximate result of Jane Doe's intentional interference with the contract, Villar suffered expulsion from Philadelphia University, and financial harm stemming therefrom.

110.    Jane Doe's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Anthony Villar, so as to warrant an award of punitive damages.

**WHEREFORE**, Plaintiff Anthony Villar demands judgment against Defendant Jane Doe for compensatory damages in an amount in excess of $150,000.00 plus interest, punitive damages, costs, attorney's fees and such other and further relief as the Court deems reasonable and just.

DATED:  May 23, 2014

William Spade, Esquire
Pa. Attorney No. 58965
Law Offices of William Spade
1525 Locust Street
Suite 1400
Philadelphia, PA  19102

Counsel for Plaintiff,
ANTHONY VILLAR

36

## JURY DEMAND

Plaintiff demands a jury trial as to each Defendant and as to each

count.

_____

William Spade
Counsel for Plaintiff,
ANTHONY VILLAR

"D"

Students | Alumni | Faculty & Staff | Parents | Visitors | Donors | Industry Partners
Calendar | Directory | Contact Us | Shop | Blackboard | Web Advisor | Web Mail

Google™ Custom Search

About | Admissions | Academics | Athletics | Student Life

PhilaU Home > Student Handbook > Student Life Policies > Sexual Misconduct Policy

## Sexual Misconduct Policy

**Article I.** **Preamble**

Section 1.01    Philadelphia University is committed to fostering a safe living and learning environment for all students.  This includes freedom from any form of discrimination, including sexual harassment and sexual assault.  We expect community members to engage in relationships that are characterized by mutual respect and affirmative consent.

The University's response to sexual misconduct seeks to balance the rights, needs and privacy of victims and those of the accused, while maintaining the health and safety of the campus community.  Special emphasis is placed on violence prevention, providing support for those who may have been victimized, and ensuring a vigorous enforcement of institutional policy and law.

Section 1.02    If you or someone you know may be a victim of sexual harassment, sexual assault, or any other behaviors prohibited under this policy, you are strongly encouraged to seek immediate assistance from The Dean of Students Office, Safety and Security, or The Counseling Center.  Students will be provided counseling and medical referrals; assistance with safe housing and academic concerns related to the sexual misconduct; and information concerning victim's rights. Individuals will also be provided information concerning University, civil and criminal complaints, including how to file such complaints.

**Article II.** **Goals of the Sexual Misconduct Policy**

Section 2.01    To provide a safe campus environment where students can live and study free of fear, intimidation and coercion.

Section 2.02    To provide clear guidelines for students about how to file complaints and to respond to allegations of sexual misconduct.

Section 2.03    To provide prompt and appropriate action to investigate or otherwise determine what occurred.

Section 2.04    To provide support to both parties –the complainant and respondent—during the investigative and adjudication processes.

Section 2.05    To insure fairness and equal right to both parties, including the right to present witnesses and other evidence, and to have the same rights to appeal.

Section 2.06    To protect complainants as necessary, including interim steps prior to the final outcome of an investigation.

Section 2.07    To notify both parties of the outcomes of the complaint.

**Article III.** **Confidential v. Non-confidential Campus Resources**

### Student Handbook

Mission Statement

Statement of Nondiscrimination

A Commitment to Diversity

University Resources

Division of Student Life

Academic Policies and Student Records

Computing Policies

Financial Policies

Student Life Policies
  Alcohol, Drugs and Prohibited Substances
  Balloon Policy
  Dissent and Demonstration
  Fire Safety
  Gambling
  Grievances
  Hazing Policy
  Psychological Evaluation and Withdrawal
  Residence Life Policies
  Smoking Policy
  Weapons Policy
  Sexual Misconduct Policy
  Skateboarding
  Use of Electronic and Recording Devices
Community Standards and Judicial System
Site Map

A.  Confidential Campus Resources

As required under Title IX, a federal law that applies to all colleges and universities, most University employees are required to report instances of sexual misconduct that they have been made them aware of.

Some University employees enjoy confidential status.  Students may wish to seek these confidential resources to discuss filing a complaint and/or access support services.

The following Philadelphia University student health and counseling staff, and the Coordinator of Spirituality programs, are confidential resources.

- Director of Health Services

- The Nurse Practitioners in Health Services

- Director of Counseling

- All counselors

- Coordinator of Spiritual programs

In most circumstances these confidential resources have a professional and legal obligation not to reveal information shared in the course and scope of performing their duties.

When students talk to a confidential resource about a possible violation of the Sexual Misconduct Policy, that support person will not reveal or report this conversation in any identifying manner. The confidential resource will however report the incident in a non-identifying manner to be part of University reports required by state and federal laws.

Confidential support people do have a duty to report to someone when they have reasonable cause to believe that the person sharing information with them is dangerous to themselves or others. Confidential resources will review their confidentiality obligations with you when you meet with them.

Talking to a confidential resource is not a complaint under the University's Sexual Misconduct Policy and consequently does not activate investigation and adjudication processes.

B.  Non-Confidential Campus Resources

Faculty and staff, i.e. all employees, at the University who are not "confidential resources," must report allegations of sexual misconduct to the Dean of Students Office.  This includes all professors, advisors, coaches, professional and support staff, and peer counselors (e.g. resident assistants).  The Dean of Student serves as the Title IX Coordinator for the University, and in that capacity, is obligated to insure that any and all reports of sexual misconduct against students receive prompt and appropriate action.  Allegations of sexual misconduct against employees are referred to the Assistant Vice President for Human Resources.

Off-Campus resources

(a)     Philadelphia Police department (911)

(b)     Special Victims Unit (215-685-3251)

(c)     Women Organized Against Rape (WOAR) 24 Hour Hotline          (215-985-3333)

(d)    Philadelphia Office of Civil Rights (215-861-4441)

Article IV.    **Definition of Sexual Harassment**

Sexual harassment under this policy includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact, or other verbal or physical conduct or communication of a sexual nature when:

(a)    Submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining employment or education: or

(b)    Submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's employment or education: or

(c)    That conduct or communication has the purpose or effect of substantially interfering with an individual's employment or education, or of creating an intimidating, hostile, or offensive employment or educational environment.

For purposes of this definition, communication may be oral, written, or electronically transmitted. Without limiting the foregoing, use of audio or visual equipment in violation of the University's policy on such use may constitute sexual harassment.  See the Community Standards (Section 9, The Student Handbook).

Stalking may include persistent attempts to contact the person by phone, electronic communication, or regular mail: vandalizing the person's property or leaving unwanted items for the person: and/or constantly appearing at the person's classroom, residence, or workplace without permission.

Sexual harassment can be committed by a man, a woman, or a group of people against a person or persons of the same or opposite sex. Sexual harassment can be committed by friends, acquaintances, classmates, supervisors, co-workers, faculty members, and/or any other person. Acts of sexual harassment may or may not be directed at a specific person.

Article V.    **Definition of Sexual Violence**

In general, sexual violence is any sexual physical contact (intercourse, penetration of the genitals or indecent contact) by a person, without the consent of the complainant (the individual to whom the contact is directed).  It includes sexual physical contact that involves any of the following:

(a)    Forcible compulsion

(b)    Threat of forcible compulsion that would prevent resistance by a complainant of reasonable resolution:

(c)    The complainant is unconscious or the person knows that the complainant is unaware that the intercourse, penetration or indecent contact is occurring.

(d)    The person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing, without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance:

(e)    The complainant is unable to consent due to temporary or permanent incapacity or impairment, mental or physical.  "Incapacity" or "impairment" may include, but is not limited to, being under the influence of alcohol or drugs to a degree which renders the person incapable of consent.

Article VI.    **Title IX Notice**

Sexual violence constitutes sex discrimination and sexual harassment in violation of Title IX of the Education Amendments of 1972.  Complaints of sexual violence may be filed as set forth below.

Article VII.    **Filing a Sexual Misconduct Complaint**

Any complaints alleging that a student has been the victim of sexual misconduct, perpetrated by an employee, a student or a third party on campus, are reported to the Dean of Students, who is the Title IX Coordinator for the University.  As such, he is designated coordinator for compliance with this Policy.

Students should be advised that the Title IX Coordinator is obligated to act on any report of alleged misconduct. The University does not limit the timeframe for filing a report of misconduct. Reports can be submitted at any time following an incident, although the University's ability to take any action may be negatively affected by the length of time between the alleged incident and the report.

The Title IX Coordinator will either act as the complaint coordinator or appoint a complaint coordinator. The complaint process begins when a student meets with the complaint coordinator.  Together, this student and the coordinator will review information and expectations of the complaint process and select an advisor from the University staff to assist the complainant during the complaint process.

When a complaint has been filed against a student, that student becomes the respondent. The respondent will be contacted by the complaint coordinator and informed of the complaint. The respondent, together with the coordinator, will review the same information and expectations that were shared with the complainant, and will select an adviser from the University staff to assist the respondent during the complaint process.

Both the complainant and respondent will be asked to write a statement about their participation and perspective on the incident in question. The parties will be provided with information about how to prepare a written statement and a list of questions and prompts to which they may respond as they write their statements.

The complaint coordinator will remain available to answer questions by the complainant and respondent about the complaint process.

Article VIII. **Investigation of a Sexual Misconduct Complaint**

After both parties have submitted their statements, the Title IX Coordinator or appointed complaint coordinator will appoint an investigator to initiate the investigation. All investigations will be conducted as thoroughly and expeditiously as possible and normally shall be completed within 60 days from the initiation of the complaint, except where the appropriate or circumstances require a longer period. The scope of the investigation will not be limited to information provided by the parties or to the violations alleged in the complaint. In all cases, the investigator will conduct an adequate and impartial investigation into the allegations of the complaint.  Refusal by any party or witness to cooperate with the investigator in the investigation may result in action against the person refusing to cooperate. Once the investigative report is complete, the investigator will prepare and submit a written report to the complaint coordinator and the Title IX Coordinator. The complaint coordinator will then review the report with both the complainant and respondent, and will determine how to proceed with resolution of the complaint.

Article IX.    **Complaint Resolution**

Section 9.01    **Mediation Under Certain Circumstances**

Mediation is a voluntary process intended to allow the parties involved in an alleged complaint of discrimination or harassment to discuss their respective understandings of the incident with each other through the assistance of the complaint coordinator (or his/her designee) and the students' advisors. Mediation is not appropriate for certain cases, such as alleged sexual violence, even on a voluntary basis. Mediation is designed to encourage each person to be honest and direct with the other and to accept personal responsibility where appropriate. Mediation is only offered as an option if recommended by the complaint coordinator, both the complainant and the respondent are students at the University and they both agree. (If either student is less than 18 years of age, the University may require that the

minor student's parent consent in writing to the student's participation in the Mediation).

The mediation process is conducted by a mediator assigned to the case by the Title IX Coordinator. The mediator is responsible for managing the process of resolution. The complainant, respondent or the mediator can terminate the mediation process at any time and begin the judicial process.

Any statement of resolution by mediation shall be incorporated into an agreement, which shall be signed by both parties, the complaint coordinator, and shall be approved by the Title IX Coordinator (or his/her designee) before it takes effect. Any activity or behavior, or prohibition thereof, to which either party has agreed in the mediation shall be included in the agreement.

B.     **The Judicial Process**

In the event that mediation is not appropriate (e.g. in all cases of sexual violence) or one of the parties does not want to pursue mediation, in most cases, the matter will be referred by the complaint coordinator to the University's judicial process. All cases of sexual misconduct are heard by the Sexual Misconduct Board. The actual hearing procedures will follow the procedures applicable to hearings before the all judicial boards to the extent practicable. The hearing officer of the Student Conduct Committee will have discretion to alter those procedures if the hearing officer believes it will be in the bests interests of the parties involved. The judicial procedures are described in The Community Standards and The University Judicial System.

Article X.     <u>**Prohibition Against Retaliation**</u>

Any retaliation or attempted retaliation by any person directed at a student filing a complaint of sexual misconduct, or otherwise seeking to influence the process, is strictly prohibited. Retaliation can be in the form of direct or indirect harassment, interference or intimidation of anyone involved in the process. The respondent may be held responsible for retaliation against the complainant by friends or associates acting on the respondent's behalf.

**PHILADELPHIA UNIVERSITY**
Powered to Do

**About**
News
Offices
Virtual Tour
Map & Directions
Employment
Innovator Magazine

**Academics**
Colleges
Undergraduate
Graduate
Adult Learners
Academic Catalog
Library

**Student Life**
Student Activities
Safety & Security
Student Services
Student Journals
Ask a Student
University Bookstore

**Admissions**
How to Apply
Tuition & Fees
Financial Aid
Scholarships
Request Info
Schedule a Visit

**More Info**
Calendar
Contact Us
Blackboard
WebAdvisor
Webmail
Directory

4201 Henry Avenue • Philadelphia, PA 19144 • 215.951.2700 (ph) • © 2014 Philadelphia University. All rights reserved. Privacy Policy



Students | Alumni | Faculty & Staff | Parents | Visitors | Donors | Industry Partners
Calendar | Directory | Contact Us | Shop | Blackboard | Web Advisor | Web Mail

Google™ Custom Search

About | Admissions | Academics | Athletics | Student Life

# Philadelphia University
## Student Handbook



PhilaU Home > Student Handbook > Community Standards and Judicial System

## Community Standards and Judicial System

Philadelphia University is committed to providing an atmosphere of academic freedom where students can achieve academic success and personal growth. Commitments by all community members to integrity, civility and respect are essential to achieving this goal. Those commitments are embodied in The Community Standards, the values, policies and procedures governing student behavior designed to create a safe environment which promotes the free and open exchange of ideas for all community members. All students are responsible for knowing their rights and responsibilities stated within The Community Standards.

Philadelphia University promotes self-governance: each student bears the responsibility for his/her own conduct. Students are recognized as adults. The University does not seek to occupy a parental role. In order for our community to thrive, all students and their guests must conduct themselves lawfully and responsibly in a manner that preserves the integrity of the learning environment. As befits an institution of higher education, standards of behavior and social conduct are generally more demanding than those required of the general public.

Students may find themselves experiencing conflicts with fellow students, administrators, or faculty. Conflict is inherent in any collegiate setting: managed properly, it can be a positive opportunity encouraging dialogue, fostering personal growth, and promoting understanding. In every conflict lies an opportunity to strengthen relationships and creatively solve problems. Students are encouraged to resolve conflicts among themselves. However, any student who feels uncomfortable or unable to do so may seek counsel from the Office of the Dean of Students, advisors, faculty members, or other staff who are available to assist and support students.

By accepting admission and registration, students accept responsibility for compliance with academic regulations, course syllabi, classroom policies as determined by the classroom instructor, and The Community Standards, along with other policies and regulations listed in The Student Handbook, The University Catalog, departmental websites, and policies, manuals or guidelines pertaining to any specific operation or programs within the University. In addition, students are expected to abide by all local, state, and federal laws. When a student fails to abide by the above, the University will investigate and resolve those concerns through the University Judicial System described below

### Student Handbook

Mission Statement

Statement of Nondiscrimination

A Commitment to Diversity

University Resources

Division of Student Life

Academic Policies and Student Records

Computing Policies

Financial Policies

Student Life Policies

Community Standards and Judicial System

Site Map

Consistent with the educational mission of the University, the Judicial System is primarily educational and developmental rather than punitive in nature, encouraging students to reflect on their actions and learn from their mistakes. When a concern regarding student behavior comes to the attention of University officials, judicial hearing officers or hearing boards will review the incident with the student, assess student responsibility under The Community Standards, and when appropriate, assign sanctions commensurate with the student behavior. Certain academic programs have specific procedures pertaining to student behavior occurring within the purview of those programs: students should consult the manual provided by the faculty within their programs for details.

Students and their guests are responsible under The Community Standards for conduct on campus or in any University facility, while attending or participating in any University-related activity, e.g. athletic contest, study abroad programs, field trips, or social activities sponsored by a recognized student organization. Visitors, licensees, and invitees on a University facility shall be subject to The Community Standards of the University. Further, the University reserves the right to hold students accountable for their conduct whenever and wherever it occurs, if the conduct is reasonably related to their membership in the University community. Unlawful acts of violence, violations of another's civil rights, sexual misconduct, hazing, the unlawful sale or possession of drugs, the unlawful use of alcoholic beverages, and crimes against persons or property are examples of conduct that may subject a student to the University Judicial System regardless of where the conduct occurs.

The University also reserves the right to maintain concurrent jurisdiction in the event that a student's conduct also constitutes an act in violation of local, state, or federal law. The University will hold students accountable under The Community Standards and proceed with judicial processes whether or not the conduct is subject to criminal or civil adjudication.

**The Community Standards**
Set forth below is a brief listing of the various standards, policies and regulations generally governing student behavior at the University. The listing is not exhaustive and, where appropriate, reference is made to where each particular policy can be found in its entirety.

1. The Academic Integrity Policy

The following incidences provide examples of the most common types of academic dishonesty, but other instances may occur outside of the definitions defined here.

(a) Cheating

(b) Fabrication

(c) Plagiarism

(d) Facilitating Academic Dishonesty

(e) Denying Others Access to Information or Material

2. Non-academic dishonesty: Actions including, but not limited to:

(a) Providing false, misleading, or misrepresented information to any University official or office:

(b) Forgery, alteration, or misuse of any University document, record, or instrument of identification.

3. Alcohol Policy. The University's alcohol policy can be found here . Additional rules regarding alcohol are set forth in the Office of Residence Life (ORL) rules and regulations and rules governing other University programs. Examples of prohibited behavior include:

(a) Consumption, distribution, transportation, or possession of alcoholic beverages by any person less than 21 years of age, either on or off-campus;

(b) Presence of alcoholic beverages in a residence hall room where any of the occupants are less than 21 years of age:

(c) Providing alcoholic beverages to any person less than 21 years of age;

(d) Being less than 21 years of age and in the presence of alcohol;

(e) Public intoxication as indicated by appearance or behavior, such as: slurred speech, unstable walk, unconsciousness, destruction of property, use of abusive language, alcohol on breath, vomiting, or disturbance to others;

(f) Distribution, sale, or trade of alcoholic beverages on campus property or to members of the Philadelphia University community;

(g) Possession of kegs or similar bulk containers, or any apparatus associated with drinking games;

(h) Possession by any person less than 21 years of age of paraphernalia associated with consumption of alcoholic beverages including, but not limited to, beer bongs and empty alcoholic beverage bottles;

(i) Consumption, distribution, or possession of alcoholic beverages in public areas of the campus not designated as a permitted area or in said areas without a permit;

(j) Use of alcohol to the extent that the safety to self or others on the campus is jeopardized.

4. Drug Policy. The University's drug policy can be found here. Additional rules regarding drugs are set forth in the Office of Residence Life (ORL) rules and regulations and rules governing other University programs. Examples of prohibited behavior include:

(a) Consumption, use, distribution, manufacture, transportation, or possession of illegal drugs on or off campus;

(b) Being under the influence of illegal drugs as indicated by appearance or behavior, such as: slurred speech, unstable walk, unconsciousness, destruction of property, use of abusive language, smell, vomiting or disturbance of others;

(c) Sale or trade of illegal or prescription drugs;

(d) Possession of drug or drug-related paraphernalia.

5. Harassment: Abusive, dangerous, or harmful behavior which threatens or endangers the health and safety of self or any other person, including, but not limited to:

(a) Physical abuse/assault or placing another in reasonable apprehension thereof;

(b) Verbal abuse;

(c) Rape and/or Sexual Violence (see Sexual Misconduct Policy below);

(d) Expressed or implied threats and/or intimidation, including bullying;

(e) Violation of the University's policy on the use of electronic and other recording devices;

(f) Active discrimination based on race, color, sex, age, religion, national origin, marital status, sexual orientation or disability.

6. Violations of the Sexual Misconduct Policy, which can be found here .

7. Unauthorized possession of any property, actual or attempted of the University, of a member of the University community, or other personal, public, or intellectual property, either on or off campus.

8. Unauthorized entry into, or use of, University facilities including computing networks which are restricted in access.

9. Damage and/or vandalism to public, private, personal, or University property.

10. Intentional obstruction or disruption of teaching, research, administration, disciplinary procedures, other University activities or activities authorized to take place on University property.

11. Disorderly conduct, including acts which breach the peace and/or are lewd, indecent, or obscene.

12. Failure to comply with the reasonable directions of University, local, state, or federal officials performing official duties, including but not limited to:

(a) Failure to give proper identification;

(b) Failure to complete assigned judicial sanctions or;

(c) Failure to vacate any premises when requested.

13. Being complicit with, present during, or having actual knowledge of any act which violates the Community Standards.

14. Illegal or unauthorized possession or use of firearms, explosives, other weapons, or dangerous chemicals on University premises.

15. Violations of University policies as described in The Student Handbook and the University Catalogue and all other rules governing University facilities, programs and services, including but not limited to:

(a) Academic policies
(b) Financial policies

(c) Information Resources Services (OIR) policies

(d) Office of Residence Life polices & procedures

(e) Student Life policies & procedures

(f) Parking policies and regulations

16. Violations of statutes, laws, ordinances and/or regulations of the City of Philadelphia, Commonwealth of Pennsylvania, and the United States of America.

**Judicial Processes**

Alleged violations of The Community Standards are adjudicated by judicial hearing officers or judicial hearing boards, depending upon the type of alleged violation, and other factors, such as the seriousness of the charges, the location of the event, the number of students involved, and/or the potential sanction at issue.

Types of Judicial Officers and Judicial Hearing Boards

1. Judicial Officers:

(a) Professional staff members: Designated members of the Division of Student Life are authorized to conduct hearings, determine responsibility, and, if applicable, assign sanctions for allegations for non-academic and non-sexual cases. (see Sanctions below).  The Director of Judicial Affairs has the authority to appoint a panel of judicial officers to hear cases of a non-academic and non-sexual matter that are not of a serious nature or involve prior offenses.

(b) Faculty members: Faculty serve as judicial officers for their classes and are empowered to resolve violations of the Academic Integrity Policy occurring within their classes. Faculty have the authority to administer sanctions within their courses, including failure on the assignment in question to failure for the course. Faculty have the prerogative to refer any case to the Academic Integrity Board (see below).

2. The Student Conduct Board:

The Student Conduct Board hears non-academic and non-sexual cases that are serious in nature or involve prior offences. Composition: three students selected by the Director of Judicial Affairs; three administrative staff or faculty members appointed by the Director of Judicial Affairs; and a presiding officer (the Chair of the Student Experience Committee or a faculty delegate). The Committee is advised by the Director of Judicial Affairs (or designee), who serves as the recording secretary.

3. The Academic Integrity Board (a subcommittee of The Student Experience Committee):

The Academic Integrity Board hears alleged violations of the Academic Integrity Policy referred by faculty members. Composition: three faculty members from The Student Experience Committee; three student representatives selected by the Director of Judicial Affairs; and a presiding officer (the Chair of the Student Experience Committee or faculty delegate). The Committee is advised by the Director of Judicial Affairs (or designee), who serves as the recording secretary.

4. The Sexual Misconduct Board:

The Sexual Misconduct Board hears complaints of student sexual misconduct. The committee is selected from a pool of faculty, staff and students trained in matters related to sexual misconduct. Composition: one faculty member, one student, and one administrative staff member. The Board in advised by the Title IX Coordinator. The Director of Judicial Affairs (or designee) serves as the recording secretary.

**The Complaint Process**

Any University community member who has witnessed or been victim of a violation of The Community Standards may file a complaint in writing to the Director of Judicial Affairs or Dean of Students. This includes incident reports from Safety and Security and the Residence Life staff. (For allegations of the violations of academic integrity, see The Academic Integrity Policy; for allegations of sexual misconduct, see The Sexual Misconduct Policy). Complaints from citizens outside the University community or the law enforcement officials may be grounds for adjudication under The Community Standards.

Written complaints should contain the following:

1. A description of the alleged violation with specific details re: date, time, location and incident.

2. The Community Standard alleged to have been violated.

3. The judicial officer will then arrange a meeting with the complainant to provide an overview of the University Judicial System and collect other information as needed.

**Judicial Procedures for Complaints Referred to Judicial Officers**

1. Notice:

Students who are accused of violations of The Community Standards will be contacted via University e-mail by a judicial officer to set up an appointment to discuss the allegation and advise the respondent of his/her rights under The Community Standards. The hearing will be established for a reasonable time thereafter. Students must respond to the judicial notice within 48 business hours to schedule an appointment. Failure to comply with the summons or failure to attend one's own hearing does not preclude the case from being heard and a decision being rendered in absentia.

2. Hearing Protocols

(a) Hearings shall be conducted in private. Admission of any person to the hearing shall be at the discretion of the judicial officer.

(b) In hearings involving more than one accused student, the judicial officer may conduct hearings concerning each student separately.

(c) The judicial officer will conduct an investigation of the complaint, gather evidence, and interview any parties involved in or witness to the matter.

(d) The judicial officer will present to the respondent any evidence pertaining to the allegation of the violation of The Community Standards.

(e) The respondent will be asked to present a statement regarding responsibility for the alleged violation.

3. Standard of Proof: The decision of the judicial officer shall be made on the basis of the preponderance of evidence: that is, whether it is more likely than not that the respondent committed the violation.

4. Determination of Responsibility and Sanctions: Once the judicial officer is satisfied that the necessary procedures have been completed and a hearing is held, as applicable, the judicial officer will make a determination whether the respondent is in violation of The Community Standards, and if so, will assign the appropriate sanctions (see Sanctions below).

**Judicial Procedures for Complaints Referred to Judicial Hearing Boards:**

1. Notice

Students who are accused of violations of The Community Standards will be contacted via their University e-mail account by a judicial hearing officer to set up an appointment to discuss the allegation and advise the respondent of his/her rights under The Community Standards. Students must respond to the notice within 48 hours to schedule an appointment. If the case advances to a judicial hearing board, the respondent will be provided the hearing procedure guidelines which describe in full the procedure for the hearing. Failure to comply with the summons or failure to attend one's own hearing does not preclude the case from being heard and a decision being rendered in absentia.

2. Advisors

If the complaint is advanced to a judicial hearing board for adjudication, the respondent and the complainant will be assigned advisors from the Student Life staff or other faculty or staff from the University community. The advisor's role is to assist the student in understanding the judicial procedure. The advisor may accompany the respondent or complainant throughout the judicial process. The advisor does not advocate on behalf of the complainant or respondent, or address the judicial board in any way, but may, with the permission of the presiding judicial hearing officer, consult with the advisee.

3. Personal support

Because cases are often stressful and overwhelming, both the respondent and the complainant may request that a personal friend or associate accompany them at the hearing. This person has no role other than to advise and to provide moral support to the student and may not address the judicial hearing board.

4. Pre-Hearing Procedures

(a) The respondent and the complainant have an equal opportunity to present and cross-

examine witnesses at the discretion of the Director of Judicial Affairs or the judicial hearing officer.

(b) Only those witnesses with first-hand knowledge of the alleged incident or having material information will be permitted to offer testimony. The decision to hear testimony from witnesses will be made by the judicial hearing board in consultation with the Director of Judicial Affairs.

(c) The Director of Judicial Affairs or the judicial hearing officer will establish the procedure for the parties to exchange information prior to the hearing. The exchange will occur generally and no later than five days prior to the hearing unless the judicial hearing officer sets an earlier date for the exchange. The parties will exchange copies of all information relevant to the incident to be shared at the hearing and a list of possible witnesses. The release of information pursuant to this Section may be subject to limitations imposed by state and Federal law. The judicial hearing officer may exclude any information from the hearing that a party fails to include in this exchange of information or fails to exchange according to these procedures.

5.  Hearing Protocols:

(a) All hearings shall be conducted in private and are confidential. Participants may not disclose any part of the proceedings outside the hearing. Admission of any person to the hearing is at the discretion of the judicial hearing board. Hearings are limited to the respondent, complainant, advisors, any authorized support persons, approved witnesses, the judicial hearing board members, and support staff.

(b) In hearings involving more than one respondent, the Director of Judicial Affairs determines whether the hearings will be held jointly or separately.

(c) All procedural questions are subject to the final decision of the Director of Judicial Affairs in consultation with the Chair of the judicial hearing board. Technical rules of evidence associated with criminal and civil courts are not applicable to University judicial hearings.

(d) Hearings will be conducted in a timely manner, as determined by the Director of Judicial Affairs or the Dean of Students.

6.  Evidence

(a) Pertinent records, exhibits, and written statements may be accepted as evidence for consideration by a judicial hearing board at the discretion of the Director of Judicial Affairs in consultation with the Chair of the judicial hearing board. Both the complainant and the respondent shall have an ample opportunity to review all evidence prior to the hearing. Such reviews are restricted to the privacy of the Dean of Students Office. No copies of any part of the case file may be reproduced or removed from the Dean of Students Office. No cell phones or other electronic devices are allowed in the review process. Violations of this policy will result in further charges.

(b) All materials introduced as evidence will be available to all parties during the hearing. Only presented evidence shall be considered during the hearing.

(c) References to prior incidents will not normally be permitted unless they are materially related to the matter at hand.

7.  Standard of Proof:

The decision of the judicial hearing board shall be made on the basis of the preponderance of evidence; that is, whether it is more likely than not that the respondent committed the violation.

8. Determination of Responsibility & Sanctions

(a) After all parties have testified and all evidence is considered, the respondent and complainant will be asked to make closing statements. The Respondent and Complainant and any witnesses will then be dismissed, and the judicial hearing board will deliberate in closed session to determine whether the student is responsible for violation of The Community Standard in question.

(b) In the case of a finding of responsible, the judicial hearing board will assign the appropriate sanctions. If the respondent has prior violations of the Community Standards, they will be introduced in the consideration of appropriate sanctions.

(c) Decisions made by a judicial hearing board shall be final, pending the appeal process delineated below. Following the hearing, the respondent and the complainant will be recalled and told of the decision of the hearing and of the sanctions imposed. The respondent will receive the written decision via e-mail and conventional mail within three business days, or whenever reasonably practical. In sexual misconduct cases, the complaint also receives written notification of the outcome of the proceeding.

9. Sanctions:

The following sanctions may be imposed upon any student found to have violated The Student Community Standards:

(a) Warning and/or Censure: A written notice to the student that he or she is violating or has violated The Community Standards, and that such conduct will not be tolerated within the University community.

(b) Probation: Probation is for a designated period of time and includes the probability of more severe judicial sanctions if the student is found to be in violation of The Student Community Standards during a probationary period. Probationary status may affect the student's eligibility for some University programs or activities, including but not limited to study abroad, varsity athletic competition, and summer housing.

(c) Suspension: Removal from classes and other privileges or activities as a student for a designated period of time. A suspended student must turn in campus photo ID, University keys, and all other University property at the time the suspension goes into effect. Students on suspension are considered persona non grata, i.e. loss of all privileges of enrolled students. The University may specify conditions prior to reinstatement.

(d) Expulsion: Permanent removal from classes and other privileges or activities as a student. Expelled students must turn in their campus photo ID, University keys, and all other University property at the time expulsion goes into effect and are considered persona non grata at the University.

(e) Educational Sanctions

Referral to counseling or other support services or educational programs.

Community Service or other service-work at or for the University.

Assignments as determined by the judicial hearing officer or judicial body.

(f) Other Sanctions

Loss of Privileges: Denial or restriction of specified privileges or use of specified facilities for a designated period of time.

Fines

Restitution: Compensation for loss, damage or injury through the payment of money or through

appropriate work requirement related to the offense.

Room/building reassignment: Immediate relocation of the student to another campus residence.

Termination of the Housing Agreement: removal from campus residence halls and/or restriction from access to campus housing;

Failing assignment or course grade (in cases of academic dishonesty only). If the sanction is failure of the course, an "F" will be given and will appear on the transcript; the student will not be allowed to drop the course, even within the drop period.

Persona Non Grata status: Prohibition from a specific area or all campus property and/or activities. Violation of a persona non-grata sanction may subject the violator to arrest for trespassing;

More than one of the above sanctions listed may be imposed for any single violation. Other than University expulsion, disciplinary sanctions shall not be made part of the student's academic transcript, but shall become part of the student's permanent judicial record. A student's record is, therefore, subject to review by those authorized to request it on a "need to know basis, other higher education institutions, and future employers, in cases where the student initiates the disclosure or waives his right to privacy.

(g) Student Organization & Other Group Sanctions

When a student organization engages in some act(s) of misconduct, the University may take action not only against the student(s) involved, but also against the organization itself. Options for sanctioning are outlined below. Sanctions may include deactivation or loss of privileges, including University recognition, for a specified period of time.

(h) Interim Sanctions

Should a student's presence on campus create a threat to the safety or well-being of members of the Philadelphia University community, the University reserves the right to immediately suspend that student from campus until a judicial hearing can he convened. The University shall provide the student notice of interim suspension as soon as practical. The University reserves the right to resolve a case and sanction a student, including suspension, without a hearing where such action is deemed necessary or appropriate by the Dean of Students.

Interim suspension may be imposed to help ensure the safety and well-being of members of the University community or preservation of University property; to help ensure the student's own physical or emotional safety and/or well-being; to help prevent disruption or interference with the normal operations of the University.

During interim suspension, students may be denied access to the residence areas and/or to the campus (including classes) and/or all other University activities or privileges for which the student might otherwise be eligible. Whenever interim sanctions are imposed a hearing will be convened at the earliest possible time. The interim sanction(s) may remain in effect until a final decision has been reached, including any appropriate appeals process.

10. Appeals

A decision reached by a judicial hearing officer or a judicial hearing board may be appealed by the respondent(s) or the complainant(s). A request for an appeal must be submitted in writing to the Director of Judicial Affairs (or designee) within two business days of the decision. The Director of Judicial Affairs will direct the appeal to the appropriate appellate judicial officer or judicial hearing board. Appeals are heard as follows:

(a) Appeal of a decision of a judicial hearing officer: Director of Judicial Affairs or delegate.

(b) Appeal of suspension from housing or of campus privileges: Dean of Students.

(c) Appeals of academic integrity violations: The academic program director, or Executive Dean of the School in which the violation occurred.

(d) Appeal of suspension or expulsion from the University: The President's Office.

Appeals must be submitted in writing and must meet at least one of the following criteria:
(a) Violation of University judicial procedures.

(b) Misinterpretation of the policies alleged to be violated.

(c) New evidence not reasonably available at the time of the hearing.

(d) Improper or excessive sanction(s).

(e) Decision not supported by a preponderance of evidence.

Upon receipt of the appeal, the appellate officer or judicial hearing board take the following action:
(a) Deny the appeal for lack of sufficient reason for appeal.

(b) Agree to re-hear the case.

(c) Investigate and amend the decision and/or sanction.

In appeals involving claims of improper or excessive sanctions, an appeal cannot result in more severe sanctions for the respondent. Review of the audio transcript or other supporting materials will be available to the appellate board upon request.

11.  Judicial Records

(a) The written decision is filed in the confidential Judicial File maintained in the Dean of Students Office and disclosed to third parties only with the student's permission or on a "need to know" basis. Access to the file is granted by the Dean of Students or delegate. A full explanation of the privacy of student records may be found in the Philadelphia University Family Rights and Education Act (FERPA) policy available in the Student Record policy in The University Catalogue.

(b) The complete hearing file, including, audio transcripts of hearing, is maintained in The Dean of Students Office and is not accessible once the hearing is concluded unless subpoenaed by a court of law.



**About**

News
Offices
Virtual Tour
Map & Directions
Employment
Innovator Magazine

**Academics**

Colleges
Undergraduate
Graduate
Adult Learners
Academic Catalog
Library

**Student Life**

Student Activities
Safety & Security
Student Services
Student Journals
Ask a Student
University Bookstore

**Admissions**

How to Apply
Tuition & Fees
Financial Aid
Scholarships
Request Info
Schedule a Visit

**More Info**

Calendar
Contact Us
Blackboard
WebAdvisor
Webmail
Directory

4201 Henry Avenue • Philadelphia, PA 19144 • 215.951.2700 (ph) • © 2012 Philadelphia University. All rights reserved. Privacy Policy

"E"



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

April 4, 2011

Dear Colleague:

Education has long been recognized as the great equalizer in America. The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing all students with an educational environment free from discrimination is extremely important. The sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX. In order to assist recipients, which include school districts, colleges, and universities (hereinafter "schools" or "recipients") in meeting these obligations, this letter[1] explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence.[2] Sexual violence, as that term is used in this letter, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol. An individual also may be unable to give consent due to an intellectual or other disability. A number of different acts fall into the category of sexual violence, including rape,

---

[1] The Department has determined that this Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at:* http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/012507_good_guidance.pdf. OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This letter does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to us at the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, DC 20202.

[2] Use of the term "sexual harassment" throughout this document includes sexual violence unless otherwise noted. Sexual harassment also may violate Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c), which prohibits public school districts and colleges from discriminating against students on the basis of sex, among other bases. The U.S. Department of Justice enforces Title IV.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX.

The statistics on sexual violence are both deeply troubling and a call to action for the nation. A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.[3] The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college.[4] According to data collected under the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), in 2009, college campuses reported nearly 3,300 forcible sex offenses as defined by the Clery Act.[5] This problem is not limited to college. During the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools.[6] Additionally, the likelihood that a woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.[7] The Department is deeply concerned about this problem and is committed to ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities.

This letter begins with a discussion of Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence. These requirements are discussed in detail in OCR's *Revised Sexual Harassment Guidance* issued in 2001 (*2001 Guidance*).[8] This letter supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence. This letter concludes by discussing the proactive efforts schools can take to prevent sexual harassment and violence, and by providing examples of remedies that schools and OCR may use to end such conduct, prevent its recurrence, and address its effects. Although some examples contained in this letter are applicable only in the postsecondary context, sexual

---

[3] CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY: FINAL REPORT xiii (Nat'l Criminal Justice Reference Serv., Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. This study also found that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol. *Id.* at xviii.
[4] *Id.* at 5-5.
[5] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at* http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf. Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. 34 C.F.R. Part 668, Subpt. D, App. A.
[6] SIMONE ROBERS ET AL., INDICATORS OF SCHOOL CRIME AND SAFETY: 2010 at 104 (U.S. Dep't of Educ. & U.S. Dep't of Justice, Nov. 2010), *available at* http://nces.ed.gov/pubs2011/2011002.pdf.
[7] ERIKA HARRELL & MICHAEL R. RAND, CRIME AGAINST PEOPLE WITH DISABILITIES, 2008 (Bureau of Justice Statistics, U.S. Dep't of Justice, Dec. 2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/capd08.pdf.
[8] The *2001 Guidance* is available on the Department's Web site at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. Schools' obligations and the appropriate response to sexual harassment and violence committed by employees may be different from those described in this letter. Recipients should refer to the *2001 Guidance* for further information about employee harassment of students.

harassment and violence also are concerns for school districts. The Title IX obligations discussed in this letter apply equally to school districts unless otherwise noted.

## Title IX Requirements Related to Sexual Harassment and Sexual Violence

### Schools' Obligations to Respond to Sexual Harassment and Sexual Violence

Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX.[9]

As explained in OCR's *2001 Guidance*, when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment.[10]

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

---

[9] Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in this letter also apply to gender-based harassment. Gender-based harassment is discussed in more detail in the *2001 Guidance,* and in the 2010 Dear Colleague letter on Harassment and Bullying, which is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[10] *See, e.g.*, *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as…severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.[12] Schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures. Because of these requirements, which are discussed in greater detail in the following section, schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence. OCR recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.

Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct. The specific steps in a school's

---

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at n.1.

[12] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999).

investigation will vary depending upon the nature of the allegations, the age of the student or students involved (particularly in elementary and secondary schools), the size and administrative structure of the school, and other factors. Yet as discussed in more detail below, the school's inquiry must in all cases be prompt, thorough, and impartial. In cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.[13]

Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution) before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited.[14] The school also should tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

As discussed in the *2001 Guidance*, if the complainant continues to ask that his or her name or other identifiable information not be revealed, the school should evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. Thus, the school may weigh the request for confidentiality against the following factors: the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the alleged harasser's rights to receive information about the allegations if the information is maintained by the school as an "education record" under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. Part 99.[15] The school should inform the complainant if it cannot ensure confidentiality. Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence. Examples of such steps are discussed later in this letter.

Compliance with Title IX, such as publishing a notice of nondiscrimination, designating an employee to coordinate Title IX compliance, and adopting and publishing grievance procedures, can serve as preventive measures against harassment. Combined with education and training programs, these measures can help ensure that all students and employees recognize the

---

[13] In states with mandatory reporting laws, schools may be required to report certain incidents to local law enforcement or child protection agencies.

[14] Schools should refer to the *2001 Guidance* for additional information on confidentiality and the alleged perpetrator's due process rights.

[15] For example, the alleged harasser may have a right under FERPA to inspect and review portions of the complaint that directly relate to him or her. In that case, the school must redact the complainant's name and other identifying information before allowing the alleged harasser to inspect and review the sections of the complaint that relate to him or her. In some cases, such as those where the school is required to report the incident to local law enforcement or other officials, the school may not be able to maintain the complainant's confidentiality.

nature of sexual harassment and violence, and understand that the school will not tolerate such conduct. Indeed, these measures may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment. Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond. More detailed information and examples of education and other preventive measures are provided later in this letter.

**Procedural Requirements Pertaining to Sexual Harassment and Sexual Violence**

Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:

(A) Disseminate a notice of nondiscrimination;[16]

(B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX;[17] and

(C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.[18]

These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination. They are discussed in greater detail below. OCR advises recipients to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in this letter and the *2001 Guidance.* Recipients should then implement changes as needed.

(A) _Notice of Nondiscrimination_

The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner.[19] The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator.

The notice must be widely distributed to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant persons. OCR recommends that the notice be prominently posted on school Web sites and at various

---

[16] 34 C.F.R. § 106.9.
[17] *Id.* § 106.8(a).
[18] *Id.* § 106.8(b).
[19] *Id.* § 106.9(a).

locations throughout the school or campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. The notice should be available and easily accessible on an ongoing basis.

Title IX does not require a recipient to adopt a policy specifically prohibiting sexual harassment or sexual violence. As noted in the *2001 Guidance*, however, a recipient's general policy prohibiting sex discrimination will not be considered effective and would violate Title IX if, because of the lack of a specific policy, students are unaware of what kind of conduct constitutes sexual harassment, including sexual violence, or that such conduct is prohibited sex discrimination. OCR therefore recommends that a recipient's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment, including sexual violence, and that the policy include examples of the types of conduct that it covers.

(B) *Title IX Coordinator*

The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX.[20] The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. The Title IX coordinator or designee should be available to meet with students as needed. If a recipient designates more than one Title IX coordinator, the notice should describe each coordinator's responsibilities (*e.g.*, who will handle complaints by students, faculty, and other employees). The recipient should designate one coordinator as having ultimate oversight responsibility, and the other coordinators should have titles clearly showing that they are in a deputy or supporting role to the senior coordinator. The Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.

Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate. Because sexual violence complaints often are filed with the school's law enforcement unit, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence. In addition, these employees should receive copies of the school's Title IX policies. Schools should instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents. The school's Title IX coordinator or designee should be available to provide assistance to school law enforcement unit employees regarding how to respond appropriately to reports of sexual violence. The Title IX coordinator also should be given access to school law enforcement unit investigation notes

[20] *Id.* § 106.8(a).

and findings as necessary for the Title IX investigation, so long as it does not compromise the criminal investigation.

(C) *Grievance Procedures*

The Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.[21] The grievance procedures must apply to sex discrimination complaints filed by students against school employees, other students, or third parties.

Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints. Therefore, a recipient may use student disciplinary procedures or other separate procedures to resolve such complaints. Any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary procedures, however, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution.[22] These requirements are discussed in greater detail below. If the recipient relies on disciplinary procedures for Title IX compliance, the Title IX coordinator should review the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.[23]

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

---

[21] *Id.* § 106.8(b). Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination.

[22] These procedures must apply to all students, including athletes. If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaints must not be addressed solely by athletics department procedures. Additionally, if an alleged perpetrator is an elementary or secondary student with a disability, schools must follow the procedural safeguards in the Individuals with Disabilities Education Act (at 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.519, 300.530-300.537) as well as the requirements of Section 504 of the Rehabilitation Act of 1973 (at 34 C.F.R. §§ 104.35-104.36) when conducting the investigation and hearing.

[23] A school may not absolve itself of its Title IX obligations to investigate and resolve complaints of sexual harassment or violence by delegating, whether through express contractual agreement or other less formal arrangement, the responsibility to administer school discipline to school resource officers or "contract" law enforcement officers. *See* 34 C.F.R. § 106.4.

*Prompt and Equitable Requirements*

As stated in the *2001 Guidance*, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint;[24] and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

As noted in the *2001 Guidance*, procedures adopted by schools will vary in detail, specificity, and components, reflecting differences in the age of students, school sizes and administrative structures, State or local legal requirements, and past experiences. Although OCR examines whether all applicable elements are addressed when investigating sexual harassment complaints, this letter focuses on those elements where our work indicates that more clarification and explanation are needed, including:

(A) *Notice of the grievance procedures*

The procedures for resolving complaints of sex discrimination, including sexual harassment, should be written in language appropriate to the age of the school's students, easily understood, easily located, and widely distributed. OCR recommends that the grievance procedures be prominently posted on school Web sites; sent electronically to all members of the school community; available at various locations throughout the school or campus; and summarized in or attached to major publications issued by the school, such as handbooks, codes of conduct, and catalogs for students, parents of elementary and secondary students, faculty, and staff.

(B) *Adequate, Reliable, and Impartial Investigation of Complaints*

OCR's work indicates that a number of issues related to an adequate, reliable, and impartial investigation arise in sexual harassment and violence complaints. In some cases, the conduct

---

[24] "Outcome" does not refer to information about disciplinary sanctions unless otherwise noted. Notice of the outcome is discussed in greater detail in Section D below.

may constitute both sexual harassment under Title IX and criminal activity. Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.

A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation. For instance, if a complainant wants to file a police report, the school should not tell the complainant that it is working toward a solution and instruct, or ask, the complainant to wait to file the report.

Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[25] Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement.

As noted above, the Title IX regulation requires schools to provide equitable grievance procedures. As part of these procedures, schools generally conduct investigations and hearings to determine whether sexual harassment or violence occurred. In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* Like Title IX,

---

[25] In one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances.

Title VII prohibits discrimination on the basis of sex.[26] OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[27] OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings.[28] Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.[29] For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's

---

[26] *See, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment). The *2001 Guidance* noted (on page vi) that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." *See also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[27] OCR's Case Processing Manual is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

[28] The Title IX regulations adopt the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. *See* 34 C.F.R. § 106.71 ("The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). The Title VI regulations apply the Administrative Procedure Act to administrative hearings required prior to termination of Federal financial assistance and require that termination decisions be "supported by and in accordance with the reliable, probative and substantial evidence." 5 U.S.C. § 556(d). The Supreme Court has interpreted "reliable, probative and substantial evidence" as a direction to use the preponderance standard. *See Steadman v. SEC*, 450 U.S. 91, 98-102 (1981).

[29] Access to this information must be provided consistent with FERPA. For example, if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records. Additionally, access should not be given to privileged or confidential information. For example, the alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history.

statement without also allowing the complainant to review the alleged perpetrator's statement.

While OCR does not require schools to permit parties to have lawyers at any stage of the proceedings, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment. OCR also recommends that schools provide an appeals process. If a school provides for appeal of the findings or remedy, it must do so for both parties. Schools must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

All persons involved in implementing a recipient's grievance procedures (*e.g.*, Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures. The training also should include applicable confidentiality requirements. In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence.[30] Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Public and state-supported schools must provide due process to the alleged perpetrator. However, schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant.

(C) *Designated and Reasonably Prompt Time Frames*

OCR will evaluate whether a school's grievance procedures specify the time frames for all major stages of the procedures, as well as the process for extending timelines. Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment. For example, the resolution of a complaint involving multiple incidents with multiple complainants likely would take longer than one involving a single incident that

---

[30] For instance, if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner.

occurred in a classroom during school hours with a single complainant.

(D) *Notice of Outcome*

Both parties must be notified, in writing, about the outcome of both the complaint and any appeal,[31] *i.e.*, whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently. Title IX does not require the school to notify the alleged perpetrator of the outcome before it notifies the complainant.

Due to the intersection of Title IX and FERPA requirements, OCR recognizes that there may be confusion regarding what information a school may disclose to the complainant.[32] FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's "education record." However, as stated in the *2001 Guidance*, FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student. This includes an order that the harasser stay away from the harassed student, or that the harasser is prohibited from attending school for a period of time, or transferred to other classes or another residence hall.[33] Disclosure of other information in the student's "education record," including information about sanctions that do not relate to the harassed student, may result in a violation of FERPA.

Further, when the conduct involves a crime of violence or a non-forcible sex offense,[34] FERPA permits a postsecondary institution to disclose to the alleged victim the final results of a

---

[31] As noted previously, "outcome" does not refer to information about disciplinary sanctions unless otherwise noted.

[32] In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964, title IX of Education Amendments of 1972, title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

[33] This information directly relates to the complainant and is particularly important in sexual harassment cases because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether he or she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the rest of the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

[34] Under the FERPA regulations, crimes of violence include arson; assault offenses (aggravated assault, simple assault, intimidation); burglary; criminal homicide (manslaughter by negligence); criminal homicide (murder and

disciplinary proceeding against the alleged perpetrator, regardless of whether the institution concluded that a violation was committed.[35] Additionally, a postsecondary institution may disclose to anyone—not just the alleged victim—the final results of a disciplinary proceeding if it determines that the student is an alleged perpetrator of a crime of violence or a non-forcible sex offense, and, with respect to the allegation made, the student has committed a violation of the institution's rules or policies.[36]

Postsecondary institutions also are subject to additional rules under the Clery Act. This law, which applies to postsecondary institutions that participate in Federal student financial aid programs, requires that "both the accuser and the accused must be informed of the outcome[37] of any institutional disciplinary proceeding brought alleging a sex offense."[38] Compliance with this requirement does not constitute a violation of FERPA. Furthermore, the FERPA limitations on redisclosure of information do not apply to information that postsecondary institutions are required to disclose under the Clery Act.[39] Accordingly, postsecondary institutions may not require a complainant to abide by a nondisclosure agreement, in writing or otherwise, that would prevent the redisclosure of this information.

## Steps to Prevent Sexual Harassment and Sexual Violence and Correct its Discriminatory Effects on the Complainant and Others

### Education and Prevention

In addition to ensuring full compliance with Title IX, schools should take proactive measures to prevent sexual harassment and violence. OCR recommends that all schools implement preventive education programs and make victim resources, including comprehensive victim services, available. Schools may want to include these education programs in their (1) orientation programs for new students, faculty, staff, and employees; (2) training for students who serve as advisors in residence halls; (3) training for student athletes and coaches; and (4) school assemblies and "back to school nights." These programs should include a

---

non-negligent manslaughter); destruction, damage or vandalism of property; kidnapping/abduction; robbery; and forcible sex offenses. Forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include rape, sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 99, App. A.

[35] 34 C.F.R. § 99.31(a)(13). For purposes of 34 C.F.R. §§ 99.31(a)(13)-(14), disclosure of "final results" is limited to the name of the alleged perpetrator, any violation found to have been committed, and any sanction imposed against the perpetrator by the school. 34 C.F.R. § 99.39.

[36] 34 C.F.R. § 99.31(a)(14).

[37] For purposes of the Clery Act, "outcome" means the institution's final determination with respect to the alleged sex offense and any sanctions imposed against the accused. 34 C.F.R. § 668.46(b)(11)(vi)(B).

[38] 34 C.F.R. § 668.46(b)(11)(vi)(B). Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the person is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses include incest and statutory rape. 34 C.F.R. Part 668, Subpt. D, App. A.

[39] 34 C.F.R. § 99.33(c).

discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies.

The education programs also should include information aimed at encouraging students to report incidents of sexual violence to the appropriate school and law enforcement authorities. Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved.[40] As a result, schools should consider whether their disciplinary policies have a chilling effect on victims' or other students' reporting of sexual violence offenses. For example, OCR recommends that schools inform students that the schools' primary concern is student safety, that any other rules violations will be addressed separately from the sexual violence allegation, and that use of alcohol or drugs never makes the victim at fault for sexual violence.

OCR also recommends that schools develop specific sexual violence materials that include the schools' policies, rules, and resources for students, faculty, coaches, and administrators. Schools also should include such information in their employee handbook and any handbooks that student athletes and members of student activity groups receive. These materials should include where and to whom students should go if they are victims of sexual violence. These materials also should tell students and school employees what to do if they learn of an incident of sexual violence. Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence.

**Remedies and Enforcement**

As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. In addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies. Examples of these actions are discussed in greater detail below.

Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation. When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the

---

[40] The Department's Higher Education Center for Alcohol, Drug Abuse, and Violence Prevention (HEC) helps campuses and communities address problems of alcohol, other drugs, and violence by identifying effective strategies and programs based upon the best prevention science. Information on HEC resources and technical assistance can be found at www.higheredcenter.org.

complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain. In addition, schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement.[41]

Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred.

When OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population. When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

Schools should proactively consider the following remedies when determining how to respond to sexual harassment or violence. These are the same types of remedies that OCR would seek in its cases.

Depending on the specific nature of the problem, remedies for the complainant might include, but are not limited to:[42]

- providing an escort to ensure that the complainant can move safely between classes and activities;
- ensuring that the complainant and alleged perpetrator do not attend the same classes;
- moving the complainant or alleged perpetrator to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;
- providing counseling services;
- providing medical services;
- providing academic support services, such as tutoring;

---

[41] The Clery Act requires postsecondary institutions to develop and distribute a statement of policy that informs students of their options to notify proper law enforcement authorities, including campus and local police, and the option to be assisted by campus personnel in notifying such authorities. The policy also must notify students of existing counseling, mental health, or other student services for victims of sexual assault, both on campus and in the community. 20 U.S.C. §§ 1092(f)(8)(B)(v)-(vi).

[42] Some of these remedies also can be used as interim measures before the school's investigation is complete.

- arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record; and
- reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the harassment and the misconduct that may have resulted in the complainant being disciplined.[43]

Remedies for the broader student population might include, but are not limited to:
*Counseling and Training*
- offering counseling, health, mental health, or other holistic and comprehensive victim services to all students affected by sexual harassment or sexual violence, and notifying students of campus and community counseling, health, mental health, and other student services;
- designating an individual from the school's counseling center to be "on call" to assist victims of sexual harassment or violence whenever needed;
- training the Title IX coordinator and any other employees who are involved in processing, investigating, or resolving complaints of sexual harassment or sexual violence, including providing training on:
  - o the school's Title IX responsibilities to address allegations of sexual harassment or violence
  - o how to conduct Title IX investigations
  - o information on the link between alcohol and drug abuse and sexual harassment or violence and best practices to address that link;
- training all school law enforcement unit personnel on the school's Title IX responsibilities and handling of sexual harassment or violence complaints;
- training all employees who interact with students regularly on recognizing and appropriately addressing allegations of sexual harassment or violence under Title IX; and
- informing students of their options to notify proper law enforcement authorities, including school and local police, and the option to be assisted by school employees in notifying those authorities.

*Development of Materials and Implementation of Policies and Procedures*
- developing materials on sexual harassment and violence, which should be distributed to students during orientation and upon receipt of complaints, as well as widely posted throughout school buildings and residence halls, and which should include:
  - o what constitutes sexual harassment or violence
  - o what to do if a student has been the victim of sexual harassment or violence
  - o contact information for counseling and victim services on and off school grounds
  - o how to file a complaint with the school
  - o how to contact the school's Title IX coordinator

---

[43] For example, if the complainant was disciplined for skipping a class in which the harasser was enrolled, the school should review the incident to determine if the complainant skipped the class to avoid contact with the harasser.

- o what the school will do to respond to allegations of sexual harassment or violence, including the interim measures that can be taken
- requiring the Title IX coordinator to communicate regularly with the school's law enforcement unit investigating cases and to provide information to law enforcement unit personnel regarding Title IX requirements;[44]
- requiring the Title IX coordinator to review all evidence in a sexual harassment or sexual violence case brought before the school's disciplinary committee to determine whether the complainant is entitled to a remedy under Title IX that was not available through the disciplinary committee;[45]
- requiring the school to create a committee of students and school officials to identify strategies for ensuring that students:
  - o know the school's prohibition against sex discrimination, including sexual harassment and violence
  - o recognize sex discrimination, sexual harassment, and sexual violence when they occur
  - o understand how and to whom to report any incidents
  - o know the connection between alcohol and drug abuse and sexual harassment or violence
  - o feel comfortable that school officials will respond promptly and equitably to reports of sexual harassment or violence;
- issuing new policy statements or other steps that clearly communicate that the school does not tolerate sexual harassment and violence and will respond to any incidents and to any student who reports such incidents; and
- revising grievance procedures used to handle sexual harassment and violence complaints to ensure that they are prompt and equitable, as required by Title IX.

*School Investigations and Reports to OCR*
- conducting periodic assessments of student activities to ensure that the practices and behavior of students do not violate the school's policies against sexual harassment and violence;
- investigating whether any other students also may have been subjected to sexual harassment or violence;
- investigating whether school employees with knowledge of allegations of sexual harassment or violence failed to carry out their duties in responding to those allegations;
- conducting, in conjunction with student leaders, a school or campus "climate check" to assess the effectiveness of efforts to ensure that the school is free from sexual harassment and violence, and using the resulting information to inform future proactive steps that will be taken by the school; and

---

[44] Any personally identifiable information from a student's education record that the Title IX coordinator provides to the school's law enforcement unit is subject to FERPA's nondisclosure requirements.
[45] For example, the disciplinary committee may lack the power to implement changes to the complainant's class schedule or living situation so that he or she does not come in contact with the alleged perpetrator.

- submitting to OCR copies of all grievances filed by students alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals.

## Conclusion

The Department is committed to ensuring that all students feel safe and have the opportunity to benefit fully from their schools' education programs and activities. As part of this commitment, OCR provides technical assistance to assist recipients in achieving voluntary compliance with Title IX.

If you need additional information about Title IX, have questions regarding OCR's policies, or seek technical assistance, please contact the OCR enforcement office that serves your state or territory. The list of offices is available at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. Additional information about addressing sexual violence, including victim resources and information for schools, is available from the U.S. Department of Justice's Office on Violence Against Women (OVW) at http://www.ovw.usdoj.gov/.[46]

Thank you for your prompt attention to this matter. I look forward to continuing our work together to ensure that all students have an equal opportunity to learn in a safe and respectful school climate.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights

---

[46] OVW also administers the Grants to Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program. This Federal funding is designed to encourage institutions of higher education to adopt comprehensive, coordinated responses to domestic violence, dating violence, sexual assault, and stalking. Under this competitive grant program, campuses, in partnership with community-based nonprofit victim advocacy organizations and local criminal justice or civil legal agencies, must adopt protocols and policies to treat these crimes as serious offenses and develop victim service programs and campus policies that ensure victim safety, offender accountability, and the prevention of such crimes. OVW recently released the first solicitation for the Services, Training, Education, and Policies to Reduce Domestic Violence, Dating Violence, Sexual Assault and Stalking in Secondary Schools Grant Program. This innovative grant program will support a broad range of activities, including training for school administrators, faculty, and staff; development of policies and procedures for responding to these crimes; holistic and appropriate victim services; development of effective prevention strategies; and collaborations with mentoring organizations to support middle and high school student victims.

"F"



## Questions and Answers on Title IX and Sexual Violence[1]

Title IX of the Education Amendments of 1972 ("Title IX")[2] is a federal civil rights law that prohibits discrimination on the basis of sex in federally funded education programs and activities. All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance (hereinafter "schools", "recipients", or "recipient institutions") must comply with Title IX.[3]

On April 4, 2011, the Office for Civil Rights (OCR) in the U.S. Department of Education issued a Dear Colleague Letter on student-on-student sexual harassment and sexual violence ("DCL").[4] The DCL explains a school's responsibility to respond promptly and effectively to sexual violence against students in accordance with the requirements of Title IX.[5] Specifically, the DCL:

- Provides guidance on the unique concerns that arise in sexual violence cases, such as a school's independent responsibility under Title IX to investigate (apart from any separate criminal investigation by local police) and address sexual violence.

---

[1] The Department has determined that this document is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at* www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf. The Office for Civil Rights (OCR) issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, D.C. 20202.
[2] 20 U.S.C. § 1681 *et seq.*
[3] Throughout this document the term "schools" refers to recipients of federal financial assistance that operate educational programs or activities. For Title IX purposes, at the elementary and secondary school level, the recipient generally is the school district; and at the postsecondary level, the recipient is the individual institution of higher education. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that the law's requirements conflict with the organization's religious tenets. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a). For application of this provision to a specific institution, please contact the appropriate OCR regional office.
[4] Available at http://www.ed.gov/ocr/letters/colleague-201104.html.
[5] Although this document and the DCL focus on sexual violence, the legal principles generally also apply to other forms of sexual harassment.

- Provides guidance and examples about key Title IX requirements and how they relate to sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish grievance procedures.

- Discusses proactive efforts schools can take to prevent sexual violence.

- Discusses the interplay between Title IX, the Family Educational Rights and Privacy Act ("FERPA"),[6] and the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act ("Clery Act")[7] as it relates to a complainant's right to know the outcome of his or her complaint, including relevant sanctions imposed on the perpetrator.

- Provides examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual violence.

The DCL supplements OCR's *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, issued in 2001 (*2001 Guidance*).[8] The *2001 Guidance* discusses in detail the Title IX requirements related to sexual harassment of students by school employees, other students, or third parties. The DCL and the *2001 Guidance* remain in full force and we recommend reading these Questions and Answers in conjunction with these documents.

In responding to requests for technical assistance, OCR has determined that elementary and secondary schools and postsecondary institutions would benefit from additional guidance concerning their obligations under Title IX to address sexual violence as a form of sexual harassment. The following questions and answers further clarify the legal requirements and guidance articulated in the DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects. In order to gain a complete understanding of these legal requirements and recommendations, this document should be read in full.

Authorized by

/s/

Catherine E. Lhamon                     April 29, 2014
Assistant Secretary for Civil Rights

---

[6] 20 U.S.C. §1232g; 34 C.F.R. Part 99.
[7] 20 U.S.C. §1092(f).
[8] Available at http://www.ed.gov/ocr/docs/shguide.html.

## Notice of Language Assistance
## Questions and Answers on Title IX and Sexual Violence

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov.。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

**TABLE OF CONTENTS**

Notice of Language Assistance .................................................................................................iii

A. A School's Obligation to Respond to Sexual Violence ............................................... 1

A-1. What is sexual violence?.................................................................................1

A-2. How does Title IX apply to student-on-student sexual violence? ........................................1

A-3. How does OCR determine if a hostile environment has been created? ............................1

A-4. When does OCR consider a school to have notice of student-on-student sexual violence? ...................................................................................................2

A-5. What are a school's basic responsibilities to address student-on-student sexual violence? ...................................................................................................2

A-6. Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children? ...................................................................................................3

B. Students Protected by Title IX ................................................................................ 5

B-1. Does Title IX protect all students from sexual violence?.....................................5

B-2. How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?................................5

B-3. What issues may arise with respect to students with disabilities who experience sexual violence? ........................................................................................6

B-4. What issues arise with respect to international students and undocumented students who experience sexual violence? ........................................................7

B-5. How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school? ..........................................................................9

C. Title IX Procedural Requirements .......................................................................... 9

C-1. What procedures must a school have in place to prevent sexual violence and resolve complaints? ..................................................................................9

C-2. What information must be included in a school's notice of nondiscrimination? .............10

C-3. What are a Title IX coordinator's responsibilities?............................................10

C-4. Are there any employees who should not serve as the Title IX coordinator? .................11

C-5. Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?....................................................12

C-6. Is a school required to use separate grievance procedures for sexual violence complaints?..................................................................................................14

**D. Responsible Employees and Reporting** .................................................................**14**

D-1. Which school employees are obligated to report incidents of possible sexual violence to school officials? ................................................................ 14

D-2. Who is a "responsible employee"? ................................................................ 15

D-3. What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence? ................................................ 16

D-4. What should a responsible employee tell a student who discloses an incident of sexual violence? ............................................................................ 16

D-5. If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials? ........................................................ 17

**E. Confidentiality and a School's Obligation to Respond to Sexual Violence** ...........................**18**

E-1. How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence? ...................................... 18

E-2. What factors should a school consider in weighing a student's request for confidentiality? ................................................................................ 21

E-3. What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence? .............. 22

E-4. Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"? ........................................................................................ 24

**F. Investigations and Hearings** .......................................................................**24**

F-1. What elements should a school's Title IX investigation include? ......................... 24

F-2. What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation? .............................. 27

F-3. How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation? ................................................................................ 28

F-4. Is a school required to process complaints of alleged sexual violence that occurred off campus? .................................................................................... 29

F-5. Must a school allow or require the parties to be present during an entire hearing? ........ 30

F-6.   May every witness at the hearing, including the parties, be cross-examined? ................ 31

F-7.   May the complainant's sexual history be introduced at hearings? ................................... 31

F-8.   What stages of the investigation are included in the 60-day timeframe referenced
in the DCL as the length for a typical investigation? ......................................................... 31

**G. Interim Measures ........................................................................................................................32**

G-1.   Is a school required to take any interim measures before the completion of its
investigation? ...................................................................................................................... 32

G-2.   How should a school determine what interim measures to take? .................................... 33

G-3.   If a school provides all students with access to counseling on a fee basis, does that
suffice for providing counseling as an interim measure? ................................................. 33

**H. Remedies and Notice of Outcome ...........................................................................................34**

H-1.   What remedies should a school consider in a case of student-on-student sexual
violence? ............................................................................................................................. 34

H-2.   If, after an investigation, a school finds the alleged perpetrator responsible and
determines that, as part of the remedies for the complainant, it must separate the
complainant and perpetrator, how should the school accomplish this if both
students share the same major and there are limited course options? ........................... 36

H-3.   What information must be provided to the complainant in the notice of the
outcome? ............................................................................................................................ 36

**I.   Appeals ......................................................................................................................................37**

I-1.   What are the requirements for an appeals process? ....................................................... 37

I-2.   Must an appeal be available to a complainant who receives a favorable finding but
does not believe a sanction that directly relates to him or her was sufficient? ............... 38

**J.   Title IX Training, Education and Prevention ...........................................................................38**

J-1.   What type of training on Title IX and sexual violence should a school provide to its
employees? ......................................................................................................................... 38

J-2.   How should a school train responsible employees to report incidents of possible
sexual harassment or sexual violence? ............................................................................. 39

J-3.   What type of training should a school provide to employees who are involved in
implementing the school's grievance procedures? ........................................................... 40

J-4.   What type of training on sexual violence should a school provide to its students? ......... 41

**K. Retaliation** ...................................................................................................**42**

   K-1.  Does Title IX protect against retaliation? .......................................... 42

**L. First Amendment** .........................................................................................**43**

   L-1.  How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution? ........................................................................................... 43

**M. The Clery Act and the Violence Against Women Reauthorization Act of 2013** ......................**44**

   M-1. How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs? ...................... 44

   M-2. Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act? ...................................... 44

**N. Further Federal Guidance** ...............................................................................**45**

   N-1.  Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance? ......................................................................................... 45

   N-2.  Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence? ................................................. 45

## A. A School's Obligation to Respond to Sexual Violence

**A-1. What is sexual violence?**

> **Answer:** Sexual violence, as that term is used in this document and prior OCR guidance, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (*e.g.*, due to the student's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent). A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. Sexual violence can be carried out by school employees, other students, or third parties. All such acts of sexual violence are forms of sex discrimination prohibited by Title IX.

**A-2. How does Title IX apply to student-on-student sexual violence?**

> **Answer:** Under Title IX, federally funded schools must ensure that students of all ages are not denied or limited in their ability to participate in or benefit from the school's educational programs or activities on the basis of sex. A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, *i.e.* creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.[9]

**A-3. How does OCR determine if a hostile environment has been created?**

> **Answer:** As discussed more fully in OCR's *2001 Guidance*, OCR considers a variety of related factors to determine if a hostile environment has been created; and also considers the conduct in question from both a subjective and an objective perspective. Specifically, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. Indeed, a single or isolated incident of sexual violence may create a hostile environment.

---

[9] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 643 (1999).

**A-4. When does OCR consider a school to have notice of student-on-student sexual violence?**

**Answer:** OCR deems a school to have notice of student-on-student sexual violence if a responsible employee knew, or in the exercise of reasonable care should have known, about the sexual violence. See question D-2 regarding who is a responsible employee.

A school can receive notice of sexual violence in many different ways. Some examples of notice include: a student may have filed a grievance with or otherwise informed the school's Title IX coordinator; a student, parent, friend, or other individual may have reported an incident to a teacher, principal, campus law enforcement, staff in the office of student affairs, or other responsible employee; or a teacher or dean may have witnessed the sexual violence.

The school may also receive notice about sexual violence in an indirect manner, from sources such as a member of the local community, social networking sites, or the media. In some situations, if the school knows of incidents of sexual violence, the exercise of reasonable care should trigger an investigation that would lead to the discovery of additional incidents. For example, if school officials receive a credible report that a student has perpetrated several acts of sexual violence against different students, that pattern of conduct should trigger an inquiry as to whether other students have been subjected to sexual violence by that student. In other cases, the pervasiveness of the sexual violence may be widespread, openly practiced, or well-known among students or employees. In those cases, OCR may conclude that the school should have known of the hostile environment. In other words, if the school would have found out about the sexual violence had it made a proper inquiry, knowledge of the sexual violence will be imputed to the school even if the school failed to make an inquiry. A school's failure to take prompt and effective corrective action in such cases (as described in questions G-1 to G-3 and H-1 to H-3) would violate Title IX even if the student did not use the school's grievance procedures or otherwise inform the school of the sexual violence.

**A-5. What are a school's basic responsibilities to address student-on-student sexual violence?**

**Answer:** When a school knows or reasonably should know of possible sexual violence, it must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E). If an investigation reveals that sexual violence created a hostile environment, the school must then take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its

effects. But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation.[10] The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. If the school determines that the sexual violence occurred, the school must continue to take these steps to protect the complainant and ensure his or her safety, as necessary. The school should also ensure that the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. For additional information on interim measures, see questions G-1 to G-3.

If a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile environment. If it does, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately. For example, if a school's ignoring of a student's complaints of sexual assault by a fellow student results in the complaining student having to remain in classes with the other student for several weeks and the complaining student's grades suffer because he or she was unable to concentrate in these classes, the school may need to permit the complaining student to retake the classes without an academic or financial penalty (in addition to any other remedies) in order to address the effects of the sexual violence.

**A-6. Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children?**

**Answer:** Yes. Although this document and the DCL focus on student-on-student sexual violence, Title IX also protects students from other forms of sexual harassment (including sexual violence and sexual abuse), such as sexual harassment carried out by school employees. Sexual harassment by school employees can include unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, or physical conduct of a sexual nature, including but not limited to sexual activity. Title IX's prohibition against

---

[10] Throughout this document, unless otherwise noted, the term "complainant" refers to the student who allegedly experienced the sexual violence.

sexual harassment generally does not extend to legitimate nonsexual touching or other nonsexual conduct. But in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment. Early signs of inappropriate behavior with a child can be the key to identifying and preventing sexual abuse by school personnel.

A school's Title IX obligations regarding sexual harassment by employees can, in some instances, be greater than those described in this document and the DCL. Recipients should refer to OCR's *2001 Guidance* for further information about Title IX obligations regarding harassment of students by school employees. In addition, many state and local laws have mandatory reporting requirements for schools working with minors. Recipients should be careful to satisfy their state and local legal obligations in addition to their Title IX obligations, including training to ensure that school employees are aware of their obligations under such state and local laws and the consequences for failing to satisfy those obligations.

With respect to sexual activity in particular, OCR will always view as unwelcome and nonconsensual sexual activity between an adult school employee and an elementary school student or any student below the legal age of consent in his or her state. In cases involving a student who meets the legal age of consent in his or her state, there will still be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and nonconsensual. When a school is on notice that a school employee has sexually harassed a student, it is responsible for taking prompt and effective steps reasonably calculated to end the sexual harassment, eliminate the hostile environment, prevent its recurrence, and remedy its effects. Indeed, even if a school was not on notice, the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (*e.g.*, teaching, counseling, supervising, advising, or transporting students).

A school should take steps to protect its students from sexual abuse by its employees. It is therefore imperative for a school to develop policies prohibiting inappropriate conduct by school personnel and procedures for identifying and responding to such conduct. For example, this could include implementing codes of conduct, which might address what is commonly known as grooming – a desensitization strategy common in adult educator sexual misconduct. Such policies and procedures can ensure that students, parents, and

school personnel have clear guidelines on what are appropriate and inappropriate interactions between adults and students in a school setting or in school-sponsored activities. Additionally, a school should provide training for administrators, teachers, staff, parents, and age-appropriate classroom information for students to ensure that everyone understands what types of conduct are prohibited and knows how to respond when problems arise.[11]

## B.  Students Protected by Title IX

**B-1.  Does Title IX protect all students from sexual violence?**

**Answer:**  Yes. Title IX protects all students at recipient institutions from sex discrimination, including sexual violence. Any student can experience sexual violence: from elementary to professional school students; male and female students; straight, gay, lesbian, bisexual and transgender students; part-time and full-time students; students with and without disabilities; and students of different races and national origins.

**B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?**

**Answer:**  A school's obligation to respond appropriately to sexual violence complaints is the same irrespective of the sex or sexes of the parties involved. Title IX protects all students from sexual violence, regardless of the sex of the alleged perpetrator or complainant, including when they are members of the same sex. A school must investigate and resolve allegations of sexual violence involving parties of the same sex using the same procedures and standards that it uses in all complaints involving sexual violence.

Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation. Similarly, the actual or perceived sexual orientation or gender identity of the parties does not change a school's obligations. Indeed, lesbian, gay, bisexual, and transgender (LGBT) youth report high rates of sexual harassment and sexual violence. A school should investigate and resolve allegations of sexual violence regarding LGBT students using the same procedures and standards that it

---

[11] For additional informational on training please see the Department of Education's Resource and Emergency Management for Schools Technical Assistance Center – Adult Sexual Misconduct in Schools: Prevention and Management Training, available at http://rems.ed.gov/Docs/ASM_Marketing_Flyer.pdf.

uses in all complaints involving sexual violence. The fact that incidents of sexual violence may be accompanied by anti-gay comments or be partly based on a student's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy those instances of sexual violence.

If a school's policies related to sexual violence include examples of particular types of conduct that violate the school's prohibition on sexual violence, the school should consider including examples of same-sex conduct. In addition, a school should ensure that staff are capable of providing culturally competent counseling to all complainants. Thus, a school should ensure that its counselors and other staff who are responsible for receiving and responding to complaints of sexual violence, including investigators and hearing board members, receive appropriate training about working with LGBT and gender-nonconforming students and same-sex sexual violence. See questions J-1 to J-4 for additional information regarding training.

Gay-straight alliances and similar student-initiated groups can also play an important role in creating safer school environments for LGBT students. On June 14, 2011, the Department issued guidance about the rights of student-initiated groups in public secondary schools under the Equal Access Act. That guidance is available at http://www2.ed.gov/policy/elsec/guid/secletter/110607.html.

**B-3. What issues may arise with respect to students with disabilities who experience sexual violence?**

**Answer:** When students with disabilities experience sexual violence, federal civil rights laws other than Title IX may also be relevant to a school's responsibility to investigate and address such incidents.[12] Certain students require additional assistance and support. For example, students with intellectual disabilities may need additional help in learning about sexual violence, including a school's sexual violence education and prevention programs, what constitutes sexual violence and how students can report incidents of sexual

---

[12] OCR enforces two civil rights laws that prohibit disability discrimination. Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits disability discrimination by public or private entities that receive federal financial assistance, and Title II of the American with Disabilities Act of 1990 (Title II) prohibits disability discrimination by all state and local public entities, regardless of whether they receive federal funding. *See* 29 U.S.C. § 794 and 34 C.F.R. part 104; 42 U.S.C. § 12131 *et seq.* and 28 C.F.R. part 35. OCR and the U.S. Department of Justice (DOJ) share the responsibility of enforcing Title II in the educational context. The Department of Education's Office of Special Education Programs in the Office of Special Education and Rehabilitative Services administers Part B of the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. 1400 *et seq.* and 34 C.F.R. part 300. IDEA provides financial assistance to states, and through them to local educational agencies, to assist in providing special education and related services to eligible children with disabilities ages three through twenty-one, inclusive.

violence. In addition, students with disabilities who experience sexual violence may require additional services and supports, including psychological services and counseling services. Postsecondary students who need these additional services and supports can seek assistance from the institution's disability resource office.

A student who has not been previously determined to have a disability may, as a result of experiencing sexual violence, develop a mental health-related disability that could cause the student to need special education and related services. At the elementary and secondary education level, this may trigger a school's child find obligations under IDEA and the evaluation and placement requirements under Section 504, which together require a school to evaluate a student suspected of having a disability to determine if he or she has a disability that requires special education or related aids and services.[13]

A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner that is accessible to students and employees with disabilities, for example, by providing electronically-accessible versions of paper forms to individuals with print disabilities, or by providing a sign language interpreter to a deaf individual attending a training. See question J-4 for more detailed information on student training.

**B-4. What issues arise with respect to international students and undocumented students who experience sexual violence?**

**Answer:** Title IX protects all students at recipient institutions in the United States regardless of national origin, immigration status, or citizenship status.[14] A school should ensure that all students regardless of their immigration status, including undocumented students and international students, are aware of their rights under Title IX. A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner accessible to students who are English language learners. OCR recommends that a school coordinate with its international office and its undocumented student program coordinator, if applicable, to help communicate information about Title IX in languages that are accessible to these groups of students. OCR also encourages schools to provide foreign national complainants with information about the U nonimmigrant status and the T nonimmigrant status. The U nonimmigrant status is set

---

[13] *See* 34 C.F.R. §§ 300.8; 300.111; 300.201; 300.300-300.311 (IDEA); 34 C.F.R. §§ 104.3(j) and 104.35 (Section 504). Schools must comply with applicable consent requirements with respect to evaluations. *See* 34 C.F.R. § 300.300.
[14] OCR enforces Title VI of the Civil Rights Act of 1964, which prohibits discrimination by recipients of federal financial assistance on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

aside for victims of certain crimes who have suffered substantial mental or physical abuse as a result of the crime and are helpful to law enforcement agency in the investigation or prosecution of the qualifying criminal activity.[15]  The T nonimmigrant status  is available for victims of severe forms of human trafficking who generally comply with a law enforcement agency in the investigation or prosecution of the human trafficking and who would suffer extreme hardship involving unusual and severe harm if they were removed from the United States.[16]

A school should be mindful that unique issues may arise when a foreign student on a student visa experiences sexual violence. For example, certain student visas require the student to maintain a full-time course load (generally at least 12 academic credit hours per term), but a student may need to take a reduced course load while recovering from the immediate effects of the sexual violence. OCR recommends that a school take steps to ensure that international students on student visas understand that they must typically seek prior approval of the designated school official (DSO) for student visas to drop below a full-time course load. A school may also want to encourage its employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence to approach the DSO on the student's behalf if the student wishes to drop below a full-time course load. OCR recommends that a school take steps to ensure that its employees who work with international students, including the school's DSO, are trained on the school's sexual violence policies and that employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence are aware of the special issues that international students may encounter. See questions J-1 to J-4 for additional information regarding training.

A school should also be aware that threatening students with deportation or invoking a student's immigration status in an attempt to intimidate or deter a student from filing a Title IX complaint would violate Title IX's protections against retaliation. For more information on retaliation see question K-1.

---

[15] For more information on the U nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/questions-answers-victims-criminal-activity-u-nonimmigrant-status.

[16] For more information on the T nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status.

**B-5. How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school?**

**Answer:** The appropriate response will differ depending on the level of control the school has over the alleged perpetrator. For example, if an athlete or band member from a visiting school sexually assaults a student at the home school, the home school may not be able to discipline or take other direct action against the visiting athlete or band member. However (and subject to the confidentiality provisions discussed in Section E), it should conduct an inquiry into what occurred and should report the incident to the visiting school and encourage the visiting school to take appropriate action to prevent further sexual violence. The home school should also notify the student of any right to file a complaint with the alleged perpetrator's school or local law enforcement. The home school may also decide not to invite the visiting school back to its campus.

Even though a school's ability to take direct action against a particular perpetrator may be limited, the school must still take steps to provide appropriate remedies for the complainant and, where appropriate, the broader school population. This may include providing support services for the complainant, and issuing new policy statements making it clear that the school does not tolerate sexual violence and will respond to any reports about such incidents. For additional information on interim measures see questions G-1 to G-3.

**C. Title IX Procedural Requirements**

*Overview*

**C-1. What procedures must a school have in place to prevent sexual violence and resolve complaints?**

**Answer:** The Title IX regulations outline three key procedural requirements. Each school must:

(1) disseminate a notice of nondiscrimination (see question C-2);[17]

(2) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX (see questions C-3 to C-4);[18] and

---

[17] 34 C.F.R. § 106.9.
[18] *Id.* § 106.8(a).

(3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints (see questions C-5 to C-6).[19]

These requirements apply to all forms of sex discrimination and are particularly important for preventing and effectively responding to sexual violence.

Procedural requirements under other federal laws may also apply to complaints of sexual violence, including the requirements of the Clery Act.[20] For additional information about the procedural requirements in the Clery Act, please see http://www2.ed.gov/admins/lead/safety/campus.html.

*Notice of Nondiscrimination*

**C-2. What information must be included in a school's notice of nondiscrimination?**

**Answer:** The notice of nondiscrimination must state that the school does not discriminate on the basis of sex in its education programs and activities, and that it is required by Title IX not to discriminate in such a manner. The notice must state that questions regarding Title IX may be referred to the school's Title IX coordinator or to OCR. The school must notify all of its students and employees of the name or title, office address, telephone number, and email address of the school's designated Title IX coordinator.[21]

*Title IX Coordinator*

**C-3. What are a Title IX coordinator's responsibilities?**

**Answer:** A Title IX coordinator's core responsibilities include overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school. To accomplish this, subject to the exemption for school counseling employees discussed in question E-3, the Title IX coordinator must be informed of all

---

[19] *Id.* § 106.8(b).
[20] All postsecondary institutions participating in the Higher Education Act's Title IV student financial assistance programs must comply with the Clery Act.
[21] For more information on notices of nondiscrimination, please see OCR's Notice of Nondiscrimination (August 2010), available at http://www.ed.gov/ocr/docs/nondisc.pdf.

reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or office or if the investigation will be conducted by another individual or office. The school should ensure that the Title IX coordinator is given the training, authority, and visibility necessary to fulfill these responsibilities.

Because the Title IX coordinator must have knowledge of all Title IX reports and complaints at the school, this individual (when properly trained) is generally in the best position to evaluate a student's request for confidentiality in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students. A school may determine, however, that another individual should perform this role. For additional information on confidentiality requests, see questions E-1 to E-4. If a school relies in part on its disciplinary procedures to meet its Title IX obligations, the Title IX coordinator should review the disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX as discussed in question C-5.

In addition to these core responsibilities, a school may decide to give its Title IX coordinator additional responsibilities, such as: providing training to students, faculty, and staff on Title IX issues; conducting Title IX investigations, including investigating facts relevant to a complaint, and determining appropriate sanctions against the perpetrator and remedies for the complainant; determining appropriate interim measures for a complainant upon learning of a report or complaint of sexual violence; and ensuring that appropriate policies and procedures are in place for working with local law enforcement and coordinating services with local victim advocacy organizations and service providers, including rape crisis centers. A school must ensure that its Title IX coordinator is appropriately trained in all areas over which he or she has responsibility. The Title IX coordinator or designee should also be available to meet with students as needed.

If a school designates more than one Title IX coordinator, the school's notice of nondiscrimination and Title IX grievance procedures should describe each coordinator's responsibilities, and one coordinator should be designated as having ultimate oversight responsibility.

## C-4.  Are there any employees who should not serve as the Title IX coordinator?

**Answer:**  Title IX does not categorically preclude particular employees from serving as Title IX coordinators. However, Title IX coordinators should not have other job responsibilities that may create a conflict of interest. Because some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating

the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest. Other employees whose job responsibilities may conflict with a Title IX coordinator's responsibilities include Directors of Athletics, Deans of Students, and any employee who serves on the judicial/hearing board or to whom an appeal might be made. Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest.

*Grievance Procedures*

**C-5.  Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?**

**Answer:**  Title IX requires that a school adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints of sex discrimination, including sexual violence. In evaluating whether a school's grievance procedures satisfy this requirement, OCR will review all aspects of a school's policies and practices, including the following elements that are critical to achieve compliance with Title IX:

   (1)    notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;

   (2)    application of the grievance procedures to complaints filed by students or on their behalf alleging sexual violence carried out by employees, other students, or third parties;

   (3)    provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence;

   (4)    designated and reasonably prompt time frames for the major stages of the complaint process (see question F-8);

   (5)    written notice to the complainant and alleged perpetrator of the outcome of the complaint (see question H-3); and

   (6)    assurance that the school will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.

To ensure that students and employees have a clear understanding of what constitutes sexual violence, the potential consequences for such conduct, and how the school processes complaints, a school's Title IX grievance procedures should also explicitly include the following in writing, some of which themselves are mandatory obligations under Title IX:

(1)   a statement of the school's jurisdiction over Title IX complaints;

(2)   adequate definitions of sexual harassment (which includes sexual violence) and an explanation as to when such conduct creates a hostile environment;

(3)   reporting policies and protocols, including provisions for confidential reporting;

(4)   identification of the employee or employees responsible for evaluating requests for confidentiality;

(5)   notice that Title IX prohibits retaliation;

(6)   notice of a student's right to file a criminal complaint and a Title IX complaint simultaneously;

(7)   notice of available interim measures that  may be taken to protect the student in the educational setting;

(8)   the evidentiary standard that must be used (preponderance of the evidence) (*i.e.*, more likely than not that sexual violence occurred) in resolving a complaint;

(9)   notice of potential remedies for students;

(10)  notice of potential sanctions against perpetrators; and

(11)  sources of counseling, advocacy, and support.

For more information on interim measures, see questions G-1 to G-3.

The rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights. Procedures that ensure the Title IX rights of the complainant, while at the same time according any federally guaranteed due process to both parties involved, will lead to sound and supportable decisions. Of course, a school should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

A school's procedures and practices will vary in detail, specificity, and components, reflecting differences in the age of its students, school size and administrative structure, state or local legal requirements (*e.g.*, mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

**C-6. Is a school required to use separate grievance procedures for sexual violence complaints?**

**Answer:** No. Under Title IX, a school may use student disciplinary procedures, general Title IX grievance procedures, sexual harassment procedures, or separate procedures to resolve sexual violence complaints. However, any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution (as discussed in question C-5), including applying the preponderance of the evidence standard of review. As discussed in question C-3, the Title IX coordinator should review any process used to resolve complaints of sexual violence to ensure it complies with requirements for prompt and equitable resolution of these complaints. When using disciplinary procedures, which are often focused on the alleged perpetrator and can take considerable time, a school should be mindful of its obligation to provide interim measures to protect the complainant in the educational setting. For more information on timeframes and interim measures, see questions F-8 and G-1 to G-3.

**D. <u>Responsible Employees and Reporting</u>**[22]

**D-1. Which school employees are obligated to report incidents of possible sexual violence to school officials?**

**Answer:** Under Title IX, whether an individual is obligated to report incidents of alleged sexual violence generally depends on whether the individual is a responsible employee of the school. A responsible employee must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee, subject to the exemption for school counseling employees discussed in question E-3. This is because, as discussed in question A-4, a school is obligated to address sexual violence about which a responsible employee knew or should have known. As explained in question C-3, the Title IX coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or

---

[22] This document addresses only Title IX's reporting requirements. It does not address requirements under the Clery Act or other federal, state, or local laws, or an individual school's code of conduct.

complaint was initially filed with another individual or office, subject to the exemption for school counseling employees discussed in question E-3.

**D-2.  Who is a "responsible employee"?**

**Answer**:  According to OCR's *2001 Guidance*, a responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty.[23]

A school must make clear to all of its employees and students which staff members are responsible employees so that students can make informed decisions about whether to disclose information to those employees. A school must also inform all employees of their own reporting responsibilities and the importance of informing complainants of: the reporting obligations of responsible employees; complainants' option to request confidentiality and available confidential advocacy, counseling, or other support services; and complainants' right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement.

Whether an employee is a responsible employee will vary depending on factors such as the age and education level of the student, the type of position held by the employee, and consideration of both formal and informal school practices and procedures. For example, while it may be reasonable for an elementary school student to believe that a custodial staff member or cafeteria worker has the authority or responsibility to address student misconduct, it is less reasonable for a college student to believe that a custodial staff member or dining hall employee has this same authority.

As noted in response to question A-4, when a responsible employee knows or reasonably should know of possible sexual violence, OCR deems a school to have notice of the sexual violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E), and, if the school determines that sexual violence created a hostile environment, the school must then take appropriate steps to address the situation. The

---

[23] The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998), and *Davis*, 524 U.S. at 642. The concept of a "responsible employee" under OCR's guidance for administrative enforcement of Title IX is broader.

school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint. For additional information on a school's responsibilities to address student-on-student sexual violence, see question A-5. For additional information on training for school employees, see questions J-1 to J-3.

**D-3.  What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence?**

**Answer:** Subject to the exemption for school counseling employees discussed in question E-3, a responsible employee must report to the school's Title IX coordinator, or other appropriate school designee, all relevant details about the alleged sexual violence that the student or another person has shared and that the school will need to determine what occurred and to resolve the situation. This includes the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location. A school must make clear to its responsible employees to whom they should report an incident of alleged sexual violence.

To ensure compliance with these reporting obligations, it is important for a school to train its responsible employees on Title IX and the school's sexual violence policies and procedures. For more information on appropriate training for school employees, see question J-1 to J-3.

**D-4.  What should a responsible employee tell a student who discloses an incident of sexual violence?**

**Answer**: Before a student reveals information that he or she may wish to keep confidential, a responsible employee should make every effort to ensure that the student understands: (i) the employee's obligation to report the names of the alleged perpetrator and student involved in the alleged sexual violence, as well as relevant facts regarding the alleged incident (including the date, time, and location), to the Title IX coordinator or other appropriate school officials, (ii) the student's option to request that the school maintain his or her confidentiality, which the school (*e.g.*, Title IX coordinator) will consider, and (iii) the student's ability to share the information confidentially with counseling, advocacy, health, mental health, or sexual-assault-related services (*e.g.*, sexual assault resource centers, campus health centers, pastoral counselors, and campus mental health centers). As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request

and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

**D-5.** **If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials?**

**Answer:** As discussed in questions D-1 and D-2, for Title IX purposes, whether an individual is obligated under Title IX to report alleged sexual violence to the school's Title IX coordinator or other appropriate school designee generally depends on whether the individual is a responsible employee.

The duties and responsibilities of RAs vary among schools, and, therefore, a school should consider its own policies and procedures to determine whether its RAs are responsible employees who must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee.[24] When making this determination, a school should consider if its RAs have the general authority to take action to redress misconduct or the duty to report misconduct to appropriate school officials, as well as whether students could reasonably believe that RAs have this authority or duty. A school should also consider whether it has determined and clearly informed students that RAs are generally available for confidential discussions and do not have the authority or responsibility to take action to redress any misconduct or to report any misconduct to the Title IX coordinator or other appropriate school officials. A school should pay particular attention to its RAs' obligations to report other student violations of school policy (*e.g.*, drug and alcohol violations or physical assault). If an RA is required to report other misconduct that violates school policy, then the RA would be considered a responsible employee obligated to report incidents of sexual violence that violate school policy.

If an RA is a responsible employee, the RA should make every effort to ensure that *before* the student reveals information that he or she may wish to keep confidential, the student understands the RA's reporting obligation and the student's option to request that the school maintain confidentiality. It is therefore important that schools widely disseminate policies and provide regular training clearly identifying the places where students can seek confidential support services so that students are aware of this information. The RA

---

[24] Postsecondary institutions should be aware that, regardless of whether an RA is a responsible employee under Title IX, RAs are considered "campus security authorities" under the Clery Act. A school's responsibilities in regard to crimes reported to campus security authorities are discussed in the Department's regulations on the Clery Act at 34 C.F.R. § 668.46.

should also explain to the student (again, before the student reveals information that he or she may wish to keep confidential) that, although the RA must report the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location to the Title IX coordinator or other appropriate school designee, the school will protect the student's confidentiality to the greatest extent possible. Prior to providing information about the incident to the Title IX coordinator or other appropriate school designee, the RA should consult with the student about how to protect his or her safety and the details of what will be shared with the Title IX coordinator. The RA should explain to the student that reporting this information to the Title IX coordinator or other appropriate school designee does not necessarily mean that a formal complaint or investigation under the school's Title IX grievance procedure must be initiated if the student requests confidentiality. As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

Regardless of whether a reporting obligation exists, all RAs should inform students of their right to file a Title IX complaint with the school and report a crime to campus or local law enforcement. If a student discloses sexual violence to an RA who is a responsible employee, the school will be deemed to have notice of the sexual violence even if the student does not file a Title IX complaint. Additionally, all RAs should provide students with information regarding on-campus resources, including victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. RAs should also be familiar with local rape crisis centers or other off-campus resources and provide this information to students.

## E.   Confidentiality and a School's Obligation to Respond to Sexual Violence

**E-1.   How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence?**

**Answer:**  Students, or parents of minor students, reporting incidents of sexual violence sometimes ask that the students' names not be disclosed to the alleged perpetrators or that no investigation or disciplinary action be pursued to address the alleged sexual violence. OCR strongly supports a student's interest in confidentiality in cases involving sexual violence. There are situations in which a school must override a student's request

for confidentiality in order to meet its Title IX obligations; however, these instances will be limited and the information should only be shared with individuals who are responsible for handling the school's response to incidents of sexual violence. Given the sensitive nature of reports of sexual violence, a school should ensure that the information is maintained in a secure manner. A school should be aware that disregarding requests for confidentiality can have a chilling effect and discourage other students from reporting sexual violence. In the case of minors, state mandatory reporting laws may require disclosure, but can generally be followed without disclosing information to school personnel who are not responsible for handling the school's response to incidents of sexual violence.[25]

Even if a student does not specifically ask for confidentiality, to the extent possible, a school should only disclose information regarding alleged incidents of sexual violence to individuals who are responsible for handling the school's response. To improve trust in the process for investigating sexual violence complaints, a school should notify students of the information that will be disclosed, to whom it will be disclosed, and why. Regardless of whether a student complainant requests confidentiality, a school must take steps to protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. For additional information on interim measures see questions G-1 to G-3.

For Title IX purposes, if a student requests that his or her name not be revealed to the alleged perpetrator or asks that the school not investigate or seek action against the alleged perpetrator, the school should inform the student that honoring the request may limit its ability to respond fully to the incident, including pursuing disciplinary action against the alleged perpetrator. The school should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate

---

[25] The school should be aware of the alleged student perpetrator's right under the Family Educational Rights and Privacy Act ("FERPA") torequest to inspect and review information about the allegations if the information directly relates to the alleged student perpetrator and the information is maintained by the school as an education record. In such a case, the school must either redact the complainant's name and all identifying information before allowing the alleged perpetrator to inspect and review the sections of the complaint that relate to him or her, or must inform the alleged perpetrator of the specific information in the complaint that are about the alleged perpetrator. *See* 34 C.F.R. § 99.12(a) The school should also make complainants aware of this right and explain how it might affect the school's ability to maintain complete confidentiality.

and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary. See question K-1 regarding retaliation.

If the student still requests that his or her name not be disclosed to the alleged perpetrator or that the school not investigate or seek action against the alleged perpetrator, the school will need to determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. As discussed in question C-3, the Title IX coordinator is generally in the best position to evaluate confidentiality requests. Because schools vary widely in size and administrative structure, OCR recognizes that a school may reasonably determine that an employee other than the Title IX coordinator, such as a sexual assault response coordinator, dean, or other school official, is better suited to evaluate such requests. Addressing the needs of a student reporting sexual violence while determining an appropriate institutional response requires expertise and attention, and a school should ensure that it assigns these responsibilities to employees with the capability and training to fulfill them. For example, if a school has a sexual assault response coordinator, that person should be consulted in evaluating requests for confidentiality. The school should identify in its Title IX policies and procedures the employee or employees responsible for making such determinations.

If the school determines that it can respect the student's request not to disclose his or her identity to the alleged perpetrator, it should take all reasonable steps to respond to the complaint consistent with the request. Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual allegation of sexual violence, other means may be available to address the sexual violence. There are steps a school can take to limit the effects of the alleged sexual violence and prevent its recurrence without initiating formal action against the alleged perpetrator or revealing the identity of the student complainant. Examples include providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred; providing training and education materials for students and employees; changing and publicizing the school's policies on sexual violence; and conducting climate surveys regarding sexual violence. In instances affecting many students, an alleged perpetrator can be put on notice of allegations of harassing behavior and be counseled appropriately without revealing, even indirectly, the identity of the student complainant. A school must also take immediate action as necessary to protect the student while keeping the identity of the student confidential. These actions may include providing support services to the student and changing living arrangements or course schedules, assignments, or tests.

**E-2. What factors should a school consider in weighing a student's request for confidentiality?**

**Answer:** When weighing a student's request for confidentiality that could preclude a meaningful investigation or potential discipline of the alleged perpetrator, a school should consider a range of factors.

These factors include circumstances that suggest there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence (e.g., whether there have been other sexual violence complaints about the same alleged perpetrator, whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of violence, whether the alleged perpetrator threatened further sexual violence or other violence against the student or others, and whether the sexual violence was committed by multiple perpetrators). These factors also include circumstances that suggest there is an increased risk of future acts of sexual violence under similar circumstances (e.g., whether the student's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group). Other factors that should be considered in assessing a student's request for confidentiality include whether the sexual violence was perpetrated with a weapon; the age of the student subjected to the sexual violence; and whether the school possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence).

A school should take requests for confidentiality seriously, while at the same time considering its responsibility to provide a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. For example, if the school has credible information that the alleged perpetrator has committed one or more prior rapes, the balance of factors would compel the school to investigate the allegation of sexual violence, and if appropriate, pursue disciplinary action in a manner that may require disclosure of the student's identity to the alleged perpetrator. If the school determines that it must disclose a student's identity to an alleged perpetrator, it should inform the student prior to making this disclosure. In these cases, it is also especially important for schools to take whatever interim measures are necessary to protect the student and ensure the safety of other students. If a school has a sexual assault response coordinator, that person should be consulted in identifying safety risks and interim measures that are necessary to protect the student. In the event the student requests that the school inform the perpetrator that the student asked the school not to investigate or seek discipline, the school should honor this request and inform the alleged perpetrator that the school made the decision to go forward. For additional information on interim measures see questions G-1 to G-3. Any school officials responsible for

discussing safety and confidentiality with students should be trained on the effects of trauma and the appropriate methods to communicate with students subjected to sexual violence. See questions J-1 to J-3.

On the other hand, if, for example, the school has no credible information about prior sexual violence committed by the alleged perpetrator and the alleged sexual violence was not perpetrated with a weapon or accompanied by threats to repeat the sexual violence against the complainant or others or part of a larger pattern at a given location or by a particular group, the balance of factors would likely compel the school to respect the student's request for confidentiality. In this case the school should still take all reasonable steps to respond to the complaint consistent with the student's confidentiality request and determine whether interim measures are appropriate or necessary. Schools should be mindful that traumatic events such as sexual violence can result in delayed decisionmaking by a student who has experienced sexual violence. Hence, a student who initially requests confidentiality might later request that a full investigation be conducted.

**E-3. What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence?**

**Answer:** OCR does not require campus mental-health counselors, pastoral counselors, social workers, psychologists, health center employees, or any other person with a professional license requiring confidentiality, or who is supervised by such a person, to report, without the student's consent, incidents of sexual violence to the school in a way that identifies the student. Although these employees may have responsibilities that would otherwise make them responsible employees for Title IX purposes, OCR recognizes the importance of protecting the counselor-client relationship, which often requires confidentiality to ensure that students will seek the help they need.

Professional counselors and pastoral counselors whose official responsibilities include providing mental-health counseling to members of the school community are not required by Title IX to report *any* information regarding an incident of alleged sexual violence to the Title IX coordinator or other appropriate school designee.[26]

---

[26] The exemption from reporting obligations for pastoral and professional counselors under Title IX is consistent with the Clery Act. For additional information on reporting obligations under the Clery Act, see Office of Postsecondary Education, *Handbook for Campus Safety and Security Reporting* (2011), available at http://www2.ed.gov/admins/lead/safety/handbook.pdf. Similar to the Clery Act, for Title IX purposes, a pastoral counselor is a person who is associated with a religious order or denomination, is recognized by that religious

OCR recognizes that some people who provide assistance to students who experience sexual violence are not professional or pastoral counselors. They include all individuals who work or volunteer in on-campus sexual assault centers, victim advocacy offices, women's centers, or health centers ("non-professional counselors or advocates"), including front desk staff and students. OCR wants students to feel free to seek their assistance and therefore interprets Title IX to give schools the latitude not to require these individuals to report incidents of sexual violence in a way that identifies the student without the student's consent.[27] These non-professional counselors or advocates are valuable sources of support for students, and OCR strongly encourages schools to designate these individuals as confidential sources.

Pastoral and professional counselors and non-professional counselors or advocates should be instructed to inform students of their right to file a Title IX complaint with the school and a separate complaint with campus or local law enforcement. In addition to informing students about campus resources for counseling, medical, and academic support, these persons should also indicate that they are available to assist students in filing such complaints. They should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary.

In order to identify patterns or systemic problems related to sexual violence, a school should collect aggregate data about sexual violence incidents from non-professional counselors or advocates in their on-campus sexual assault centers, women's centers, or

---

order or denomination as someone who provides confidential counseling, and is functioning within the scope of that recognition as a pastoral counselor. A professional counselor is a person whose official responsibilities include providing mental health counseling to members of the institution's community and who is functioning within the scope of his or her license or certification. This definition applies even to professional counselors who are not employees of the school, but are under contract to provide counseling at the school. This includes individuals who are not yet licensed or certified as a counselor, but are acting in that role under the supervision of an individual who is licensed or certified. An example is a Ph.D. counselor-trainee acting under the supervision of a professional counselor at the school.

[27] Postsecondary institutions should be aware that an individual who is counseling students, but who does not meet the Clery Act definition of a pastoral or professional counselor, is not exempt from being a campus security authority if he or she otherwise has significant responsibility for student and campus activities. See fn. 24.

health centers. Such individuals should report only general information about incidents of sexual violence such as the nature, date, time, and general location of the incident and should take care to avoid reporting personally identifiable information about a student. Non-professional counselors and advocates should consult with students regarding what information needs to be withheld to protect their identity.

**E-4. Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"?**

**Answer:** No. OCR wants students to feel free to participate in preventive education programs and access resources for survivors. Therefore, public awareness events such as "Take Back the Night" or other forums at which students disclose experiences with sexual violence are not considered notice to the school for the purpose of triggering an individual investigation unless the survivor initiates a complaint. The school should instead respond to these disclosures by reviewing sexual assault policies, creating campus-wide educational programs, and conducting climate surveys to learn more about the prevalence of sexual violence at the school. Although Title IX does not require the school to investigate particular incidents discussed at such events, the school should ensure that survivors are aware of any available resources, including counseling, health, and mental health services. To ensure that the entire school community understands their Title IX rights related to sexual violence, the school should also provide information at these events on Title IX and how to file a Title IX complaint with the school, as well as options for reporting an incident of sexual violence to campus or local law enforcement.

**F. Investigations and Hearings**

*Overview*

**F-1. What elements should a school's Title IX investigation include?**

**Answer:** The specific steps in a school's Title IX investigation will vary depending on the nature of the allegation, the age of the student or students involved, the size and administrative structure of the school, state or local legal requirements (including mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

For the purposes of this document the term "investigation" refers to the process the school uses to resolve sexual violence complaints. This includes the fact-finding investigation and any hearing and decision-making process the school uses to determine: (1) whether or not the conduct occurred; and, (2) if the conduct occurred, what actions

the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, which may include imposing sanctions on the perpetrator and providing remedies for the complainant and broader student population.

In all cases, a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence. The investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing.[28] Furthermore, neither Title IX nor the DCL specifies who should conduct the investigation. It could be the Title IX coordinator, provided there are no conflicts of interest, but it does not have to be. All persons involved in conducting a school's Title IX investigations must have training or experience in handling complaints of sexual violence and in the school's grievance procedures. For additional information on training, see question J-3.

When investigating an incident of alleged sexual violence for Title IX purposes, to the extent possible, a school should coordinate with any other ongoing school or criminal investigations of the incident and establish appropriate fact-finding roles for each investigator. A school should also consider whether information can be shared among the investigators so that complainants are not unnecessarily required to give multiple statements about a traumatic event. If the investigation includes forensic evidence, it may be helpful for a school to consult with local or campus law enforcement or a forensic expert to ensure that the evidence is correctly interpreted by school officials. For additional information on working with campus or local law enforcement see question F-3.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without additional remedies, likely will not be sufficient to eliminate the hostile environment and prevent recurrence as required by Title IX. If a school typically processes complaints of sexual violence through its disciplinary process and that process, including any investigation and hearing, meets the Title IX requirements discussed above and enables the school to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, then the school may use that process to satisfy its Title IX obligations and does not need to conduct a separate Title IX investigation. As discussed in question C-3, the Title IX coordinator should review the disciplinary process

---

[28] This answer addresses only Title IX's requirements for investigations. It does not address legal rights or requirements under the U.S. Constitution, the Clery Act, or other federal, state, or local laws.

to ensure that it: (1) complies with the prompt and equitable requirements of Title IX; (2) allows for appropriate interim measures to be taken to protect the complainant during the process; and (3) provides for remedies to the complainant and school community where appropriate. For more information about interim measures, see questions G-1 to G-3, and about remedies, see questions H-1 and H-2.

The investigation may include, but is not limited to, conducting interviews of the complainant, the alleged perpetrator, and any witnesses; reviewing law enforcement investigation documents, if applicable; reviewing student and personnel files; and gathering and examining other relevant documents or evidence. While a school has flexibility in how it structures the investigative process, for Title IX purposes, a school must give the complainant any rights that it gives to the alleged perpetrator. A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions.[29] Specifically:

- Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence.

- The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings, including any fact-finding and hearings.

- If the school permits one party to have lawyers or other advisors at any stage of the proceedings, it must do so equally for both parties. Any school-imposed restrictions on the ability of lawyers or other advisors to speak or otherwise participate in the proceedings must also apply equally.

- If the school permits one party to submit third-party expert testimony, it must do so equally for both parties.

- If the school provides for an appeal, it must do so equally for both parties.

- Both parties must be notified, in writing, of the outcome of both the complaint and any appeal (see question H-3).

---

[29] As explained in question C-5, the parties may have certain due process rights under the U.S. Constitution.

**F-2.  What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation?**

**Answer:**  A criminal investigation is intended to determine whether an individual violated criminal law; and, if at the conclusion of the investigation, the individual is tried and found guilty, the individual may be imprisoned or subject to criminal penalties. The U.S. Constitution affords criminal defendants who face the risk of incarceration numerous protections, including, but not limited to, the right to counsel, the right to a speedy trial, the right to a jury trial, the right against self-incrimination, and the right to confrontation. In addition, government officials responsible for criminal investigations (including police and prosecutors) normally have discretion as to which complaints from the public they will investigate.

By contrast, a Title IX investigation will never result in incarceration of an individual and, therefore, the same procedural protections and legal standards are not required. Further, while a criminal investigation is initiated at the discretion of law enforcement authorities, a Title IX investigation is not discretionary; a school has a duty under Title IX to resolve complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students, free from sexual harassment and sexual violence. Because the standards for pursuing and completing criminal investigations are different from those used for Title IX investigations, the termination of a criminal investigation without an arrest or conviction does not affect the school's Title IX obligations.

Of course, criminal investigations conducted by local or campus law enforcement may be useful for fact gathering if the criminal investigation occurs within the recommended timeframe for Title IX investigations; but, even if a criminal investigation is ongoing, a school must still conduct its own Title IX investigation.

A school should notify complainants of the right to file a criminal complaint and should not dissuade a complainant from doing so either during or after the school's internal Title IX investigation. Title IX does not require a school to report alleged incidents of sexual violence to law enforcement, but a school may have reporting obligations under state, local, or other federal laws.

**F-3. How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation?**

**Answer:** A school should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, it is important for a school to understand that during this brief delay in the Title IX investigation, it must take interim measures to protect the complainant in the educational setting. The school should also continue to update the parties on the status of the investigation and inform the parties when the school resumes its Title IX investigation. For additional information on interim measures see questions G-1 to G-3.

If a school delays the fact-finding portion of a Title IX investigation, the school must promptly resume and complete its fact-finding for the Title IX investigation once it learns that the police department has completed its evidence gathering stage of the criminal investigation. The school should not delay its investigation until the ultimate outcome of the criminal investigation or the filing of any charges. OCR recommends that a school work with its campus police, local law enforcement, and local prosecutor's office to learn when the evidence gathering stage of the criminal investigation is complete. A school may also want to enter into a memorandum of understanding (MOU) or other agreement with these agencies regarding the protocols and procedures for referring allegations of sexual violence, sharing information, and conducting contemporaneous investigations. Any MOU or other agreement must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably, and must comply with the Family Educational Rights and Privacy Act ("FERPA") and other applicable privacy laws.

The DCL states that in one instance a prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances. OCR understands that this example may not be representative and that the law enforcement agency's process often takes more than ten days. OCR recognizes that the length of time for evidence gathering by criminal investigators will vary depending on the specific circumstances of each case.

**F-4. Is a school required to process complaints of alleged sexual violence that occurred off campus?**

**Answer:** Yes. Under Title IX, a school must process all complaints of sexual violence, regardless of where the conduct occurred, to determine whether the conduct occurred in the context of an education program or activity or had continuing effects on campus or in an off-campus education program or activity.

A school must determine whether the alleged off-campus sexual violence occurred in the context of an education program or activity of the school; if so, the school must treat the complaint in the same manner that it treats complaints regarding on-campus conduct. In other words, if a school determines that the alleged misconduct took place in the context of an education program or activity of the school, the fact that the alleged misconduct took place off campus does not relieve the school of its obligation to investigate the complaint as it would investigate a complaint of sexual violence that occurred on campus.

Whether the alleged misconduct occurred in this context may not always be apparent from the complaint, so a school may need to gather additional information in order to make such a determination. Off-campus education programs and activities are clearly covered and include, but are not limited to: activities that take place at houses of fraternities or sororities recognized by the school; school-sponsored field trips, including athletic team travel; and events for school clubs that occur off campus (*e.g.*, a debate team trip to another school or to a weekend competition).

Even if the misconduct did not occur in the context of an education program or activity, a school must consider the effects of the off-campus misconduct when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity because students often experience the continuing effects of off-campus sexual violence while at school or in an off-campus education program or activity. The school cannot address the continuing effects of the off-campus sexual violence at school or in an off-campus education program or activity unless it processes the complaint and gathers appropriate additional information in accordance with its established procedures.

Once a school is on notice of off-campus sexual violence against a student, it must assess whether there are any continuing effects on campus or in an off-campus education program or activity that are creating or contributing to a hostile environment and, if so, address that hostile environment in the same manner in which it would address a hostile environment created by on-campus misconduct. The mere presence on campus or in an

off-campus education program or activity of the alleged perpetrator of off-campus sexual violence can have continuing effects that create a hostile environment. A school should also take steps to protect a student who alleges off-campus sexual violence from further harassment by the alleged perpetrator or his or her friends, and a school may have to take steps to protect other students from possible assault by the alleged perpetrator. In other words, the school should protect the school community in the same way it would had the sexual violence occurred on campus. Even if there are no continuing effects of the off-campus sexual violence experienced by the student on campus or in an off-campus education program or activity, the school still should handle these incidents as it would handle other off-campus incidents of misconduct or violence and consistent with any other applicable laws. For example, if a school, under its code of conduct, exercises jurisdiction over physical altercations between students that occur off campus outside of an education program or activity, it should also exercise jurisdiction over incidents of student-on-student sexual violence that occur off campus outside of an education program or activity.

*Hearings*[30]

**F-5. Must a school allow or require the parties to be present during an entire hearing?**

**Answer:** If a school uses a hearing process to determine responsibility for acts of sexual violence, OCR does not require that the school allow a complainant to be present for the entire hearing; it is up to each school to make this determination. But if the school allows one party to be present for the entirety of a hearing, it must do so equally for both parties. At the same time, when requested, a school should make arrangements so that the complainant and the alleged perpetrator do not have to be present in the same room at the same time. These two objectives may be achieved by using closed circuit television or other means. Because a school has a Title IX obligation to investigate possible sexual violence, if a hearing is part of the school's Title IX investigation process, the school must not require a complainant to be present at the hearing as a prerequisite to proceed with the hearing.

---

[30] As noted in question F-1, the investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing. Although Title IX does not dictate the membership of a hearing board, OCR discourages schools from allowing students to serve on hearing boards in cases involving allegations of sexual violence.

**F-6.** **May every witness at the hearing, including the parties, be cross-examined?**

**Answer:** OCR does not require that a school allow cross-examination of witnesses, including the parties, if they testify at the hearing. But if the school allows one party to cross-examine witnesses, it must do so equally for both parties.

OCR strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing on alleged sexual violence. Allowing an alleged perpetrator to question a complainant directly may be traumatic or intimidating, and may perpetuate a hostile environment. A school may choose, instead, to allow the parties to submit questions to a trained third party (*e.g.*, the hearing panel) to ask the questions on their behalf. OCR recommends that the third party screen the questions submitted by the parties and only ask those it deems appropriate and relevant to the case.

**F-7.** **May the complainant's sexual history be introduced at hearings?**

**Answer:** Questioning about the complainant's sexual history with anyone other than the alleged perpetrator should not be permitted. Further, a school should recognize that the mere fact of a current or previous consensual dating or sexual relationship between the two parties does not itself imply consent or preclude a finding of sexual violence. The school should also ensure that hearings are conducted in a manner that does not inflict additional trauma on the complainant.

*Timeframes*

**F-8.** **What stages of the investigation are included in the 60-day timeframe referenced in the DCL as the length for a typical investigation?**

**Answer:** As noted in the DCL, the 60-calendar day timeframe for investigations is based on OCR's experience in typical cases. The 60-calendar day timeframe refers to the entire investigation process, which includes conducting the fact-finding investigation, holding a hearing or engaging in another decision-making process to determine whether the alleged sexual violence occurred and created a hostile environment, and determining what actions the school will take to eliminate the hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant and school community, as appropriate. Although this timeframe does not include appeals, a school should be aware that an unduly long appeals process may impact whether the school's response was prompt and equitable as required by Title IX.

OCR does not require a school to complete investigations within 60 days; rather OCR evaluates on a case-by-case basis whether the resolution of sexual violence complaints is prompt and equitable. Whether OCR considers an investigation to be prompt as required by Title IX will vary depending on the complexity of the investigation and the severity and extent of the alleged conduct. OCR recognizes that the investigation process may take longer if there is a parallel criminal investigation or if it occurs partially during school breaks. A school may need to stop an investigation during school breaks or between school years, although a school should make every effort to try to conduct an investigation during these breaks unless so doing would sacrifice witness availability or otherwise compromise the process.

Because timeframes for investigations vary and a school may need to depart from the timeframes designated in its grievance procedures, both parties should be given periodic status updates throughout the process.

## G. Interim Measures

### G-1. Is a school required to take any interim measures before the completion of its investigation?

**Answer:** Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working situation as appropriate. The school should also ensure that the complainant is aware of his or her Title IX rights and any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. If a school does not offer these services on campus, it should enter into an MOU with a local victim services provider if possible.

Even when a school has determined that it can respect a complainant's request for confidentiality and therefore may not be able to respond fully to an allegation of sexual violence and initiate formal action against an alleged perpetrator, the school must take immediate action to protect the complainant while keeping the identity of the complainant confidential. These actions may include: providing support services to the

complainant; changing living arrangements or course schedules, assignments, or tests; and providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred.

**G-2. How should a school determine what interim measures to take?**

**Answer:** The specific interim measures implemented and the process for implementing those measures will vary depending on the facts of each case. A school should consider a number of factors in determining what interim measures to take, including, for example, the specific need expressed by the complainant; the age of the students involved; the severity or pervasiveness of the allegations; any continuing effects on the complainant; whether the complainant and alleged perpetrator share the same residence hall, dining hall, class, transportation, or job location; and whether other judicial measures have been taken to protect the complainant (*e.g.*, civil protection orders).

In general, when taking interim measures, schools should minimize the burden on the complainant. For example, if the complainant and alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case.

**G-3. If a school provides all students with access to counseling on a fee basis, does that suffice for providing counseling as an interim measure?**

**Answer:** No. Interim measures are determined by a school on a case-by-case basis. If a school determines that it needs to offer counseling to the complainant as part of its Title IX obligation to take steps to protect the complainant while the investigation is ongoing, it must not require the complainant to pay for this service.

## H. Remedies and Notice of Outcome[31]

### H-1. What remedies should a school consider in a case of student-on-student sexual violence?

**Answer:** Effective remedial action may include disciplinary action against the perpetrator, providing counseling for the perpetrator, remedies for the complainant and others, as well as changes to the school's overall services or policies. All services needed to remedy the hostile environment should be offered to the complainant. These remedies are separate from, and in addition to, any interim measure that may have been provided prior to the conclusion of the school's investigation. In any instance in which the complainant did not take advantage of a specific service (*e.g.*, counseling) when offered as an interim measure, the complainant should still be offered, and is still entitled to, appropriate final remedies that may include services the complainant declined as an interim measure. A refusal at the interim stage does not mean the refused service or set of services should not be offered as a remedy.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without more, likely will not be sufficient to satisfy its Title IX obligation to eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. Additional remedies for the complainant and the school community may be necessary. If the school's student disciplinary procedure does not include a process for determining and implementing these remedies for the complainant and school community, the school will need to use another process for this purpose.

Depending on the specific nature of the problem, remedies for the complainant may include, but are not limited to:

- Providing an effective escort to ensure that the complainant can move safely between classes and activities;

---

[31] As explained in question A-5, if a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to be subjected to a hostile environment. In this case, in addition to the remedies discussed in this section, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately.

- Ensuring the complainant and perpetrator do not share classes or extracurricular activities;

- Moving the perpetrator or complainant (if the complainant requests to be moved) to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;

- Providing comprehensive, holistic victim services including medical, counseling and academic support services, such as tutoring;

- Arranging for the complainant to have extra time to complete or re-take a class or withdraw from a class without an academic or financial penalty; and

- Reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the sexual violence and the misconduct that may have resulted in the complainant being disciplined.[32]

Remedies for the broader student population may include, but are not limited to:

- Designating an individual from the school's counseling center who is specifically trained in providing trauma-informed comprehensive services to victims of sexual violence to be on call to assist students whenever needed;

- Training or retraining school employees on the school's responsibilities to address allegations of sexual violence and how to conduct Title IX investigations;

- Developing materials on sexual violence, which should be distributed to all students;

- Conducting bystander intervention and sexual violence prevention programs with students;

- Issuing policy statements or taking other steps that clearly communicate that the school does not tolerate sexual violence and will respond to any incidents and to any student who reports such incidents;

---

[32] For example, if the complainant was disciplined for skipping a class in which the perpetrator was enrolled, the school should review the incident to determine if the complainant skipped class to avoid contact with the perpetrator.

- Conducting, in conjunction with student leaders, a campus climate check to assess the effectiveness of efforts to ensure that the school is free from sexual violence, and using that information to inform future proactive steps that the school will take;

- Targeted training for a group of students if, for example, the sexual violence created a hostile environment in a residence hall, fraternity or sorority, or on an athletic team; and

- Developing a protocol for working with local law enforcement as discussed in question F-3.

When a school is unable to conduct a full investigation into a particular incident (*i.e.*, when it received a general report of sexual violence without any personally identifying information), it should consider remedies for the broader student population in response.

**H-2. If, after an investigation, a school finds the alleged perpetrator responsible and determines that, as part of the remedies for the complainant, it must separate the complainant and perpetrator, how should the school accomplish this if both students share the same major and there are limited course options?**

**Answer:** If there are limited sections of required courses offered at a school and both the complainant and perpetrator are required to take those classes, the school may need to make alternate arrangements in a manner that minimizes the burden on the complainant. For example, the school may allow the complainant to take the regular sections of the courses while arranging for the perpetrator to take the same courses online or through independent study.

**H-3. What information must be provided to the complainant in the notice of the outcome?**

**Answer:** Title IX requires both parties to be notified, in writing, about the outcome of both the complaint and any appeal. OCR recommends that a school provide written notice of the outcome to the complainant and the alleged perpetrator concurrently.

For Title IX purposes, a school must inform the complainant as to whether or not it found that the alleged conduct occurred, any individual remedies offered or provided to the complainant or any sanctions imposed on the perpetrator that directly relate to the complainant, and other steps the school has taken to eliminate the hostile environment, if the school finds one to exist, and prevent recurrence. The perpetrator should not be notified of the individual remedies offered or provided to the complainant.

Sanctions that directly relate to the complainant (but that may also relate to eliminating the hostile environment and preventing recurrence) include, but are not limited to, requiring that the perpetrator stay away from the complainant until both parties graduate, prohibiting the perpetrator from attending school for a period of time, or transferring the perpetrator to another residence hall, other classes, or another school. Additional steps the school has taken to eliminate the hostile environment may include counseling and academic support services for the complainant and other affected students. Additional steps the school has taken to prevent recurrence may include sexual violence training for faculty and staff, revisions to the school's policies on sexual violence, and campus climate surveys. Further discussion of appropriate remedies is included in question H-1.

In addition to the Title IX requirements described above, the Clery Act requires, and FERPA permits, postsecondary institutions to inform the complainant of the institution's final determination and any disciplinary sanctions imposed on the perpetrator in sexual violence cases (as opposed to all harassment and misconduct covered by Title IX) not just those sanctions that directly relate to the complainant.[33]

**I.** **Appeals**

**I-1.** **What are the requirements for an appeals process?**

**Answer:** While Title IX does not require that a school provide an appeals process, OCR does recommend that the school do so where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is substantially disproportionate to the findings. If a school chooses to provide for an appeal of the findings or remedy or both, it must do so equally for both parties. The specific design of the appeals process is up to the school, as long as the entire grievance process, including any appeals, provides prompt and equitable resolutions of sexual violence complaints, and the school takes steps to protect the complainant in the educational setting during the process. Any individual or body handling appeals should be trained in the dynamics of and trauma associated with sexual violence.

If a school chooses to offer an appeals process it has flexibility to determine the type of review it will apply to appeals, but the type of review the school applies must be the same regardless of which party files the appeal.

---

[33] 20 U.S.C. § 1092(f) and 20 U.S.C. § 1232g(b)(6)(A).

**I-2.** **Must an appeal be available to a complainant who receives a favorable finding but does not believe a sanction that directly relates to him or her was sufficient?**

**Answer:** The appeals process must be equal for both parties. For example, if a school allows a perpetrator to appeal a suspension on the grounds that it is too severe, the school must also allow a complainant to appeal a suspension on the grounds that it was not severe enough. See question H-3 for more information on what must be provided to the complainant in the notice of the outcome.

**J.** **Title IX Training, Education and Prevention**[34]

**J-1.** **What type of training on Title IX and sexual violence should a school provide to its employees?**

**Answer:** A school needs to ensure that responsible employees with the authority to address sexual violence know how to respond appropriately to reports of sexual violence, that other responsible employees know that they are obligated to report sexual violence to appropriate school officials, and that all other employees understand how to respond to reports of sexual violence. A school should ensure that professional counselors, pastoral counselors, and non-professional counselors or advocates also understand the extent to which they may keep a report confidential. A school should provide training to all employees likely to witness or receive reports of sexual violence, including teachers, professors, school law enforcement unit employees, school administrators, school counselors, general counsels, athletic coaches, health personnel, and resident advisors. Training for employees should include practical information about how to prevent and identify sexual violence, including same-sex sexual violence; the behaviors that may lead to and result in sexual violence; the attitudes of bystanders that may allow conduct to continue; the potential for revictimization by responders and its effect on students; appropriate methods for responding to a student who may have experienced sexual violence, including the use of nonjudgmental language; the impact of trauma on victims; and, as applicable, the person(s) to whom such misconduct must be reported. The training should also explain responsible employees' reporting obligation, including what should be included in a report and any consequences for the failure to report and the procedure for responding to students' requests for confidentiality, as well as provide the contact

---

[34] As explained earlier, although this document focuses on sexual violence, the legal principles apply to other forms of sexual harassment. Schools should ensure that any training they provide on Title IX and sexual violence also covers other forms of sexual harassment. Postsecondary institutions should also be aware of training requirements imposed under the Clery Act.

information for the school's Title IX coordinator. A school also should train responsible employees to inform students of: the reporting obligations of responsible employees; students' option to request confidentiality and available confidential advocacy, counseling, or other support services; and their right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement. For additional information on the reporting obligations of responsible employees and others see questions D-1 to D-5.

There is no minimum number of hours required for Title IX and sexual violence training at every school, but this training should be provided on a regular basis. Each school should determine based on its particular circumstances how such training should be conducted, who has the relevant expertise required to conduct the training, and who should receive the training to ensure that the training adequately prepares employees, particularly responsible employees, to fulfill their duties under Title IX. A school should also have methods for verifying that the training was effective.

**J-2. How should a school train responsible employees to report incidents of possible sexual harassment or sexual violence?**

**Answer:** Title IX requires a school to take prompt and effective steps reasonably calculated to end sexual harassment and sexual violence that creates a hostile environment (*i.e.*, conduct that is sufficiently serious as to limit or deny a student's ability to participate in or benefit from the school's educational program and activity). But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

OCR therefore recommends that a school train responsible employees to report to the Title IX coordinator or other appropriate school official any incidents of sexual harassment or sexual violence that may violate the school's code of conduct or may create or contribute to the creation of a hostile environment. The school can then take steps to investigate and prevent any harassment or violence from recurring or escalating, as appropriate. For example, the school may separate the complainant and alleged perpetrator or conduct sexual harassment and sexual violence training for the school's students and employees. Responsible employees should understand that they do not need to determine whether the alleged sexual harassment or sexual violence actually occurred or that a hostile environment has been created before reporting an incident to the school's Title IX coordinator. Because the Title IX coordinator should have in-depth knowledge of Title IX and Title IX complaints at the school, he or she is likely to be in a better position than are other employees to evaluate whether an incident of sexual

harassment or sexual violence creates a hostile environment and how the school should respond. There may also be situations in which individual incidents of sexual harassment do not, by themselves, create a hostile environment; however when considered together, those incidents may create a hostile environment.

**J-3. What type of training should a school provide to employees who are involved in implementing the school's grievance procedures?**

**Answer:** All persons involved in implementing a school's grievance procedures (*e.g.*, Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual violence complaints, and in the operation of the school's grievance procedures. The training should include information on working with and interviewing persons subjected to sexual violence; information on particular types of conduct that would constitute sexual violence, including same-sex sexual violence; the proper standard of review for sexual violence complaints (preponderance of the evidence); information on consent and the role drugs or alcohol can play in the ability to consent; the importance of accountability for individuals found to have committed sexual violence; the need for remedial actions for the perpetrator, complainant, and school community; how to determine credibility; how to evaluate evidence and weigh it in an impartial manner; how to conduct investigations; confidentiality; the effects of trauma, including neurobiological change; and cultural awareness training regarding how sexual violence may impact students differently depending on their cultural backgrounds.

In rare circumstances, employees involved in implementing a school's grievance procedures may be able to demonstrate that prior training and experience has provided them with competency in the areas covered in the school's training. For example, the combination of effective prior training and experience investigating complaints of sexual violence, together with training on the school's current grievance procedures may be sufficient preparation for an employee to resolve Title IX complaints consistent with the school's grievance procedures. In-depth knowledge regarding Title IX and sexual violence is particularly helpful. Because laws and school policies and procedures may change, the only way to ensure that all employees involved in implementing the school's grievance procedures have the requisite training or experience is for the school to provide regular training to all individuals involved in implementing the school's Title IX grievance procedures even if such individuals also have prior relevant experience.

**J-4.** **What type of training on sexual violence should a school provide to its students?**

**Answer:** To ensure that students understand their rights under Title IX, a school should provide age-appropriate training to its students regarding Title IX and sexual violence. At the elementary and secondary school level, schools should consider whether sexual violence training should also be offered to parents, particularly training on the school's process for handling complaints of sexual violence. Training may be provided separately or as part of the school's broader training on sex discrimination and sexual harassment. However, sexual violence is a unique topic that should not be assumed to be covered adequately in other educational programming or training provided to students. The school may want to include this training in its orientation programs for new students; training for student athletes and members of student organizations; and back-to-school nights. A school should consider educational methods that are most likely to help students retain information when designing its training, including repeating the training at regular intervals. OCR recommends that, at a minimum, the following topics (as appropriate) be covered in this training:

- Title IX and what constitutes sexual violence, including same-sex sexual violence, under the school's policies;
- the school's definition of consent applicable to sexual conduct, including examples;
- how the school analyzes whether conduct was unwelcome under Title IX;
- how the school analyzes whether unwelcome sexual conduct creates a hostile environment;
- reporting options, including formal reporting and confidential disclosure options and any timeframes set by the school for reporting;
- the school's grievance procedures used to process sexual violence complaints;
- disciplinary code provisions relating to sexual violence and the consequences of violating those provisions;
- effects of trauma, including neurobiological changes;
- the role alcohol and drugs often play in sexual violence incidents, including the deliberate use of alcohol and/or other drugs to perpetrate sexual violence;
- strategies and skills for bystanders to intervene to prevent possible sexual violence;
- how to report sexual violence to campus or local law enforcement and the ability to pursue law enforcement proceedings simultaneously with a Title IX grievance; and
- Title IX's protections against retaliation.

The training should also encourage students to report incidents of sexual violence. The training should explain that students (and their parents or friends) do not need to determine whether incidents of sexual violence or other sexual harassment created a

hostile environment before reporting the incident. A school also should be aware that persons may be deterred from reporting incidents if, for example, violations of school or campus rules regarding alcohol or drugs were involved. As a result, a school should review its disciplinary policy to ensure it does not have a chilling effect on students' reporting of sexual violence offenses or participating as witnesses. OCR recommends that a school inform students that the school's primary concern is student safety, and that use of alcohol or drugs never makes the survivor at fault for sexual violence.

It is also important for a school to educate students about the persons on campus to whom they can confidentially report incidents of sexual violence. A school's sexual violence education and prevention program should clearly identify the offices or individuals with whom students can speak confidentially and the offices or individuals who can provide resources such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. It should also identify the school's responsible employees and explain that if students report incidents to responsible employees (except as noted in question E-3) these employees are required to report the incident to the Title IX coordinator or other appropriate official. This reporting includes the names of the alleged perpetrator and student involved in the sexual violence, as well as relevant facts including the date, time, and location, although efforts should be made to comply with requests for confidentiality from the complainant. For more detailed information regarding reporting and responsible employees and confidentiality, see questions D-1 to D-5 and E-1 to E-4.

## K.  Retaliation

### K-1.  Does Title IX protect against retaliation?

**Answer:**  Yes. The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. This means that if an individual brings concerns about possible civil rights problems to a school's attention, including publicly opposing sexual violence or filing a sexual violence complaint with the school or any State or Federal agency, it is unlawful for the school to retaliate against that individual for doing so. It is also unlawful to retaliate against an individual because he or she testified, or participated in any manner, in an OCR or school's investigation or proceeding. Therefore, if a student, parent, teacher, coach, or other individual complains formally or informally about sexual violence or participates in an OCR or school's investigation or proceedings related to sexual violence, the school is prohibited from retaliating (including intimidating, threatening, coercing, or in any way

discriminating against the individual) because of the individual's complaint or participation.

A school should take steps to prevent retaliation against a student who filed a complaint either on his or her own behalf or on behalf of another student, or against those who provided information as witnesses.

Schools should be aware that complaints of sexual violence may be followed by retaliation against the complainant or witnesses by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and witnesses and ensure their safety as necessary. At a minimum, this includes making sure that the complainant and his or her parents, if the complainant is in elementary or secondary school, and witnesses know how to report retaliation by school officials, other students, or third parties by making follow-up inquiries to see if there have been any new incidents or acts of retaliation, and by responding promptly and appropriately to address continuing or new problems. A school should also tell complainants and witnesses that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation, but will also take strong responsive action if it occurs.

## L.   First Amendment

**L-1.   How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution?**

**Answer:**  The DCL on sexual violence did not expressly address First Amendment issues because it focuses on unlawful physical sexual violence, which is not speech or expression protected by the First Amendment.

However, OCR's previous guidance on the First Amendment, including the 2001 Guidance, OCR's July 28, 2003, Dear Colleague Letter on the First Amendment,[35] and OCR's October 26, 2010, Dear Colleague Letter on harassment and bullying,[36] remain fully in effect. OCR has made it clear that the laws and regulations it enforces protect students from prohibited discrimination and do not restrict the exercise of any expressive activities or speech protected under the U.S. Constitution. Therefore, when a school works to prevent

---

[35] Available at http://www.ed.gov/ocr/firstamend.html.
[36] Available at http://www.ed.gov/ocr/letters/colleague-201010.html.

and redress discrimination, it must respect the free-speech rights of students, faculty, and other speakers.

Title IX protects students from sex discrimination; it does not regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title IX. Title IX also does not require, prohibit, or abridge the use of particular textbooks or curricular materials.[37]

## M.  The Clery Act and the Violence Against Women Reauthorization Act of 2013

**M-1. How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs?**

**Answer:**  Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX. The Clery Act requires institutions of higher education to provide current and prospective students and employees, the public, and the Department with crime statistics and information about campus crime prevention programs and policies. The Clery Act requirements apply to many crimes other than those addressed by Title IX. For those areas in which the Clery Act and Title IX both apply, the institution must comply with both laws. For additional information about the Clery Act and its regulations, please see http://www2.ed.gov/admins/lead/safety/campus.html.

**M-2. Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act?**

**Answer:**  No. The Violence Against Women Reauthorization Act has no effect on a school's obligations under Title IX or the DCL. The Violence Against Women Reauthorization Act amended the Violence Against Women Act and the Clery Act, which are separate statutes. Nothing in Section 304 or any other part of the Violence Against Women Reauthorization Act relieves a school of its obligation to comply with the requirements of Title IX, including those set forth in these Questions and Answers, the 2011 DCL, and the *2001 Guidance*. For additional information about the Department's negotiated rulemaking related to the Violence Against Women Reauthorization Act please see http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/vawa.html.

---

[37] 34 C.F.R. § 106.42.

## N. Further Federal Guidance

**N-1. Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance?**

**Answer:** Anyone who has questions regarding this guidance, or Title IX should contact the OCR regional office that serves his or her state. Contact information for OCR regional offices can be found on OCR's webpage at https://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. If you wish to file a complaint of discrimination with OCR, you may use the online complaint form available at http://www.ed.gov/ocr/complaintintro.html or send a letter to the OCR enforcement office responsible for the state in which the school is located. You may also email general questions to OCR at ocr@ed.gov.

**N-2. Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence?**

**Answer:** Yes. OCR's policy guidance on Title IX is available on OCR's webpage at http://www.ed.gov/ocr/publications.html#TitleIX. In addition to the April 4, 2011, Dear Colleague Letter, OCR has issued the following resources that further discuss a school's obligation to respond to allegations of sexual harassment and sexual violence:

- Dear Colleague Letter: Harassment and Bullying (October 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf

- *Sexual Harassment: It's Not Academic* (Revised September 2008), http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf

- *Revised Sexual Harassment Guidance: Harassment of Students by Employees, Other Students, or Third Parties* (January 19, 2001), http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf

In addition to guidance from OCR, a school may also find resources from the Departments of Education and Justice helpful in preventing and responding to sexual violence:

- Department of Education's Letter to Chief State School Officers on Teen Dating Violence Awareness and Prevention (February 28, 2013)
  https://www2.ed.gov/policy/gen/guid/secletter/130228.html

- Department of Education's National Center on Safe Supportive Learning Environments
  http://safesupportivelearning.ed.gov/

- Department of Justice, Office on Violence Against Women
  http://www.ovw.usdoj.gov/